**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.    JKB-22-439** |
| **DAVANTE HARRISON,** | |
| **Defendant.** | |

**GOVERNMENT'S RESPONSE TO HARRISON'S MOTION**
**TO DISMISS THE INDICTMENT (ECF 103)**

The United States of America, by and through counsel, submits this response to Defendant Davante Harrison's Motion to Dismiss the Indictment.  ECF No. 103.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 2

RELEVANT FACTUAL BACKGROUND .......................................................................... 2

ARGUMENT ...................................................................................................................... 15

   I.   The Defendant Has Not Met His Initial Burden to Show Misconduct ............................. 17

   II.  The Defendant's Claims Are Factually Wrong on the Merits. .......................................... 20

   III.   Any Government Error is Surely Harmless Because the Defendant Cannot Establish Any Prejudice. ...................................................................................................................... 28

   IV.  If the Court Prefers to Review the Grand Jury Transcript, an *In Camera* Review is Appropriate at this Stage. .................................................................................................... 29

CONCLUSION .................................................................................................................... 30

**INTRODUCTION**

A legally constituted grand jury charged Davante Harrison with racketeering conspiracy. The indictment alleges Harrison's involvement in four murders, non-fatal shootings, and drug trafficking. Facing an avalanche of evidence, Harrison now seeks dismissal of the entire indictment based on his view that the government mischaracterized evidence in a couple overt acts. He has turned a factual dispute into alleged government misconduct. Rather than wait for trial to argue what he believes the evidence supports, he wants the indictment thrown out. The Court should reject such an approach. The defendant has not identified any actual government misconduct, nor has he demonstrated the necessary prejudice required to support his contention. For the reasons discussed below, the Court should deny the motion.

**RELEVANT FACTUAL BACKGROUND**

On December 15, 2022, a grand jury sitting in the District of Maryland returned a single count indictment charging six defendants, including Davante Harrison a/k/a "YGG Tay," with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). ECF No. 1. The Indictment alleges a sprawling conspiracy by the defendants to conduct and participate in the affairs of the Black Guerilla Family ("BGF") through a pattern of racketeering activity, including acts involving murder, robbery, narcotics trafficking, witness retaliation, and murder for hire. Four of the six defendants have pled guilty to the charged offense and are pending sentencing.

At trial, the government will present a mountain of evidence that Harrison was an associate of BGF and that he engaged in numerous overt acts in furtherance of the conspiracy, including narcotics trafficking, murder for hire, and attempted murder. Harrison has singled out a few overt acts that he argues were the product of misconduct, but as is demonstrated in the factual section below, the indictment alleges many other overt acts performed by Harrison, enough to support the

2

charge in this case.  The following factual background focuses on Harrison's role in the conspiracy, specifically citing the relevant overt act from the indictment and the evidence that the government will present at trial prove the allegations.[1]

## I.  Harrison's Partnership with BGF to Illegally Distribute Narcotics (Overt Act 1)

In Over Act 1, the government alleges that "[b]etween 2014 and 2016, HARRISON partnered with a BGF member to supply heroin and cocaine to street-level drug "shops" in Baltimore City." ECF No. 1, ¶13(1). To prove that overt act, the government will present the following evidence at trial.

By 2014, Harrison, a popular rapper, had established himself as a high-volume drug dealer who supplied cocaine and heroin to retail-level drug shops in west Baltimore.  Harrison was also a member of the "Young Go Getters," or "YGG."  Numerous witnesses will testify that Harrison partnered with a BGF member Roger Taylor, also known as "Milk" or "YGG Milk", to distribute narcotics.  Taylor was both a member of YGG and BGF.  Witnesses will testify with specificity about Harrison's and Taylor's drug trafficking operation, including overseeing a drug shop at the intersection of Catherine and McHenry Streets in Baltimore.  A number of witnesses will testify that Harrison associated with BGF members to engage in the illegal distribution of narcotics.

## II.  Harrison's Solicitation of BGF Hitmen to Murder His Rivals

### A.  June 2014 Murder of Terrell Jarrett (Overt Act 3)

Overt Act 3 of the indictment alleges the following: "On or about June 29, 2014, HARRISON paid a BGF member to murder T.J. [Terrell Jarrett] because HARRISON believed

---

[1] The following facts are not meant to be an exact recitation of what was presented to the grand jury.  Certain evidence discussed below was not necessarily presented to the grand jury, nor does it include all the evidence heard by the grand jury.  As noted below, *infra* Section IV, it is unnecessary to review the grand jury presentation.  On their face, the defendant's allegations do not establish government misconduct.

that T.J. [Terrell Jarrett] owed him money for a supply of narcotics that HARRISON had provided
on consignment.  HARRISON supplied the BGF member with $10,000 and a gun, which the BGF
member used to shoot T.J. [Terrell Jarrett] to death in the 1300 block of Ward Street in Baltimore
City."  ECF No. 1, ¶ 13(14).

　　　At trial, the government will prove that Harrison's partnership with BGF members was not
limited to drug trafficking.  The evidence will demonstrate that, as early as 2014, Harrison hired
BGF hitmen to murder his rivals.  The first such murder alleged in the indictment was that of
Terrell Jarrett in June 2014.  Jarrett was a former football teammate of Taylor.  A witness will
explain that Harrison supplied Jarrett with drugs going back to 2006.  Taylor had introduced Jarrett
to Harrison and Taylor vouched for, or "stamped," Jarrett, so that Harrison would feel comfortable
supplying Jarrett with drugs.  Harrison entered into a years-long supplier relationship with Jarrett.
Harrison supplied a portion of the drugs on consignment, expecting that Jarrett would repay that
portion after the drugs were resold.

　　　In 2014, one of Jarrett's "hitters" (i.e., street-level drug dealers) was arrested in possession
of cocaine that Harrison had supplied to the drug shop.  Jarrett thus owed Harrison money for the
drugs the police had seized.  Impatient with Jarrett for failing to reimburse him for the missing
cocaine – which, again, Harrison had provided to Jarrett on consignment – Harrison put $10,000
on Jarrett's head.  John Harrison[2], a/k/a "Binky," took the contract.  John Harrison later explained

---

[2] Now serving a life sentence, John Harrison was one of the defendants in *United States v. Montana
Barronette, et al*.  In addition to being BGF members, Barronette and John Harrison were members
of a neighborhood gang known as "Trained to Go," or "TTG."  In late 2018, a jury convicted
Barronette, John Harrison, and other defendants of racketeering and narcotics conspiracies in case
16-cr-00597-GLR.

Roger Taylor, a/k/a "YGG Milk," was also indicted in the TTG case.  After the government
unsealed the indictment, Taylor fled the country to avoid prosecution. He was eventually
apprehended in the Dominican Republic and extradited, but not until after his codefendants had
all been convicted at trial.  On February 3, 2020, Taylor pleaded guilty to RICO and drug

a witness, a fellow BGF member, that on the evening of June 29, 2014, he met with Davante Harrison, Taylor, and a third individual in a vehicle near Carroll Park in southwest Baltimore. During the meeting, Davante Harrison explained to John Harrison that Jarrett was playing dice at a cookout in the park. Davante Harrison gave John Harrison $5,000 and a gun, and he told John Harrison that he could collect the rest of the hit money after Jarrett was dead. John Harrison went to Carroll Park, shot Jarrett to death, and reconvened with Davante Harrison, as well as Taylor and an associate of Davante Harrison at a shopping center a few blocks away. At the shopping center, Davante Harrison paid John Harrison an additional $5,000 and told him to keep the gun.

Other witnesses will corroborate that John Harrison killed Jarrett on behalf of Davante Harrison. One will testify that he spoke with Taylor, Davante Harrison's business associate. Taylor told the witness that Davante Harrison had paid $10,000 for Jarrett's murder. Another witness will provide further corroboration that Davante Harrison paid TTG members for contract killings. He observed occasions when Davante Harrison paid Montana Barronette for committing contract killings on his behalf.

### B. Davante Harrison's Association with David Warren

Overt Act 14 alleges the following:

> In or about 2018, HARRISON solicited WARREN's services as a hitman. Between February and August 2018, WARREN conspired to murder, and in fact attempted to murder, three of HARRISON's rivals in exchange for payments from HARRISON. The targeted rivals included: (i) J.A., a BGF member who burglarized HARRISON's residence in November 2013; and (ii) two members of a rival organization, R. Br. and R. Be., who publicly accused HARRISON of cooperating with law enforcement.

---

conspiracy charges. *United States v. Barronette, et al.*, CCB-16-597, ECF No. 742. In the factual stipulation of his plea agreement, Taylor admitted that he and other members of YGG provided support to TTG in the form of "money, drugs, and other assistance"; and that in August 2015, he was the intended recipient of a priority mail package containing approximately 9.9 kilograms of cocaine. *Id.*, ECF No. 742 at 10-11.

As noted above, Barronette, John Harrison, and others, were federally indicted in 2016. With his stable of hitmen locked up, Davante Harrison turned elsewhere.  At that time, Warren, a BGF member, had already established a reputation as a contract killer.  Since the grand jury returned an indictment in this case, a witness came forward who will testify that Barronette and David Warren, a/k/a "Meshawn" were in prison together and Barronette explained to Warren that Davante Harrison had paid him for "hits."  Barronette noted that when Warren was back on the street, Davante Harrison could be a referral source for contract killings, and Barronette introduced Warren to Harrison over a jail call.

Warren was released from jail in late October 2017.  At that time, one of Warren's major sources of referral for contract killings, a senior BGF member, was federally indicted.  That BGF member will testify that he spoke with John Harrison in prison, who told him that Warren was working for Davante Harrison as a hitman.

Also around the time that Warren was released from prison, Davante Harrison, was involved in a dispute with another Baltimore rapper named Ryan Brunson, a/k/a "2 Raw," his associate Raytawn Benjamin, a/k/a "Hangy," and Jebriel Ali, a/k/a "Brill." The indictment in this case details that over a period of slightly less than six months, Warren and his BGF associates, committed multiple murders and attempted murders on behalf of Davante Harrison as part of this ongoing, violent public "beef."

### C.  February 23, 2018 Attempted Murder of Jebriel Ali (Overt Act 17)

Warren's first job for Harrison was to target Jebriel Ali.  Ali's dispute with Harrison dated as far back as November 2013, when multiple individuals, including Ali, broke into Harrison's residence in Baltimore County.  During the burglary, an associate of Ali, Michael Brock, shot at Harrison and his associate Julian Allen.  Allen was struck and injured.  Brock was later convicted in state court of attempted murder for the shooting.

6

On the morning of February 23, 2018, Ali was shot three times inside his vehicle – a black Acura TL sedan – parked outside an apartment building at 6712 Bonnie Ridge Drive in Baltimore County.  Officers recovered twenty-three 9 mm shell casings at the scene.

The evidence will demonstrate that Warren participated in the plot to murder Ali.  His cell phone contains messages in the lead up to and following the attempted murder that prove his involvement in the conspiracy.  For example, two days before Ali was shot, a co-conspirator provided Warren with the make and model of Ali's vehicle, a partial tag number for the vehicle, and Ali's home address.  Additionally, within minutes of Ali being shot, Warren sent a text message, that he later deleted, that simply read, "Job √."  Warren later messaged his then-girlfriend that he "just finished a job."  Warren also sent messages indicating that he either remained near the scene following the shooting or returned—he referenced seeing the "TL gone" and that "it's a lot of yellow papers where he was parked at."  Warren's reference to "yellow papers" are the tents that officers typically use to mark ballistic evidence.

The following day – February 24, 2018 – Harrison posted multiple videos on Instagram which the government will argue were related to the shooting.  In one of the videos, Harrison stated, "Karma a bitch, ain't it" – seemingly a reference to Ali's involvement in the burglary of Harrison's home in November 2013.  In other videos, Harrison rapped along to his single "Shooters," which was released right around the time of the shooting.  One video included the following lyrics: "Breaking news I just signed the top shooter in the city to a deal.  All them years he signed to me, a lot of n***** get killed.  If he get caught, don't stress about it, his lawyer going on my bill.  If somehow he lose at trial, got one word, appeal."  This video is described in Overt Act 17. ECF No. 1, ¶13(17).

A cooperating witness will testify that that shortly after "Shooters" was released, co-defendant and BGF member Wayne Prince confirmed that the lyric quoted above was a reference

to Warren.  Similarly, on April 4, 2018 – the day he murdered two victims on Harrison's behalf, *see infra* Section II.D. – Warren participated in a recorded jail call, in which an associate asked whether "Shooters" was a tribute to him (*i.e.*, Warren).  The associate asked, "Salute, you heard me?"  Warren laughed and responded, "Yeah, the mixtape hard.  There's so much going on in the streets; that's all I'm saying.  That mixtape hard!"

### D.  Assault Following Threat to Call Police (Overt Act 21)

Overt Act 21 in the indictment alleges:

> On or about March 17, 2018, HARRISON assaulted an associate after the associate threatened to report HARRISON's unlawful activities to the police.  HARRISON exchanged Instagram messages with the associate following the assault.  The associate complained that HARRISON had stomped on her face and knocked her out.  HARRISON responded, "u talking police shit and telling the house business that's just unacceptable."

### E.  April 4, 2018 Murders of Chanette Neal and Justice Allen (Overt Act 24)

On April 2, 2018, Ryan Brunson, a/ka "2Raw," and Raytawn Benjamin, a/k/a "Hangy," two rivals of Davante Harrison, used the Instagram "Live" feature to broadcast a video in which they displayed discovery from the Michael Brock's attempted murder case, *see supra* Section II.C.  Harrison had spoken with police in 2013 following the burglary at his house.  Throughout the video posting, Brunson and Benjamin explained that Harrison was a "rat" who had broken "the code" by providing a statement to the police. ECF No. 1, ¶13(23).

News of the video quickly reached Harrison.  On the afternoon the video was posted, Harrison received a text message from his sister.  His sister reported: "[t]hat 2raw n*** all on the life [*i.e.*, Instagram Live] trynna day [sic] you a rat.  Talking about what happen at Cambridge."[3] Harrison responded, "I know.  Don't worry it's going be all good."  Harrison then exchanged

---

[3] "Cambridge" was a reference to Harrison's prior residence (the residence where Brock shot Julian Allen) at 8 Cambridge Court in Baltimore.

messages with a member of his production team.  "Cancel the [recording] session," Harrison wrote,

"I got some shit to handle."  When the producer responded, "Damn I just hit the road," Harrison

answered, "N*** I know u see what's going on."

> Later that evening, Harrison posted a response to Brunson's allegation that he had snitched:

>> How the fuck can you tell on an "Uknown [sic] Subject" not once
>> did it say the shooter name …… No pointing out in court, No
>> pointing out in photo Array/lineup, no nothing with the shooter
>> name !! not one statement with his name ….. my lawyer going clear
>> my name by the end of the week ….. and for all u dick riding n***
>> I see y'all and y'all going have to see me bout that[.]

> ECF No. 1, ¶13(23).

On the morning of April 4, 2018, Benjamin's mother and sister, Chanette Neal and Justice

Allen, were shot to death inside their home at 42 North Gorman Avenue in southwest Baltimore.

At approximately 11:51 a.m., a 911 caller reported hearing four gunshots and seeing three black

males exiting the residence and getting into a silver vehicle.  Officers recovered four .357 caliber

shell casings, as well as cell phones belonging to the victims, at the scene. ECF No. 1, ¶13(24).

At trial, the government will present overwhelming evidence demonstrating that Warren

participated in the double murder.  For example, historical cell site location information puts

Warren's phone in the area of 42 North Gorman Avenue at the time of the murder.  Additionally,

Warren was also connected to the murder weapon.  Shell casings recovered from the scene matched

shell casings recovered six weeks later at the scene of the attempted murder of Raytawn Benjamin.

The gun that fired those shell casings was ultimately recovered over a year after Warren was

arrested and last out of prison.  On October 22, 2019, an individual was arrested in possession of

a .357 Glock model 31 handgun, which a firearms examiner determined had been used to fire the

shell casings recovered at the scene of Benjamin's attempted murder, as well as the murders of his

mother and sister in April 2018.  The recovered firearm was distinct in appearance, featuring a

green receiver, a black slide, and a laser sight affixed underneath the barrel.  Warren's cell phone contains a picture of him lying on a couch next to firearms, including that very handgun after midnight on April 4, 2018 – less than 12 hours before Neal and Allen were killed.

The government will also present evidence at trial tying Harrison to those murders.  A witness will testify that Warren told him that Warren and others went to the residence at 42 North Gorman Avenue looking for Benjamin.  Warren explained that he and his accomplices had broken into the residence and told Benjamin's sister, Allen, to call Benjamin and persuade him to come over.  Warren admitted that they shot Allen and her mother to death when Benjamin failed to show up.  Warren told the witness that Harrison paid him $50,000 – $25,000 for each victim – afterwards.  The witness's testimony is corroborated by the fact that Justice Allen's call log shows an outgoing call to "Hangy," *i.e.*, Benjamin, shortly before Allen was killed.  The call took place at 11:31 a.m., approximately 20 minutes before the initial 911 call.   According to Allen's call log, Benjamin attempted to call Allen back, via FaceTime, at 12:14 p.m.  By then it was too late.  Allen was dead.

Additionally, in April 2018, Warren, Harrison, and another individual, were observed pulling up in a sedan to 417 North Port Street.  Warren was known to spend time in that residence, and the evidence at trial will demonstrate that he was located in that residence prior to and following the double murder.  Warren and Harrison got out of the car, opened the trunk, and pulled out a large bag, which they carried into 417 North Port Street.  Warren and Harrison were inside the residence for approximately five minutes.  They then exited the residence, got back inside the sedan, and left the area.

On April 12, 2018 – eight days after Neal and Allen were killed – Baltimore Police officers executed a search warrant at 417 North Port Street.  While executing the warrant, the officers recovered two AK-47 style assault rifles; a drum magazine containing 19 rounds of 7.62x39

10

ammunition; a second magazine containing an additional 27 rounds of 7.62x39 ammunition; a .45 caliber magazine; and a loaded .38 caliber revolver.  The officers also recovered a traffic citation in Warren's name.

Additionally, there are relevant messages between Harrison and Warren prior to the double murder at Gorman Avenue.  On April 3, 2018 – the day before Neal and Allen were killed – Warren told Harrison via Instagram, "use my # bro whatever you gonna love me in a week."  Harrison responded, "Already!"  Warren replied, "Rs [real shit] pimp I'm on go!"  Notably, Warren then messaged Ryan Brunson ("2raw") via Instagram.  After providing Brunson with his phone number, Warren wrote, "run my name pimp, then get up with me."  Brunson never responded.

There are other relevant communications on Harrison's cell phone and Instagram account. On the day Neal and Allen were killed, Harrison exchanged text messages with his girlfriend, Deana Haney.  Haney operated a beauty salon in west Baltimore.  Haney told Harrison that following the murders of Neal and Allen, she believed her salon and its patrons were in danger.

After Neal and Allen were killed, Harrison began making arrangements to move Haney and his loved ones out of Baltimore.  On April 5, 2018, Harrison sent Haney a listing for an apartment in Buckhead, GA.  He wrote, "Buckhead.  Start looking now."  Later that night, Harrison messaged his daughter's mother and offered to put her in a hotel.  He explained that he was concerned for his daughter's safety.  "I'm really just trying to get her away for like a month or 2," Harrison wrote, "Until shit cool down out here."  On April 17, 2018, Harrison asked a friend named "Malcolm" how much it would cost to buy a "secure" townhome in Buckhead Park, GA.  Harrison explained that the townhome was "for my mother n lil sister."   ECF No. 1, ¶13(26-27).

Since the grand jury returned the indictment in this case, the government has developed additional evidence connecting Harrison to the double murder.  Additional witnesses will testify that they heard Warren say that Warren was involved in the murders and that he was either awaiting

or had received payment from Harrison for the hits.  Other witnesses will testify that Harrison directly admitted to his involvement in the murders.  One will testify that he spoke to Harrison sometime after the double murders and that Harrison admitted he was "beefing" with Brunson and Benjamin, and that he was behind the murder of Benjamin's mother and sister.

###### F.   August 7, 2018 Murder of Bryan McKemy and Non-Fatal Shooting of R.P. (Overt Act 31)

On August 7, 2018, Warren and multiple accomplices, including BGF member and co-defendant Wayne Prince, attempted to murder Ryan Brunson on Harrison's behalf.  The attempt took place at a vacant residence owned by Brunson in northeast Baltimore.  The home was being renovated and a construction crew was on site at the time.  Brunson escaped unscathed, but one construction worker, Bryan McKemy, was shot to death.  A second construction worker, R.P., was shot multiple times, including once in the head.  He survived.  While processing the crime scene, officers recovered multiple .40 caliber and 9 mm shell casings.  ECF No. 1, ¶13(31).

Voluminous evidence connects Warren and Prince to the shooting.  Multiple witnesses recalled seeing a maroon Toyota Avalon on scene.  And surveillance camera footage from a nearby house captured the Avalon as it drove by the residence several times.  Nine days after the incident, on August 16, 2018, BPD officers stopped Warren in a maroon Toyota Avalon in the 1200 block of Lafayette Avenue.  After a positive K-9 scan, the officers searched the Avalon and recovered a .40 caliber Glock handgun from inside a gray satchel.  The handgun had an extended magazine and was loaded with 22 rounds.  Officers also recovered two cellphones from within the car.  ECF No. 1, ¶13(35).

The registered owner of the Avalon was E.W., a girlfriend of Warren's who worked at Mercy Hospital in downtown Baltimore.  Warren often borrowed her car, including on August 7, 2018.

Investigators submitted the .40 caliber Glock handgun recovered from the Avalon to the BPD Firearms Unit for analysis.  An examiner determined that the Glock had been used to fire multiple .40 caliber shell casings recovered from Brunson's residence in connection with the murder of McKemy and the non-fatal shooting of R.P.  The same gun was ballistically linked to two additional homicides and eight non-fatal shootings in 2018, all of which took place in Baltimore City or Baltimore County.  Among those incidents was the non-fatal shooting of J.B, a BGF member, on June 27, 2018.  In October 2019, Warren pleaded guilty to first degree assault and using a firearm during a crime of violence in connection with Ben's shooting in the Circuit Court for Baltimore County in case 03-K-18-004429.

Law enforcement submitted the Glock handgun, as well as its magazine and the satchel in which it was recovered, for DNA analysis.  The analyst determined that Warren was excluded as a contributor to the profiles recovered from the firearm and magazine, and that he could neither be included nor excluded as a contributor to the profiles recovered from the satchel.  Prince, by contrast, matched an inferred genotype with respect to both the firearm and the satchel.  He could neither be included nor excluded as a contributor to the profiles recovered from the magazine.

Additional evidence tied Prince to the Avalon and the shooting at Woodlea Avenue.  One of the cellphones recovered from the Avalon on August 16, 2018 belonged to Prince.  Analysis of that phone revealed numerous photographs and videos in which Prince was depicted brandishing firearms, including, among others, a .40 caliber Glock handgun with an extended magazine.  Furthermore, a construction worker who witnessed the shooting identified Prince as one of the shooters in a photo array.[4]

---

[4] Notably, the witness also selected a second photograph, and he identified the person depicted in the photograph as the second shooter.  That photograph, however, was a "filler" photograph; the person it depicted has no connection to the murder of McKemy or the non-fatal shooting of R.P.

On the day before the attack, Prince participated in a recorded jail call, in which he told an incarcerated associate, "YGG Tay [*i.e.*, Harrison] was asking about you." The associate responded, "Yo's a bitch. Yo told, dummy." Prince replied, "And 2Raw didn't? I know the whole thing, my n***, I be with those n*** 24/7 now." ECF No. 1, ¶13(30). The following day – hours after murdering McKemy – Prince told the same associate, in another recorded jail call, "I'm about to get some money later today." ECF No. 1, ¶13(33). The evidence will also establish that Prince was tied in with Harrison and his cohort in other ways. For one, he can be seen wearing a YGG chain, which signifies membership in the gang, and his Instagram handle was "YGG Shorty."

Before and after McKemy's murder, Warren and Prince both exchanged messages (via Instagram) with Harrison's lieutenant, Darius Singleton, also known as "YGG Scratch." Those messages are described in Overt Act 34. Warren and Prince messaged with Singleton about meeting up in the days leading up to and following the murder and about collecting money. For example, prior to the shooting, Warren wrote to Singleton, "Let bro know I'm rey grab some money from my brova and fall back." Singleton replied, "He said he ready call now." Later Singleton wrote, "I just now got up wit him." Warren responded, "I NEED Y'ALL," and informed Singleton that he was on his "BLOCK." Singleton then noted, "we ready come over." On August 4, 2018, Harrison messaged Warren directly. He wrote, "Yeaaaa stupid" and ended the message with two emjois: a gorilla and an image of flexing biceps. Witnesses will testify that an image of a gorilla is a reference to BGF.

On the morning of the attack at Brunson's home, Warren sent a message to Singleton via Instagram in which he told Singleton to call him on Prince's phone. Two hours later, someone used Prince's phone to send a text message to Singleton. The message read, "hit me." The attack began approximately 20 minutes later.

The day after the murder, Prince exchanged messages with Singleton, which suggest that Prince was attempting to collect money. He wrote, "we not seeing no funds for that." He later wrote, "I need to make something shake." Singleton replied, "Come pull up on me." On August 9, 2018 – two days after the attack at Brunson's home – Warren also exchanged messages with Singleton (via Instagram) about meeting up and collecting payment. At approximately 2:30 that afternoon, Singleton wrote to Warren, "come cross round like 6 I got sumthin for u." Warren replied, "6." Singleton responded with a thumbs-up emoji. Warren, in turn, replied with a smiley face emoji with sunglasses. At 6:02 p.m., Warren messaged Singleton and let him know that he was on his way.

### III.   Harrison's Association with BGF in Rap Music, on Social Media, and in Private Messages

The evidence at trial will also demonstrate that Harrison referenced his connection to BGF in rap lyrics, on social media, and in messages with his co-conspirators. For example, in his single, "I," Harrison rapped, "I run with *apes and gorillas*; that's cause I'm from the zoo. Get money, play with them pistols, ain't nothing else to do." ECF No. 1, ¶13(37). Similarly, as discussed above, in August 2018, days before Prince and Warren conspired to murder Bryan McKemy, Harrison messaged Warren via Instagram and sent him an emoji of a black gorilla. As noted above, witnesses will testify that references to apes and gorillas are a homage to BGF.

### ARGUMENT

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury…"

It has been the "longstanding rule of law" that courts may not "look behind" a grand jury indictment if the indictment has been returned by a legally constituted and unbiased grand jury.

*United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1993) (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956)).  Rather, such an indictment "if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *See Costello*, 350 U.S. at 409.  Likewise, a court "as a general matter ... may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988).  Consistent with those principles, the Supreme Court has rejected the proposition that defendants may "challenge indictments on the ground that they are not supported by adequate or competent evidence." *Mills*, 995 F.2d at 487 (quoting *Costello*, 350 U.S. at 364).

Thus, there is a strong presumption of regularity attaching to grand jury proceedings.  *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991) ("We begin by reiterating that the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority.").  It is the defendant's burden to overcome that presumption of regularity. *See United States v. Alvarado*, 840 F.3d 184, 189 (4th Cit. 2016).

Furthermore, a challenge to an indictment on grounds such as prosecutorial misconduct requires a showing of "actual prejudice" to the defendant.  *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999) (citing *Bank of Nova Scotia*, 487 U.S. at 256).  The "prejudice must amount either to proof that the grand jury's decision to indict was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *Id*.

Here, the defense has not demonstrated any improper conduct in the indictment of this case. Furthermore, the defense has not demonstrated any prejudice resulting from its alleged misconduct.

I.      **The Defendant Has Not Met His Initial Burden to Show Misconduct**

The defendant has not come close to meeting his burden to demonstrate the grave misconduct necessary to warrant dismissal of the indictment, an extraordinary remedy. "Defendants alleging grand jury abuse bear the burden of rebutting the presumption of regularity attached to a grand jury's proceeding."  United States v. Alvarado, 840 F.3d 184, 189 (4th Cir. 2016) (cleaned up).

The gravamen of the defendant's claim is that the government presented Instagram and text messages in the speaking indictment in a misleading way and that the government made inferences that he does not believe are supported by the evidence.  Specifically, with respect to Overt Act 22, he takes issue with the government leaving out parts of Warren's message about rap, which he believes demonstrates that the entire message was about rap, not committing acts of violence. And regarding Overt Act 20, Harrison argues that the government mistakenly attributed a text message as having being sent by Warren.  The text message in question contained a selfie-style photograph of Warren brandishing an assault rifle and a message written in the first person.

The essence of the defendant's arguments is the government's presentation of two messages (Overt Act 22 and Overt Act 20) was unreliable and led to inferences that the defendant does not agree with.  The government does not agree that its presentation in the speaking indictment was wrong, which we argue in the section below.  But even if the defense is right that the entire Instagram message should have been included in Overt Act 22 and that it was not Warren, but another individual, who sent that selfie-style phone to Harrison described in Overt Act 20, that amounts at most to questions regarding the reliability of the evidence, whether the government should have included exculpatory evidence, or whether the government made a mistake—all issues that courts have repeatedly indicated do not form the basis for dismissal of an indictment.  In other words, the defendant's theory of misconduct is not legally cognizable.

17

In *Bank of Novia Scotia*, the Supreme Court rejected a challenge to an indictment based on a complaint about the "reliability or competence of the evidence presented to the grand jury." 487 U.S. at 260-61. Notwithstanding the defense's claim in that case about the content of summaries of information presented to the grand jury, the Supreme Court stated that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment." *Id*. at 261 (citing *Costello*, 350 U.S. at 363). Indeed, the Court stated that "[a]lthough the Government may have had doubts about the accuracy of certain aspects of the summaries, this is quite different from having knowledge of falsity." Id.

A court in this district has pointed out that the "the Fourth Circuit has held in no uncertain terms that '[w]e will not hear a challenge to the reliability or competence of the evidence presented to the grand jury, and the mere fact that evidence is unreliable is not sufficient to require a dismissal of the indictment.'" *United States v. Remarque*, No. CR SAG-19-0039, 2021 WL 597681, at *5 (D. Md. Feb. 12, 2021) (*citing United States v. McDonald*, 61 F.3d 248, 252 (4th Cir. 1995)). Additionally, it is well established that the government is not required to present exculpatory evidence to the grand jury. *See United States v. Williams*, 504 U.S. 36, 53-54 (1992).

It is black letter law that "courts lack authority to review the sufficiency of the evidence supporting an indictment, even when a mistake was mistakenly made." *United States v. Wills*, 346 F.3d 476 (4th Cir. 2003) (citing *United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1983)); *see also Costello v. United States*, 350 U.S. 359, 363-64 (1956) ("Petitioner urges that this Court … establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules.") Where, as here, an

indictment returned by a legally constituted and unbiased grand jury [is] valid on its face," it is "enough to call for a trial on the merits."

Moreover, the mere fact that a defense attorney might disagree with a grand jury witness's opinion or presentation of events is not sufficient to show that the government knowingly presented false evidence. *See United States v. Outlaw*, 464 Fed. Appx. 165, 167 (4th Cir. Feb. 8. 2021) (affirming denial of motion to dismiss indictment based on alleged false agent testimony, where defense claimed that agent testimony was contradicted by video of alleged assault and "falsely exaggerated" strength of the government's case; defendant's "argument that dismissal of the superseding indictment was warranted because [agent witness] provided false grand jury testimony amounts to 'nothing more than a disagreement with the witness's opinions of the facts of the case.'") (*citing* district court's findings).

Harrison is entitled, of course, to dispute the government's interpretation of the evidence, and to seek to persuade a factfinder to accept his "rap music" defense.  The time and place for doing that, however, is at trial, before a jury, *not* in a motion to dismiss.  Harrison is not entitled to dismissal of the indictment because a quote from an Instagram message does not endorse his theory of the case and because he believes that the government mistakenly attributed a message as having been sent by Warren.

Harrison bears the burden of showing grave governmental misconduct.  His theory of misconduct falls far short, and the Court can dismiss his motion on that basis alone.[5]

---

[5] Harrison argues that, in the alternative, the Court should dismiss the Notice of Enhanced Sentencing paragraphs 6 and 7.  ECF No. 103 at 10.  He does not appear to argue any independent reasons to dismiss those enhanced sentencing paragraphs apart for his arguments for dismissal of the indictment.  Accordingly, that argument should be rejected for the same reasons outlined in this Response.

II.    **The Defendant's Claims Are Factually Wrong on the Merits.**

    1.    **The Indictment's Interpretation of the Instagram Message Excerpted in Overt Act Paragraph 22 is Accurate.**

As discussed in the background section, the government will prove at trial that Warren attempted to murder Jebriel Ali in exchange for a payment from Harrison on February 23, 2018. The following day, Harrison released a rap song, "Shooters," in which he bragged that he had "signed the top shooter in the city to a deal."  The government will offer testimony and recorded jail calls establishing that the "shooter" whom Harrison referenced in his rap lyrics was Warren. Indeed, the evidence will establish that in the eyes of Harrison's rivals – Ali and Michael Brock, among others – Harrison's rap lyrics were not simply a shout-out to Warren generally; they were also a reference to Warren's attempt to murder Ali on Harrison's behalf.   As Brock himself explained during a jail call with Ali, Brock believed that Harrison had "made a song" regarding Warren's attempt on Ali's life.  In response to Harrison's boasting, Brock released discovery paperwork in an attempt to damage Harrison's reputation by having him labeled a "snitch."  The discovery paperwork was ultimately posted on Instagram, leading to additional violence by Warren and others on Harrison's behalf.

On March 14, 2018, Warren released a rap video of his own – "Clutchin Freestyle" – in which he also bragged of his exploits as a contract killer.  Warren rapped: "I'm on this n*** trail like a fucking bounty hunter.  He don't see it coming, I find this shit so funny.  Blow his brains out, leave him stretched out like a dummy."  The video depicted Warren lip-syncing while several of his associates – including co-defendant Wayne Prince – danced in the background and brandished handguns.

It was against this backdrop that Warren and Harrison began exchanging Instagram messages in early 2018.  On March 15, 2018 – one day after releasing his rap video – Warren

wrote to Harrison, "Check out my video let me know if I'm onto something." The following day, Harrison responded, "I been saw it, I prolly was the first one to see it." Harrison added, "Keep talking that pistol play that shit going go just off your name alone." ECF No. 103, Ex. 3, at 2.

Later the same evening – March 16, 2018 – Warren wrote to Harrison, "YGG will look good around my neck stand up n**** loyalty come first." *Id.* At this point in the conversation, Warren was not simply talking about rap music. He was instead telling Harrison that he wanted to become a member of Harrison's gang, the "Young Go Getters," or "YGG." The government will establish that members of YGG operated multiple drug shops in southwest Baltimore, including one in the 2500 block of McHenry Street. To signify their membership in YGG, members wore pendants displaying either "YGG" or "Young Go Getters" around their necks. Below is a screen shot of an Instagram post by Wayne Prince, who, along with Warren, is accused by the grand jury of committing contract killings on Harrison's behalf. The post depicted Prince wearing a "Young Go Getters" pendant while standing next to YGG member Aaron Parham, a/k/a "YGG Ham." The post featured an audio excerpt of Harrison's single "Fly Shit," which included the following lyrics: "n**** respect us because we be on that killing shit … ***wanna join my gang, gotta kill a n**** for your membership***."



It was Warren's expression of interest in joining YGG – and in earning a YGG chain, like the one depicted above – that prompted the message excerpted in Overt Act paragraph 22.  The paragraph alleges: "On or about March 17, 2018, WARREN told HARRISON that he was willing to commit additional acts of violence in order to become a member of HARRISON's inner circle. WARREN wrote: 'More then [sic] willing to put it in for my spot … [t]he route I'm going Ima [sic] be in the can or gone[.]'  HARRISON responded, "Alreadyyyy we going get up."  ECF 1 at ¶ 13(22).

In support of his motion to dismiss, Harrison argues that Overt Act paragraph 22 is misleading for two reasons: first, because the excerpt quoted above does not include the final sentence of Warren's message to Harrison — "I can do that rap shit no effort"; and second, because the "meaning of the message," according to Harrison, "concerned rap music," instead of Warren's willingness to commit additional acts of violence on Harrison's behalf.  ECF 103 at 3.  Apparently, Harrison's theory is that when Warren told him that he was "willing to put it in for [his] spot," he was essentially saying that he was prepared to work as hard as necessary to further his career as a rapper.

That interpretation is inaccurate.  It ignores key contextual factors that support the interpretation offered in Overt Act paragraph 22.  First, as discussed above, the immediately preceding messages – including Warren's message that "YGG will look good around my neck" – did *not* pertain to rap, but rather to Warren's interest in becoming a member of Harrison's gang. Second, Warren's statement that he was "willing to ***put it in*** for [his] spot" was a shorthand for "putting in the work," which, on the streets of Baltimore, is a well-known slang term for committing acts of violence.  Third, the most reasonable interpretation of Warren's subsequent statement – "the route I'm going Ima [sic] be in the can or gone" – is that Warren realized, presciently, that he had already "put in" so much work that he was going to end up in jail or dead.

Fourth, by time of his message to Harrison, Warren had already attempted to murder Ali on Harrison's behalf, as discussed above.  So when Warren told Harrison, three weeks later, that he was willing to "put it in for [his spot]," he was necessarily saying that he was prepared to commit *additional* acts of violence, above and beyond the attempted murder of Ali, in order to gain a place in YGG (which the indictment describes as Harrison's "inner circle").

The unquoted portion of Warren's message – "I can do that rap shit no effort" – strongly suggests that "putting it in" was a reference to something else.  The most logical reading of the message, as a whole, is that rap was not work for David Warren, but killing was.    *That* is what Warren was conveying to Harrison in the message excerpted in Overt Act paragraph 22: Warren was willing to kill, and keep killing, to earn himself a YGG chain.  The unquoted portion of the message – "I can do that rap shit no effort" – neither captures nor undercuts that point.  It was therefore entirely reasonable, and in no way misleading, not to quote the excerpt in the speaking indictment.

As support for his competing interpretation of the message excerpted in Overt Act paragraph 22, Harrison points to similar messages between Warren and a second rapper, Dajuan Cannady, also known as "YBS Skola."  Harrison attaches what purports to be a complete list of Instagram communications between Warren and Cannady as Exhibit 4 to his motion to dismiss. The messages establish that (i) Warren sought feedback from Cannady regarding his rap video; (ii) Warren told Cannady, just as he told Harrison four weeks earlier, that he was "willing to put in that W"; and (iii) Warren told Cannady that he was going "to end right back in the can."  ECF 103, Ex. 4 at 1.

Inexplicably, Harrison fails to acknowledge - both in his brief and in the chart set forth in Exhibit 4 – a critical message between Warren and Cannady that clearly establishes Warren's intent.  That message is pasted directly from the Instagram business record below:

| | |
|---|---|
| **Id** | 28104585070258187356269187254190080 |
| **Time** | 2018-04-12 17:03:29 UTC |
| **Item Type** | text |
| **Thread Id** | 340282366684171030094912811627158851936 |
| **Text** | When time right link in I'm going for the bag the rap shit just a plus |
| **Author** | la_meshawn (6884275965) |
| **Recipients** | ybs_skola (1767469607) |
| | la_meshawn (6884275965) |

This message between Warren and Cannady should have been provided to the Court. It establishes that Warren's top priority was "going for *the bag*," *i.e.*, the bounty offered in exchange for a contract killing, and that Warren was selling himself as a hitman to both Harrison and Cannady in order to get his hands on their money. To be sure, Warren was also interested in burnishing his reputation as a rapper (by leveraging his notoriety as a hitman), and he sought advice from Harrison and Cannady as to how he could go about doing that. But that motivation was secondary. As Warren himself put it in the above-quoted message to Cannady, "***the rap shit just a plus***." In other words, Warren was telling Cannady, just as he told Harrison in the message excerpted in Overt Act paragraph 22, that killing was his livelihood and rap was simply a hobby. Thus, to the extent that Warren's messages with Cannady have any bearing on his earlier messages with Harrison, they establish that the government's interpretation of the messages was correct.

In sum, the government's presentation of the message between Warren and Harrison in Overt Act paragraph 22 was not, as defense argues, a material misrepresentation that influenced the grand jury's decision to indict. Rather, when considering the full context, it was an accurate representation and a proper inference.

### 2. The Indictment's Allegations Regarding the Relationship Between Harrison and Warren Are Accurate.

In Sections B and C of his motion to dismiss, Harrison argues that the government misled the grand jury by suggesting that Harrison hired Warren as a hitman. ECF 103 at 5-7. Incredibly, the sole basis for this argument is that the Instagram messages between Harrison and Warren do

not prove the government's case by themselves.  As discussed in Section II above, however, the Instagram messages are but a drop in a vast ocean of evidence that the government will present against Harrison and Warren at trial.  A parade of witnesses will testify.  The majority have already testified before the grand jury.  The witnesses will be corroborated by ballistics, cell site location information, recorded jail calls, DNA analysis, rap lyrics, and yes, messages exchanged on cell phones and social media accounts.  The witnesses will also be corroborated by one another.

The fact that one piece of a puzzle does not reveal a broader picture does not equate to government misconduct.  At this point in the proceedings, the Court can rest assured that when the broader picture comes into focus, it will be rich, vivid, and more than sufficient to persuade 12 jurors that Harrison paid Warren and other members of BGF to murder multiple victims on his behalf.  Here again, Harrison is free to dispute the government's allegations, and to argue that certain pieces of evidence should be viewed in the light most favorable to him.  That is what trials are for.  Harrison must raise that defense in the arena, before a jury, not in a motion to dismiss. Harrison has not met his burden—his arguments do not come close to suggesting government misconduct, nor do they demonstrate prejudice to justify such an extraordinary remedy.

### 3. The Indictment's Interpretation of the Messages Excerpted in Overt Act 20 Was Reasonable.

As the government investigated this case, it determined that Warren sometimes used cell phones belonging to others to communicate with Harrison and his associates.  For example, on August 3, 2018, Warren sent an Instagram message to Harrison's now-deceased lieutenant, Darius Singleton.   Warren wrote, "Man, tell bro [*i.e.*, Harrison] I'm about to put a number in there.  I need him hit me right quick."  Singleton responded, "Send da number."  Warren replied, "443-469-7539."  Investigators have determined that this phone number belonged to Donna Moye, a/k/a "Luvbee," the leaseholder of 417 North Port Street, where Warren sometimes stayed.

Similarly, on August 7, 2018 – the day Bryan McKemy was murdered – Warren wrote to

Singleton, again via Instagram, "What it do bro."  Warren sent Singleton a phone number, 667-

203-0358, which belonged to Warren's co-conspirator (and co-defendant), Wayne Prince.  He then

told Singleton, "[H]it me."  Singleton responded by directing Warren to call the following number:

"443-570-9384."   Warren and Prince murdered Bryan McKemy approximately one hour later.

In addition to the messages between Warren and Singleton, investigators have identified a

series of messages that they believe Warren either sent or caused to be sent to Harrison's cell phone

on March 14, 2018.  The messages are reproduced below, beginning with a photograph of Warren

brandishing an assault rifle.



In his motion to dismiss, Harrison points out, correctly, that the message depicted above was sent from a cell phone number, 410-793-9164, that did not belong to Warren himself.  The owner of that cell phone had communications with both Harrison and Warren during the winter and early spring of 2018.  She is identified in Warren's contacts as "Keyshay."  According to the FBI's analysis of Warren's cell phone, the image of Warren brandishing the assault rifle was captured during a FaceTime call between Warren and "Keyshay" on February 8, 2018.  As shown above, the image was later sent to Harrison from Keyshay's phone.  The sender of the message wrote, apparently in the first person, "I'm young bitch with a lotta power don't make me shut down your hood."  The sender then wrote, "Delete this after you see it."

Contextual clues suggest that Warren either sent or caused these messages to be sent from "Keyshay" to Harrison's phone.  First, the text message immediately following the selfie-style photograph – "I'm young bitch with a lotta power don't make me shut your hood" – was written in the first person, suggesting that the sender of the message and the person depicted in the photograph (Warren) are one and the same.  Harrison contends that the message is a quotation from one of his rap songs, ECF 103 at 8, but a Google search (using the lyrics themselves, bounded by quotation marks) does not appear to bear this out.

Second, and notably, the message containing the photograph was sent to Harrison's phone on the same day Warren released the YouTube video for his rap single, "Clutchin."  "Keyshay" appeared to reference Warren's video (and Warren himself) in messages sent to Harrison the following day.  On March 15, 2018, at 3:46 p.m., "Keyshay" wrote to Harrison: "You see the video bro made."  ECF 103, Ex. 8 at 10.  Harrison responded: "Yea."  *Id*. at 11.  "Keyshay" replied, "He [*i.e.*, Warren] said he wanna holla at you."

These messages establish that "Keyshay" was communicating with Harrison about and on behalf of David Warren.  This, in conjunction with the first-person message immediately following

the selfie-style photograph ("I'm young bitch with a lotta power …"), as well as Warren's history of using others' cell phones to communicate with Harrison's associates, supports the allegation in Overt Act paragraph 20 that Warren sent the photograph and accompanying messages to Harrison.

Assuming, arguendo, that the indictment is mistaken, and that "Keyshay," not Warren, sent the photograph and accompanying messages to Harrison, the fact remains that Harrison had a photograph depicting Warren brandishing an assault rifle, followed by a message stating "delete this after you see it" in his cell phone; and further that the photograph and messages were sent to Harrison during a period of time when a wealth of other evidence establishes that Warren was committing contract killings on Harrison's behalf.  In short, even if Harrison's theory is correct, the photograph and messages are plainly still incriminating.  As discussed above, a witness will testify that he saw Harrison and Warren exiting a car together and carrying a large duffle bag into a home in east Baltimore in or about March of 2018.  In early April of 2018, Baltimore Police officers recovered multiple firearms, including an assault rifle, while executing a warrant at the home.  The photograph in Harrison's cell phone tends to prove that he did, in fact, know, that Warren possessed and used firearms in furtherance of the conspiracy with which he and Warren are charged.

## III. Any Government Error is Surely Harmless Because the Defendant Cannot Establish Any Prejudice.

Finally, even if the defendant has established government misconduct, any error is harmless because he has not established any prejudice.  The defendant cannot show "grave doubt" that the grand jury's decision to indict him "was free from the substantial influence" of misconduct in the government's presentment of this case.  *Bank of Nova Scotia*, 487 U.S. at 256.

Harrison only challenges two overt acts out of many that contain allegations regarding his participation in the racketeering conspiracy.  The Instagram and text messages questioned by

28

Harrison are but grace notes, at most, in the indictment that the grand jury returned.  As discussed above, the indictment presents a sprawling conspiracy, spanning years and various types of racketeering activity.  The indictment's allegations that Harrison paid Warren and other BGF members, including John Harrison, to commit acts of violence on his behalf are amply supported by evidence from a bevy of sources.  A single Instagram message and text message exchange are but a drop in a much larger bucket of evidence that the government will present against Harrison at trial.

Even the most generous reading of Harrison's motion establishes that he believes the government's misconduct called into question for the grand jury his relationship with Warren.  His argument is that the relationship was about rap, not murder.  But that says nothing about the overt acts in the speaking indictment that have nothing to do with Harrison's association with Warren.  For example, Overt Act 1 alleges that Harrison partnered with a BGF member to unlawfully distribute controlled substances.  And Over Act 3 alleges that Harrison paid a BGF member, John Harrison, to kill Terrell Jarrett.  There is no argument from Harrison that those allegations were the product of government misconduct.  And those allegations alone support his indictment in this case.  Accordingly, even if the portions of the indictment related to Warren were set aside, there is more than enough to support the racketeering conspiracy charge against the defendant.

In sum, even if Harrison has established misconduct (which he has not), he has failed to demonstrate the necessary prejudice to justify dismissing the indictment.  His motion can also be denied on that basis alone.

## IV.   If the Court Prefers to Review the Grand Jury Transcript, an *In Camera* Review Is Appropriate at this Stage.

For the reasons discussed above, review of the grand jury transcript is not necessary.  The defendant's motion fails simply because he has not identified any misconduct.  The government's

interpretations of the questioned messages in the speaking indictment are reasonable.  And even if the government was mistaken, the defendant has not established prejudice when considering the scope of the conspiracy and the mountain of evidence supporting the conspiracy.

That being said, if the Court would like to review the transcript, the Government respectfully requests that the Court conduct an *in camera* review.  The transcript contains significant *Jencks* material.  Premature production of that material to the defendant could present witness safety issues.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny the motion to dismiss.

Respectfully submitted,

EREK L. BARRON
United States Attorney

By:  _____/s/_____

Ari D. Evans
Patricia C. McLane
Kim Y. Hagan
Assistant United States Attorneys
36 South Charles Street
Baltimore, Maryland 21201
(410) 209-4800

30

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 10, 2024, a copy of the foregoing response was served

on counsel of record through the Court's electronic case filing system.

By:_____/s/_____

Ari D. Evans
Assistant United States Attorney