**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. JKB-22-00439** |
| | * | |
| **DAVID WARREN, et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, by and through counsel, submits this consolidated response to the defendants' pretrial motions in this case.

## TABLE OF CONTENTS

BACKGROUND ……………………………………………………………………..3

ARGUMENT ……………................................................................................. 5

I. Response to Warren's Motion to Suppress Fruits of Warrantless Searches and Seizures (ECF 134)……… ....................................................................................... 5

A.    Legal Standard ................................................................................. 5

B.    All Warrantless Searches of Warren Were Lawful.................................... 6

II. Response to Warren's Motion to Suppress Statements (ECF No. 141)........................... 22

A.    Legal Standard ........................................................................ 22

B.    Warren's Statements to Law Enforcement Were Voluntarily Made Following the Proper Administration of Miranda Warnings. .................. 24

III. Response to Warren's Motion to Suppress In-Court and Out-of-Court Identifications (ECF No. 142) …………………………………………………………29

A.    Legal Standard ..................................................................... 29

B.    Argument ........................................................................ 31

IV. Response to Warren's Motion to Suppress Fruits of Search Warrants (ECF No. 138)……………………………………………………………… 34

A.    Legal Standard ....................................................................... 34

B.       Argument ........................................................................................ 36

V.  Response to Warren's and Harrison's Motions to Suppress Evidence from Cell Phone Searches (ECF No. 108 and 135) ...................................................... 43

    A.       Legal Standard ............................................................................... 43

    B.       Harrison's Motion (ECF No. 108) ............................................. 44

    C.       Warren's Motion (ECF No. 135) ............................................... 50

VI.  Response to Harrison's Motion to Suppress Tangible, Derivative Evidence and Statements Pursuant to Federal Rule 12(b)(3) (ECF 112) ........................... 57

    A.       Relevant Facts ............................................................................... 57

    B.       Argument ........................................................................................ 59

VII.  Response to Harrison's Motion to Preclude Government From Introducing Evidence As Set Out in Overt Act 41 (ECF 110) ............................................... 69

    A.       Relevant Facts ............................................................................... 70

    B.       Argument ........................................................................................ 70

VIII.  Response to Harrison's Motion to Sever (ECF No. 107) ........................... 74

    A.       Legal Standard ............................................................................... 74

    B.       Argument ........................................................................................ 75

IX.  Response to Harrison's Motion to Exclude Rap Music (ECF No. 109) ......................... 80

    A.       Legal Standard ............................................................................... 81

    B.       Argument ........................................................................................ 82

X.  Response to Harrison's Motion to Dismiss Sentencing Enhancements and Alternatively to Sever (ECF No. 113) ....................................................................... 89

    A.       Relevant Facts ............................................................................... 89

    B.       Argument ........................................................................................ 90

    C.       Conclusion .................................................................................... 106

XI.  Response to Warren's Request for Notice of Rule 404(b) Evidence (ECF No. 143) .. 106

XII.  Response to Warren's Motion for Disclosure of Materials Related to Law Enforcement Witnesses (ECF No. 144) ............................................................... 107

XIII.  Response to Warren's Motion to Join and Adopt Motions by Other Co-Defendants (ECF No. 145)   …………………………………………………………………………..108

XIV.  Response to Warren's Motion for Leave to File Additional Motions (ECF No. 146)   …………………………………………………………………………...   108

CONCLUSION   ........................................................................................................ 109

## BACKGROUND

On December 15, 2022, a federal grand jury sitting in the District of Maryland returned a single count indictment charging six defendants with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d).  ECF No. 1.  The Indictment alleges a sprawling conspiracy by the defendants to conduct and participate in the affairs of the Black Guerilla Family ("BGF") through a pattern of racketeering activity, including acts involving murder, robbery, narcotics trafficking, witness retaliation, and murder for hire.  Four of the six defendants—Barak Olds, Wayne Prince a/k/a "Taz", Josh Duffy, and Tyrell Jeffries a/k/a "Whitebread"—have pled guilty to the charged offense and are pending sentencing.

The two defendants pending trial—David Warren a/k/a "Meshawn" and Davante Harrison a/k/a "YGG Tay"—have filed a total of sixteen pretrial motions.  These consist of a motion to dismiss the indictment, a motion for severance, a motion to dismiss the sentencing enhancements, a motion to exclude rap music, motions to suppress the fruits of search warrants and warrantless searches, motions to suppress statements, a motion to suppress in-court and out-of-court identifications, motions to suppress the fruits of cell phone search warrants, a motion for the production of early *Giglio* material for law enforcement witnesses, a motion to adopt the motions of other defendants, and a motion for leave to file additional motions.

The government has responded to Defendant Harrison's motion to dismiss the indictment (ECF No. 103) in a separate standalone response brief.  *See* ECF No. 203.  A chart of pending

motions filed by Warren and Harrison that the government is responding to in this consolidated

response follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| **David Warren** | Motion to Suppress Fruits of Warrantless Searches and Seizures | 134 |
| | Motion to Suppress Fruits of Cell Phone Searches | 135 |
| | Motion to Suppress Fruits of Searches Conduct Pursuant to Warrants | 138 |
| | Motion to Suppress Statements | 141 |
| | Motion to Suppress In-Court and Out-of-Court Identifications | 142 |
| | Request for Notice of Rule 404(b) Evidence | 143 |
| | Motion for Disclosure of Materials Related to law Enforcement Witnesses | 144 |
| | Motion to Adopt Motions Filed by Co-Defendants | 145 |
| | Motion for Leave to File Additional Motions | 146 |
| **Davante Harrison** | Motion for Severance | 107 |
| | Motion to Suppress Tangible Evidence Seized from the Search of a Cell Phone | 108 |
| | Motion to Exclude Rap Music, Videos, and Associated Content | 109 |
| | Motion to Preclude Government from Introducing Evidence as Set Out in Overt Act 41 | 110 |
| | Motion to Suppress Tangible, Derivative Evidence and Statements Pursuant to Federal Rule 12(b)(3) | 112 |
| | Motion to Dismiss Sentencing Enhancement and Alternatively, To Sever | 113 |

The speaking indictment contains a more thorough description of the history and structure

of BGF, how the gang operated, as well as the defendants' criminal activities in furtherance of the

racketeering conspiracy.  *See* ECF 1.  The government has also provided a fulsome recitation of

the facts in the response to Defendant Harrison's motion to dismiss the indictment.  *See* ECF No.

203.  In this memorandum, we will discuss relevant facts in the context of each motion.  Where

the relevant facts and legal issues overlap, we will address groups of motions together.

## ARGUMENT

I. **Response to Warren's Motion to Suppress Fruits of Warrantless Searches and Seizures (ECF 134)**

   A. **Legal Standard**

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *See United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.") (*quoting Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)); *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) ("The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant.") (*citing Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)); *United States v. Pollins*, 145 F. Supp. 3d 525, 538 (D. Md. 2015) (Quarles, J.); *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014); *United States v. Freeman*, 61 F. Supp. 3d 534, 536 (E.D. Va. 2014); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  Only once the defendant has established a basis for his motion to suppress does the burden shift to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *Pollins*, 145 F. Supp. 3d at 538*; Hunter*, 63 F. Supp. 3d at 619; *Freeman*, 61 F. Supp. 3d at 536.

In order to meet his initial burden of proof, a defendant moving to suppress evidence must submit a memorandum "setting forth the reasoning and authorities in support of" the motion. District of Maryland Local Rule 105(1); *see also United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity").  Boilerplate, vague, or conclusory allegations will not suffice*.  See United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality.

Reliance on vague, conclusory allegations is insufficient."); *United States v. Benoit,* 730 F.3d 280, 288 (3d Cir. 2013) (affirming denial of motion to suppress, finding that the defendant had "not fulfilled his burden of establishing a basis for his motion" because he "offered nothing but conclusory allegations that [the] authorities may have acted improperly" in obtaining the evidence at issue); *United States v. Edmonds*, 438 F. Supp. 3d 689, 693 (S.D.W. Va. 2020) (denying defendant's motion to suppress evidence seized during various searches because it was based on "bare, conclusory allegations" and did not "permit either the United States or the Court to meaningfully address the motion or prepare for a hearing, as it does not identify any specific deficiency or area of potential factual dispute").

### B.    All Warrantless Searches of Warren Were Lawful.

Warren's boilerplate motion should be denied.  He has not explained why the warrantless searches and seizures at issue were unlawful.  He has not identified any particular evidence he seeks to suppress, nor does not point to any factual disputes with the government.  He has not included a case-specific discussion of legal authorities pursuant to which he seeks relief.  Warren simply moves to suppress any and all warrantless searches and seizures from which the government obtained evidence that it intends to introduce at trial on the grounds that no Fourth Amendment exceptions apply.   For the reasons outlined below, Warren's motion should be denied.

### 1.    May 31, 2016 Arrest

On May 31, 2016, Baltimore City Police ("BPD") Detective David Green received information from a confidential source that an individual wearing a black t-shirt, blue jean shorts, and a black ball cap was armed with a handgun in the 1200 block of E. Lafayette Avenue and Hope Street, known to officers as a high crime area, specifically for narcotics trafficking.   The information was disseminated to Detectives Tim Romeo and Frank Golimowski who responded to the area in separate vehicles.  The detectives were in plain clothes wearing tactical vests marked

"POLICE." Golimowski noticed a male matching the physical description provided by the confidential source standing on the 1200 block of E. Lafayette Avenue next to a cut that leads to the rear of a parking lot area.  The male appeared to take notice of the officer and then immediately fled on foot.  Golimowski exited his vehicle and pursued the male on foot.  Detectives Romeo and Kevin Fassl drove through the rear parking lot area of the 1200 block of E. Lanvale Street and noticed Warren walking in a nearby alley.  They exited their vehicle and detained Warren, who was sweating heavily and out of breath, while other officers immediately canvassed the area along Warren's path of travel.  Detective Howard Ilgenfritz located two silver and black handguns in the grass next to a tree in the rear of 1210 E. Lanvale Street, directly off the sidewalk where Warren was observed by officers.  No other individuals were observed in the area.  The first handgun was a Smith and Wesson SW40VE handgun with serial number DUY7508 containing one magazine and 15 .40 caliber cartridges with one loaded in the chamber.  The second handgun was a Smith and Wesson SW40VE handgun with a mounting bracket attached over the serial number containing one magazine with 11 .40 caliber cartridges with one loaded in the chamber.  Because he was prohibited from possessing a firearm, Warren was placed under arrest.  Warren's possession of those two firearms has been alleged in Overt Act 10 in the indictment.  ECF No. 1 at ¶13(10).

> *i.*    *Warren lacks standing to challenge the warrantless seizure of abandoned property in a public location.*

Warren voluntarily discarded the two handguns in a public place while attempting to evade officers on foot.  Therefore, the handguns were abandoned property and not the fruit of any seizure.  A person does not have a legitimate expectation of privacy in voluntarily abandoned property.  *United States v. Frazer*, No. 23-4179, 2024 WL 1514960, at *8 (4th Cir. Apr. 9, 2024); *United States v. Leshuk,* 65 F.3d 1105, 1111 (4th Cir. 1995) ("The law is well established that a person

who voluntarily abandons property ... is consequently precluded from seeking to suppress evidence seized from the property.").  Property discarded during flight from law enforcement is deemed abandoned.  *California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)(drugs tossed by a fleeing suspect was abandoned).

To determine whether the defendant maintains a reasonable expectation of privacy in an item, the court performs "an objective analysis" which considers the defendant's actions and intentions.  *United States v. Davis*, 657 F. Supp. 2d 630, 647-48 (D. Md. 2009), aff'd, 690 F.3d 226 (4th Cir. 2012).  "Intent [to abandon] may be inferred from words spoken, acts done, and other objective facts."  *Id.* at 648 (quoting *United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993)).

In *United States v. Small*, the defendant, a carjacking suspect, discarded his cellphone while fleeing police.  944 F.3d 490 (4th Cir. 2019).  The court held that by discarding his phone, the defendant "ran the risk that complete and total strangers would come upon it... and that [i]n tossing his phone, he relinquished his reasonable expectation of privacy in it as well."  *Id.* at 504.  In *Frazer*, the officer sought to conduct a pretextual investigatory stop of the defendant who after a foot chase, complied with the officer's order to stop.  In response to the officer ordering the defendant to drop a bag that was strapped across his body, the defendant walked a short distance and threw the bag into an apartment complex courtyard.  *Frazer,* No. 23-4179, 2024 WL 1514960, at *3.  The court concluded that it was objectively reasonable for the officers to believe that the defendant intentionally got rid of the bag, relinquishing any reasonable expectation of privacy in the property.  *Id.* at 9.

Additionally, Warren does not have a reasonable expectation of privacy in the *location* where the guns were found.  "If the individual seeking to challenge a search does not have a legitimate expectation of privacy in the property or place being searched, the individual lacks

'standing' and the inquiry ends without consideration of the merits of the search claim." *United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020).  Importantly, "[t]he burden of showing a legitimate expectation of privacy in the area searched rests with the defendant." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir.2013).  To satisfy this burden, the defendant must satisfy two prongs by a preponderance of the evidence.  *Id.* at 833.  First, the defendant "must have a subjective expectation of privacy." *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010).  Second, that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotations omitted).

Warren tossed the firearms into a location that was public – in the grass next to a tree in the rear of 1210 E. Lanvale Street, directly off the sidewalk.  Ex. A (street view image).  He cannot show or credibly claim that he had a subjective expectation of privacy in that location, nor can he show that such a subjective expectation of privacy would be viewed as objectively reasonable.  Warren abandoned the firearms while attempting to elude law enforcement, intending to distance himself from them as officers approached on foot.  Given his abandonment of the firearms in a location in which he has no reasonable expectation of privacy, Warren has no standing to challenge the seizure of the guns.

        *ii.    At the time that Warren discarded the firearms, he had not yet been seized.*

The evidence presented at the motions hearing will demonstrate that the detectives involved in the May 31st contact with Warren were in plain clothes but wearing tactical vests marked "POLICE."  As soon as Warren observed them and without any commands or words of any kind from the detectives, he immediately fled.  When they located Warren (after he discarded the firearms), he was walking in an alley.  Detectives detained him at that point.

A seizure implicating the Fourth Amendment does not occur until an "officer, by means of physical force or show of authority, has in some way restrained the liberty of" the individual. *Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968). Not only that, but the defendant must submit to the physical force or show of authority for there to be a seizure. *Hodari D.,* 499 at 626 (1991). It is settled law that the individual "who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated." *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005). In *Hodari D.*, a juvenile moved to suppress the cocaine tossed away as he ran from the police. Like the case presently before the Court, the officers in *Hodari D.* were in plain clothes wearing jackets marked "Police." 499 U.S. at 622. They were on patrol in a high crime area when they saw a group of youths around a car. When the youths noticed the officers, they fled in different directions. *Id*. When officers regained sight of the defendant, he threw away a small object as he ran and just before he was tackled by police. *Id.* at 623. The issue before the court was whether Hodari had been seized within the meaning of the Fourth Amendment at the time he threw the drugs. *Id*. The court rejected Hodari's argument that he was seized when there was a *show* of authority (the officer's pursuit of him). Rather, Hodari was not seized until he was tackled and the cocaine that he threw while being pursued was abandoned. *Id*. at 625, 629.

Likewise, Warren was not seized until he was physically detained by Detectives Romeo and Fassl. By that time, he had already discarded and abandoned the firearms. Therefore, Warren's surrender of the firearms was not the fruit of an unlawful seizure.

Even if the Court concludes that Warren was seized at the time he threw the guns, there was reasonable articulable suspicion to conduct an investigatory stop based on the information from the confidential source and Warren's movements upon seeing officers. The basis for an investigatory stop can be based on information supplied by another person and need not be solely

based on a police officer's observations. *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 1688, 188 L. Ed. 2d 680 (2014); *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The information shared with the detectives was detailed in the description of the armed individual. Detectives located a person matching that description in the area. It is true that an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000). But here, Warren fled upon seeing the officers and unprovoked flight from officers in area of heavy narcotics trafficking supported reasonable suspicion that defendant was involved in criminal activity and justified stop. *Id*. The facts are even stronger here than in *Wardlow* because the officers had received a tip that Warren was armed. While officers lawfully detained him for an investigatory stop, another officer located the discarded firearms, establishing probable cause to place Warren under arrest.

### 2.     May 2, 2018 Arrest

On May 2, 2018, at approximately 1:30 p.m., BPD officers were conducting routine patrol in the Oliver Community in east Baltimore when they observed a blue Honda Accord with a license plate hanging from the rear of the vehicle. Officers conducted a computer check of the tag number with no results found, which indicated to the officers that either the tag was fake or had been cancelled by the Motor Vehicle Administration ("MVA"). Officers followed the vehicle a short distance as it crossed over the 1800 block of Aiken Street. Officers activated lights and sirens to initiate a traffic stop. The blue Honda Accord continued into the 1200 block of E. Lafayette before stopping. Detective Romeo approached the passenger side of the Honda Accord and detected a strong odor of marijuana emanating from the vehicle. Detective Romeo asked Warren to exit the

vehicle at which time Warren was detained in handcuffs.  Officers conducted a *Carroll* doctrine search of the Honda Accord based on the odor of marijuana and recovered a brown cigar containing suspected marijuana and a live .45 caliber bullet from the center console of the vehicle.  Officers placed Warren under arrest as he was prohibited from possessing a firearm or ammunition based on a prior robbery conviction in the Circuit Court for Baltimore City.  Warren's unlawful possession of the ammunition is alleged in Overt Act 28 of the indictment.  ECF No. 1 at ¶13(28).  Incident to this arrest, officers recovered an iPhone from Warren's person.

> i.    *Reasonable articulable suspicion to believe that a traffic violation occurred justified a stop of the Honda Accord.*

For a vehicle stop to be valid under the Fourth Amendment, the stop "much be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Wilson*, 205 F.3d 720, 723 (4th Cir. 2000); *United States v. Harris*, 39 F.3d 1262, 1269 (4th Cir. 1994) (explaining that a traffic stop is justified at its inception if it is based "on a reasonable suspicion of illegal activity").

In this case, the testimony at the motions hearing will demonstrate that the officers observed that the rear license plate was hanging and not securely fastened to the vehicle, a violation of §13-411 Transportation Article of the Annotated Code of Maryland.  Officers ran a computer check on the license plate and no records were found, raising concerns that the registration tag was fake or had been canceled.  Both observations provided an independent reason for the traffic stop.

There is no dispute that "[w]hen an officer observes a traffic offense—however minor— he has probable cause to stop the driver of the vehicle." *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014); *see also United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic

stop."). Indeed, the Supreme Court has stated "it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *see also United States v. Anderson*, 114 F.3d 1059, 1063-64 (4th Cir. 1997) (explaining that a traffic stop is valid under the Fourth Amendment "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring") (internal quotation marks omitted).

Here, the traffic stop was justified because it was based on the officer's reasonable suspicion that Maryland traffic laws were being violated. Ultimately, upon identifying Warren and running a computer check through the MVA, officers learned that his driving privileges were revoked in the state of Maryland. Warren was issued a citation for driving on a revoked license.

> ii. *The odor of marijuana established probable cause to conduct a search of the Honda Accord.*

An officer's detection of the odor of marijuana is sufficient to establish probable cause to search a vehicle. *United States v. White*, 836 F.3d 437, 441-442 (4th Cir. 2016); *see also, e.g., United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010) (finding probable cause justifying a vehicle search when an officer "smelled the odor of marijuana emanating from the vehicle"); *United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002) (holding that an officer "clearly had probable cause to search the passenger compartment of [the] vehicle without a warrant, based on the burning marijuana he smelled as he approached the car").

As Detective Romeo approached the passenger side window of the Honda Accord to make contact with the driver, he detected a strong odor of marijuana emanating from the car which provided probable cause to search the vehicle without a warrant. While searching the vehicle in areas where marijuana could be located, officers located the ammunition in the center console area.

### 3. July 23, 2018 Arrest

On June 27, 2018, at 10:18 a.m., Baltimore County police officers responded to 8509 Glen Michael Lane in Randallstown, Maryland for a shooting. Upon arrival, officers located victim J.B. on the ground suffering from multiple gunshot wounds. Two separate witnesses told officers on scene that the suspect vehicle was a blue Honda. Eleven .40 caliber Smith and Wesson cartridge casings were recovered at the scene close to where the vehicle was parked.[1]

A motion activated surveillance camera attached to 8517 Glen Michael Lane captured a blue Honda with Maryland registration 6DF7581 leaving the area immediately after the shooting. A check of the registration revealed that the vehicle was a Honda Accord that was previously stopped by Baltimore City police officers on May 2, 2018. As discussed above, the driver was identified as Warren, who was placed under arrest after officers located ammunition and marijuana in the vehicle. The registered owner of the Honda Accord was Shaquan Bell, whom Warren called from booking after his arrest. Further investigation also revealed that Bell resided at 6721 Iron Ore, Unit 322 in Elkridge and that Warren resided with her at the address. On July 17, 2018, Baltimore County Police Detective Daniel O'Shea obtained a search warrant for the blue Honda Accord, Bell's apartment, and Warren's person. The warrant authorized the seizure of active cellphones that would reveal Warren's communications and whereabouts at the time of J.B.'s shooting. Ex. B (Baltimore County Search Warrant).

On July 23, 2018, Baltimore County detectives established surveillance on a residence in Howard County. At 9:35 a.m. they observed Warren exit a residence in Elkridge. Warren entered the blue Honda Accord with Maryland registration 6DF7581 and drove into Baltimore County. A check through MVA records showed that Warren's driving privileges were revoked. Investigators

---

[1] Warren ultimately pled guilty to the shooting of J.B. The government has alleged his conduct that day in Overt Act 27 of the indictment. ECF No. 1 at ¶13(27).

activated their emergency equipment and attempted to stop the vehicle.  Warren increased his speed and drove through a red light and eluded investigators in Baltimore City.  Investigators located the abandoned Honda Accord and began surveillance in the area.  At 10:56 a.m., investigators observed Warren operating a maroon Toyota Avalon.  Investigators initiated a stop on the vehicle and placed Warren under arrest for driving on a revoked license.

E.W. was the registered owner of the Toyota Avalon.  She was an occupant in the vehicle at the time of Warren's arrest and gave officers verbal consent to search her car, which was recorded on Officer Gore's BWC.  Inside her vehicle, officers recovered two cellphones – hers and Warren's.

In his motion, Warren includes in his list of challenged conduct "a July 23, 2018 search and seizure of David Warren conducted by members of the Baltimore Police Department."  ECF 134 at 2.  This was not a warrantless search and seizure as officers had a valid search warrant to execute on Warren's person that authorized the seizure of any cellphones.  Detective O'Shea had established probable cause to believe that Warren's cellphone would lead to evidence in the J.B. attempted murder investigation.  Warren's cellphone was in the Toyota Avalon, a vehicle registered to a third party who gave officers on scene consent to search.  Ex. Q (BWC clip of consent).  Once the owner of the Toyota Avalon identified a cellphone as Warren's, it was immediately apparent to the officers that it was evidence in a criminal investigation, and officers properly seized it under the plain view exception.

The plain view doctrine authorizes the warrantless seizure of incriminating evidence when 1) the officer is lawfully in a place from which the object may be plainly viewed, 2) the officer has a lawful right of access to the object itself, and 3) the object's incriminating character is immediately apparent. *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997), *citing Horton*

*v. California,* 496 U.S. 128, 136-37 (1990).   Courts have even found that cell phones are such common and integral tools of the criminal trade that their incriminating nature is immediately apparent and therefore their seizure falls within the plain view exception to the warrant requirement, particularly where the phones are found in close proximity to drugs.  *See, e.g., United States v. Harris,*  2016 WL 1441382, at *12 (E.D. Va. Apr. 11, 2016), aff'd, 688 F. App'x 223 (4th Cir. 2017)(support for officers' testimony regarding training experience as to the probability of finding evidence on defendant's cellphone which was near drugs and paraphernalia); *United States v. Hammett*, 2014 WL 642501, at *1-2 (2d Cir. Feb. 20, 2014) (cell phones are "tools that drug dealers often possess" and upholding seizure of two cell phones under plain view exception when discovered in an open bag containing a digital scale).

Here, Warren had previously been stopped driving the blue Honda when it contained controlled substances.   He was now a suspect in an attempt murder investigation.   The incriminating nature of a cellphone possessed by Warren would have been immediately apparent to any officer in BPD.

### 4.     August 16, 2018 Arrest

On August 16, 2018, at approximately 2:30 p.m., ATF agents were in the area of E. Lafayette Avenue, E. Lanvale Street, and N. Aisquith Street working an undercover operation involving the purchase of controlled substances from individuals in the area believed to be members of a drug trafficking organization.   Agents had been investigating drug trafficking activity in the 1200-1300 block of Lafayette Avenue since June as a result of fatal and non-fatal shootings in the area and other violent incidents.   Agents conducted surveillance on a number of occasions in June and July during which they observed several individuals including Warren, either directly engaging in drug trafficking activity or aiding and abetting drug trafficking activity.

On August 16th, the undercover officer intended to purchase drugs from one of the individuals within the drug trafficking organization.  Other agents staged around the area to monitor the situation.  After the undercover drove into the area, he made contact with multiple individuals who approached his car.  The undercover negotiated a price with one of the individuals and handed over pre-recorded funds at which time the individual stole the money and fled along with the other individuals.  Just prior to the failed drug transaction, the undercover noticed Warren walk past the driver's side of the undercover's vehicle.  The undercover overheard Warren ask the individuals with whom the undercover was speaking if they were ok.

After the individuals fled the area, the undercover called out that he had been ripped off and provided descriptions of the individuals involved and their direction of travel.  Agents in the area began looking for the subjects.  Agents Lisa Christy and Colleen Daly noticed several people near a parked, occupied maroon Toyota Avalon with tinted windows bearing Maryland registration 3DH9985.  Special Agent Daly asked the driver, Warren, to exit the vehicle so that he could confirm his identity.[2]  BPD Officers Mark Pashkevich and John Horne responded to assist the ATF agents.  Both BPD officers and the ATF agents were aware of a BPD BOLO flyer ("Be On the Look Out" flyer) disseminated via departmental e-mail on August 14, 2018 for a suspect vehicle involved in the homicide of Brian McKemy on August 7, 2018.  The vehicle depicted in the flyer matched the maroon Toyota Avalon from which Warren exited.  The flyer directed officers to stop the vehicle if located and identify all occupants.  BPD Homicide Detective Richard Moore created the flyer as part of the murder investigation after obtaining descriptions from three civilian eyewitnesses who saw the suspect vehicle and described it as a maroon or purple Toyota Avalon.

---

[2] This was the same maroon Toyota Avalon that Warren drove on July 23, 2018, which was discussed in the previous section.

Two of the witnesses further described the Avalon as having tinted or dark windows.  Detective Moore had also reviewed surveillance video from a residence near the homicide location and observed a maroon color Toyota Avalon drive by several times before the murder, corroborating the statements of the witnesses.

Officers requested a K9 to conduct an exterior scan of the vehicle.  Officer Scott Reid and his K9 Force arrived approximately 20 minutes later and conducted an exterior scan of the Toyota Avalon.  Officer Reid's K9, that had been trained as a drug detection dog, alerted on all four doors of the Toyota Avalon for the odor of controlled substances.  Officers searched the vehicle and recovered a satchel bag from the passenger side floor.  Inside the satchel the officers located a Glock 22 handgun with an extended magazine containing 22 .40 caliber rounds with one round in the chamber.  A subsequent examination of the Glock 22 established that it was the firearm used in a number of murders and non-fatal shootings in Baltimore City and Baltimore County between March and August 2018, including the August 7, 2018 murder of Brian McKemy and the June 27, 2018 non-fatal shooting of J.B. (alleged in Overt Acts 29 and 31).   Officers also recovered from the Avalon clothing and two cellphones – a black LG phone in the center console and a black iPhone from the passenger seat.[3]   The Toyota Avalon was towed to the Eastern District Garage and Warren was arrested for a handgun violation and transported to BPD headquarters.  Warren's possession of that Glock handgun is alleged in Overt Act 35.  ECF No. 1, ¶13(31).

> i.    *Reasonable articulable suspicion existed to conduct an investigatory stop of Warren.*

---

[3] Investigators executed search warrant on the iPhone on September 11, 2018 and September 25, 2020, and determined that it belonged to Warren's co-defendant, Wayne Prince.  The phone number for the device was subscribed to Prince's mother and the contents of the phone contained data and communications from Wayne Prince.

One of the exceptions to the warrant requirement is what is known as a "*Terry* stop," which permits an officer to stop and temporarily detain an individual for investigative purposes so long as the officer has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The purpose of a *Terry* stop is investigative, that is, to verify or to dispel the officer's suspicion. *Id*. at 22, 30. Officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the stop of the defendant. *Id*. at 21. Although the Toyota Avalon was parked at the time BPD officers approached, *Terry* stops can be conducted on motor vehicles as well as persons. *See United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988) (law enforcement may stop an automobile to investigate a reasonable suspicion that its occupants are engaged in criminal activity). This standard is "less demanding . . . than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Moreover, reasonable suspicion is an objective standard. *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014).

Here, officers' reasonable articulable suspicion was twofold. First, they had reason to believe that Warren was involved in the failed undercover drug transaction in which a dealer stole the undercover's money. Second, they had reason to believe that the vehicle Warren was driving was involved in a recent homicide.

Courts have found that reasonable articulable suspicion can exist to conduct an investigative stop of a person or vehicle when their descriptions match those of suspects or suspect vehicles known at the time by police. *See Torres v. Ball*, No. 21-6447, 2023 WL 2966035, at *7 (4th Cir. Apr. 17, 2023) (finding investigatory stop justified when "the make, model, color, and a specific feature—dark tinted windows—of" the stopped vehicle matched those of a suspected

vehicle); *United States v. Marxen*, 410 F.3d 326, 331-32 (6th Cir. 2005) (finding police had reasonable suspicion to stop a car that an eye witness to an armed robbery reported as the getaway car).  In *United States v. Hensley*, the Supreme Court found the police were justified in making an investigatory stop of the defendant to investigate a completed crime, relying on another police department's "wanted flyer" seeking information about an armed robbery because the defendant matched the description contained in the flyer.  469 U.S. 221, 229 (1985).  The court ruled that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."  *Id*.

When he was approached by officers, Warren matched the description of the individual observed by the undercover checking in on the dealers who ripped him off.  Additionally, Warren was also seated in the driver's seat of a vehicle that matched the exact description of the suspect vehicle in a recent homicide.  The vehicle was also surrounded by other unknown individuals. Officers Horne and Pashkevich's purpose was to confirm or dispel that the vehicle and/or its occupants were involved in criminal activity—exactly what *Terry* permits.   It was entirely proper for officers to identify Warren and investigate whether the vehicle had been used in a homicide.

As part of their effort to diligently pursue a means of investigation that was likely to confirm or dispel their suspicions, officers immediately requested a K9 officer so that a drug detection dog could scan the Toyota Avalon for the presence of contraband.  *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (20-minute detention of defendant not unreasonable given the legitimate investigation conducted by law enforcement officers).

        ii.    *The K-9 scan of the vehicle established probable cause to conduct a Carroll Doctrine search of the Toyota Avalon.*

A warrantless search of a car is valid if based on probable cause. *California v. Acevedo*, 500 U.S. 565, 569–570 (1991); *Chambers v. Maroney*, 399 U.S. 48 (1970), *Carroll v. U.S.*, 267 U.S. 132 (1925).  It is well-established that a trained drug-detection canine's positive alert is sufficient probable cause to search a vehicle.  *Florida v. Royer*, 460 U.S. 491, 506 (1983);  *see also United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) (holding "[w]hen the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed"); *United States v. Branch*, 537 F.3d 328, 340 n.2 (4th Cir. 2008) ("[I]t is well settled that a 'positive alert' from a drug-detection dog, in and of itself, provides probable cause to search a vehicle.").  In the court's probable cause analysis, it should consider whether there are some indicia of reliability for the alert, such as the dog's satisfactory performance in a certification or training program.  *United States v. Koon Chung Wu*, 217 Fed. Appx. 240, 245 (4th Cir. 2007); *Florida v. Harris*, 568 U.S. 237, 246 (2013).

Here, K9 Force had successfully completed a four-month training program with Officer Reid, who had been Force's handler during the dog's tenure as a BPD K9.  Additionally, K9 Force successfully completed rigorous follow up training four times a month with Officer Reid, who has previously testified as a K9 handler expert in both state and federal court.  Force's certification and training records establish indicia of reliability for his alert on all four doors of the Toyota Avalon, which in turn provided officers with probable cause to search the vehicle.

        iii.   *Even without the K9's positive alert, officers had probable cause to conduct a Carroll doctrine search of the Toyota Avalon.*

Probable cause existed to believe that evidence of the murder of Bryan McKemy on August 7, 2018 was in the Toyota Avalon on August 16, 2018— it was spotted less than four miles from the location of the murder.  Eyewitnesses described the suspect vehicle as a purple or maroon

Toyota Avalon with tinted windows, which was corroborated by video surveillance footage review by officers. *Chambers*, 399 U.S. at 42 (1970) (police had probable cause to believe car contained evidence of robbery because car matched eyewitnesses' descriptions). Furthermore, probable cause existed to believe that evidence of drug trafficking and/or theft of the police money stolen during the failed drug transaction would be located in the Toyota Avalon. Warren had been observed by ATF agents on numerous dates participating in drug trafficking activities in the area with the same group of individuals. On this date, August 16, the undercover officer observed Warren interact with the male who ultimately stole the police funds in such a way that it appeared to the undercover officer that not only was Warren aware of the "drug transaction" but that he was overseeing it.

## II.   Response to Warren's Motion to Suppress Statements (ECF No. 141)

### A.      Legal Standard

The Fifth Amendment prohibits compelled self-incrimination. U.S. Const. amend. V. Members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any individual in police custody and subject to custodial interrogation "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Officers may issue *Miranda* warnings orally or in writing. *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (upholding oral warnings). An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440. "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably

likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In addition to complying with *Miranda*, an individual's statements also must be provided voluntarily. The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the speaker was "overborne and his capacity for self-determination critically impaired." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)); *see also Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963). In making this determination, "coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In applying these general principles to various factual scenarios, the Fourth Circuit has considered, among other things, factors such as: (1) whether law enforcement officers properly advised the suspect of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the suspect that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the suspect; (4) whether the suspect appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning. *See United States v. Braxton*, 112 F.3d 777, 781–85 (4th Cir. 1997); *Gray*, 137 F.3d at 771.

Accordingly, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 U.S. at 299–300; *see also Michigan v. Harvey*,

494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will."). Thus, unprompted, spontaneous, and otherwise voluntary statements are not prohibited by *Miranda* and are thus admissible. *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("[S]pontaneous statements [that are] not the product of interrogation [are] not barred by the Fifth Amendment."); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989) (holding that officer's statement in response to conversation initiated by the defendant should not be construed as attempt to solicit information). The government bears the burden of proving voluntariness or spontaneity by a preponderance of the evidence. *See, e.g.*, *Braxton*, 112 F.3d at 781.

**B.    Warren's Statements to Law Enforcement Were Voluntarily Made Following the Proper Administration of Miranda Warnings.**

Warren has made a blanket claim that eight of his statements to law enforcement were made in violation of *Miranda* and not voluntary. ECF No. 141. Warren does not provide any specific reasons or factual bases for his bald assertion. Because Warren's statements were made in compliance with *Miranda* and were voluntary, the motion should be denied.

As a preliminary matter, the government is only seeking to introduce at trial three of the eight statements identified in the defendant's motion. Accordingly, the government has only focused below on the statements that it intends to introduce at trial.

**1.    May 31, 2016 – on scene[4]**

---

[4] The only body worn camera footage available for this incident is a 51 second clip of Warren sitting on the curb with a BPD officer. Waren does not make a statement during this clip.

The circumstances of Warren's arrest on May 31, 2016 are discussed above in Section I.B.1.  Relevant to this motion, Sgt. Golimowski orally provided Warren his rights pursuant to *Miranda.*  Warren exclaimed that the officers couldn't put "*them*" on him in relation to the recovered firearms.

The government anticipates that Sgt. Golimowski will testify that he knew Warren prior to his detention and arrest on May 31, 2016.  He will describe their relationship as friendly and was so on this date.  He advised Warren of his rights pursuant to *Miranda* immediately following Warren's detention either with the use of a card or from his phone; in addition, he also has the rights memorized.  Sgt. Golimowski will further testify that Warren acknowledged his rights, and he found Warren to be coherent, not under the influence of any substance, and accordingly, had no concerns about Warren's ability to understand his rights.  There will be no evidence that any officer made threats or promises to Warren to make a statement.

In fact, there will be little evidence of anyone questioning Warren at the scene.  Rather, the government anticipates that Sgt. Golimowski will testify that when Warren was advised of the reason for his arrest, Warren said the police could not put "*them*" on him.  That statement is inculpatory since at that point none of the officers had informed Warren that *two* guns had been recovered by law enforcement.

Sgt. Golimowski properly advised Warren of his *Miranda* rights.  *Berkemer v. McCarty*, 468 U.S. at 429 (quoting *Miranda*, 384 U.S. at 444).  After being so advised, Warren proceeded to voluntarily waive his rights and state that he did not possess the firearms.   And there is ample evidence that his statements were voluntary.  Warren began by agreeing orally that he was "advised of and [could] understand" his rights, and that he "freely and voluntarily" waived those rights.  Law enforcement never coerced or forced Warren to speak, nor did they make any promises or

threats. Warren did not appear intoxicated or unable to comprehend the events.  As the testimony and evidence will demonstrate, Warren freely and voluntarily chose to waive his rights and make a statement on May 31, 2016.

### 2.   July 23, 2018 – at Baltimore County Police Station

As discussed above, Baltimore County police officers stopped Warren on July 23, 2018, for driving on a suspended license.  At the time, Warren was a suspect in the non-fatal shooting of J.B. in Baltimore County.  Warren ultimately pled guilty to that shooting.  The officers brought Warren to County headquarters where he met with Det. Daniel O'Shea.  Det. O'Shea questioned Warren about the two cars he drove, a Honda Accord and a Toyota Avalon.  Det. O'Shea provided Warren with his rights pursuant to *Miranda* with the aid of a waiver form.  He read Warren each of his rights and Warren signed the acknowledgment afterwards.  Ex. C.  Warren then agreed to speak to Det. O'Shea and admitted to having cocaine in the Honda Accord and that he drove the Toyota Avalon to evade law enforcement.  The entirety of the interview – which lasted less than an hour – is recorded.  Ex. D.[5]

Prior to questioning Warren, Det. O'Shea confirmed that Warren could read and write the English language, and then provided him with an oral explanation of his *Miranda* rights.  *Id.* at 2:45:35.   Det. O'Shea proceeded to advise Warren that he had a right to remain silent, that anything he said could be used against him, that he had a right to speak to an attorney or stop the interview at any point, and that an attorney could be provided if Warren could not afford one.  *Id.* at 2:51:00.  Warren orally acknowledged that he understood each right after Det. O'Shea relayed them; in addition, Warren did not have any questions about his rights when asked. Therefore, the

---

[5] This exhibit and all media exhibits will be delivered to the Court on a disk.

investigators properly advised Warren of his *Miranda* rights.  *McCarty*, 468 U.S. at 429 (quoting *Miranda*, 384 U.S. at 444).

Warren proceeded to voluntarily waive his rights and speak with the investigators about the Honda and Avalon.  *Id.* at 2:52:00.  And there is ample evidence that his statements were voluntary.  Warren began by agreeing orally that he was "advised of and [could] understand" his rights, and that he "freely and voluntarily" waived those rights.  Throughout the interview, Det. O'Shea never coerced or forced Warren to speak, nor did he make any promises or threats.  Warren did not appear intoxicated or unable to comprehend the events.  The interview lasted less than an hour, during which Warren received water, cigarettes, and use of the bathroom.  And Warren was cooperative throughout.

Det. O'Shea did not arrest Warren that day for his involvement in the J.B.  shooting; rather, Warren was arrested for driving on a suspended license.  As the interview recording demonstrates, Warren freely and voluntarily chose to waive his rights and speak with the detectives.

### 3.     August 16, 2018 – at BPD Homicide Unit

The circumstances of Warren's arrest on August 16, 2018 for possession of a handgun are described above in Section I.B.4.  Following his arrest, officers transported Warren to BPD's Homicide Unit to be interviewed by Det. Michael Voderick.  Det. Voderick and Det. Moore were investigating the Brian McKemy murder and wanted to understand Warren's connection to the Toyota Avalon and firearm.  The interview, which lasted less than an hour, was recorded and is submitted as Exhibit E.

Det. Voderick asked Warren about his familiarity with his *Miranda* rights.  *Id.* at 4:28:39. Warren made a joke and began to read his rights from a form provided by Det. Voderick.  Warren read each right and initialed the form indicating his ability to understand each right.  *Id.; see also*

Ex. F (signed *Miranda* waiver form).  Warren did not ask any questions about his rights, nor did he appear to be under the influence of a substance, or unable to understand what was going on.

Det. Voderick asked several questions about Warren's connection to the Avalon.  Ex. E at 4:35:20.  Warren calmly explained the circumstances of being in the Avalon and told the detective about other times he drove the vehicle.  Det. Voderick also asked Warren about Woodlea Avenue where the McKemy murder occurred.  *Id.* at 4:35:00.  Warren denied ever being on Woodlea Avenue.  Later in the interview, Det. Voderick asked Warren about the handgun arrest.  *Id.* at 4:45:00.  Warren explained that a lot of people were in his car that day because it was hot.  BPD converged on the car, and everyone ran; however, Warren stayed in the car.

The interview ended at approximately 4:51 p.m.  Warren never asked for an attorney; no one made any promises or threats to Warren in exchange for his *Miranda* waiver.  Warren requested and was allowed to use the bathroom.  Homicide detectives even provided Warren a shirt upon his arrival since Warren was not wearing one at the time of his arrest.  *Id.* at 4:18:40.  The government anticipates that Det. Voderick will testify as to Warren's competency, understanding, and sobriety during the reading of the rights.  In fact, Det. Voderick will tell the Court that Warren was easy to talk to and friendly.

Once again, Warren was properly advised of his *Miranda* rights.  *McCarty*, 468 U.S. at 429 (quoting *Miranda*, 384 U.S. at 444).  After being so advised, Warren proceeded to voluntarily waive his rights and spoke to the detective. There is ample evidence that his statements were voluntary.  Warren began by agreeing orally that he was "advised of and [could] understand" his rights, and that he "freely and voluntarily" waived those rights.  Law enforcement never coerced or forced Warren to speak, nor did they make any promises or threats. Warren did not appear

intoxicated or unable to comprehend the events. As the testimony and evidence will demonstrate, Warren freely and voluntarily chose to waive his rights and make a statement on August 16, 2018.

Accordingly, Warren's motion to suppress these three statements should be denied.

## III. Response to Warren's Motion to Suppress In-Court and Out-of-Court Identifications (ECF No. 142)

Warren moves to suppress evidence relating to a pre-trial photo array identification by a government witness relating to a shooting on May 30, 2016, on the grounds that the procedure was impermissibly suggestive, and that the identification was unreliable. Warren also moves to suppress any attempted in-court identification of him by the witness on the ground that the identification would be tainted by the earlier photo array procedure.

This motion should be denied. The photo array procedure at issue cannot be characterized as impermissibly suggestive. Moreover, the surrounding circumstances of the identification procedure indicate that the witness's identification of Warren was reliable and was not corrupted by anything the police said or did. We begin with a summary of the legal landscape before turning to Warren's challenges.

### A.      Legal Standard

The Supreme Court has recognized a limited due process check on the admission of eyewitness identifications in cases where the police use an identification procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts follow a two-step analysis for determining whether identification testimony is inadmissible, *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996), and the defendant bears the burden of proof at both stages, *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997). First, the defendant must establish that the identification procedure was impermissibly suggestive. *Manson v. Brathwaite*,

432 U.S. 98, 110 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–99 (1972).  Second, the defendant must establish that the suggestive identification procedure rendered the identification unreliable. Brathwaite, 432 U.S. at 114; *Biggers*, 409 U.S. at 199.

In evaluating the reliability of the identification, courts are to consider the "totality of the circumstances," including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.  "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," the identification evidence should be admitted.  *Perry v. New Hampshire,* 565 U.S. 228, 232 (2012); *see also Brathwaite*, 432 U.S. at 106 (holding that the central question is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive").

Courts have frequently held that witness identifications were reliable and admissible notwithstanding identification procedures that were unduly suggestive.  In *Biggers*, for instance, police called a rape victim to the police station seven months after the incident for a "showup" in which they walked the defendant past the victim and directed him to say the words used by the perpetrator during the crime.  409 U.S. at 194–95.  The Court held that notwithstanding the improper showup, the victim's identification was reliable and admissible because she saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen.  *Id*. at 200–01.  Similarly, in *Brathwaite*, an undercover officer identified a drug dealer from whom he had purchased drugs after viewing a single photograph shown to him

by a fellow officer.  432 U.S. at 100–01.  Despite the suggestiveness of the procedure, the Court held that the officer's identification was reliable because he viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification, which was made only two days later.  *Id.* at 114–15; *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (notwithstanding less-than-ideal identification procedure in which the defendant appeared several times in a series of six photographs, bank tellers' identifications were reliable where they had ample opportunity to view the robber in good lighting, viewed the photographs only a day later, and did not display any doubt in their choice); *United States v. Saunders*, 501 F.3d 384, 390–93 (4th Cir. 2007) (despite unduly suggestive photo array in which defendant's photo "stood out sharply from the others" in lighting and background color and police indicated the array contained the perpetrator, cashier's identification was reliable where he had a good opportunity to view the robber, provided a "generally accurate" description, and confidently identified the defendant two days after the robbery).

Exclusion of identification evidence is a "drastic sanction" that is "limited to identification testimony which is manifestly suspect."  *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986).  The court is not presented with such circumstances here.

**B.      Argument**

**1.      The Photo Array Was Not Impermissibly Suggestive.**

On May 30, 2016, at approximately 3:00 p.m., BPD officers responded to 500 block of East 43rd Street for report of a shooting.  Upon arrival, officers located several victims.  On that same date, detectives interviewed the shooting victims, one of whom provided a description of the suspect vehicle, the shooter, and the gun.  The witness described the suspect vehicle as a "light blue van," the shooter as being in his "early 20's medium complexion with a thin build," and the

gun as a "silver handgun."  The witness also was able to see that the van "pulled off towards York Road."

On May 31, 2016 at 3:52 p.m., the day after the shooting, a detective not affiliated with the investigation met with the witness and administered a photo array presentation using the double blind/sequential method.[6]  The witness identified Warren, whose photo was the second out of a six-photo array, by stating "that's him."  The witness also wrote a brief statement under Warren's photograph.  The government has alleged that Warren committed the shooting on May 30, 2016, in Overt Act 10 in the indictment.  ECF No. 1 at ¶13(10).

As a threshold matter, Warren cannot show that the photo array was impermissibly suggestive.  The photo array, constructed by Detective Timothy Johnson, consisted of six photos.  The only identifying information connected to each photo is a seven-digit Maryland state identification or "SID" number.  The individuals in the array are men who are of the same race, appear to be similar in age to Warren, with similar complexions and hairstyles.  The individuals also have similar facial hair features – a light mustache and small goatee.  Unlike the *Saunders* case*, in which the court noted the striking difference between the defendant's photos and the filler photos, there is nothing unique about Warren's appearance in his photo or the background or border of his photo that would cause it to stand out more than the others.  *Saunders*, 501 F.3d at 390.

Additionally, there is no evidence that the police attempted to influence the witness to finger a particular suspect.  In fact, the double blind/sequential method of administering a photo array is designed to prevent even inadvertent bias.  Detective Johnson will testify that the

---

[6] The photo array is administered by an officer who is not involved in the investigation thereby removing the possibility of bias towards a suspect during the identification procedure.  The officer reads specific instructions to the witness, who then views the photographs in sequential order.

administrator of the photo array, Detective Adam Storie, was not involved in the construction of the array and was unaware of the placement of Warren in the sequence of photos and was unaware that Warren was a suspect.  Detective Johnson simply gave the array as constructed to Detective Storie with standard instructions for the administration of a photo array to be read to the witness. Detective Storie administered the instructions and permitted J.W. to view each photograph. Without any influence from Detective Storie, J.W. selected Warren, identified him as the shooter, and wrote a statement under his photo.  Warren has not come close to carrying his burden of proof in showing that the photo arrays were impermissibly suggestive.

### 2. In Any Event, the Witness Identification Was Reliable.

Even if the court finds that the photo array procedure was suggestive, the witness's identification was unquestionably reliable when considering the totality of the circumstances. Although the witness was not familiar with Warren, the witness's identification bore all the hallmarks of reliability.  The witness had opportunity to view Warren at the time of the crime which occurred outside during daylight hours.  The witness also had the opportunity to observe the suspect vehicle arrive, see the shooter look out the window and fire, and observe the vehicle's direction of flight.  This opportunity to view Warren and the degree of attention at the time of the crime strongly supports a finding of reliability.  *See United States v. Saint Louis*, 889 F.3d 145, 154 (4th Cir. 2018) (victim's ability to recall specific details about captivity show a high degree of attention during that time).  Furthermore, only one day had passed between the crime and the identification procedure during which the witness.  *See Brathwaite*, 432 U.S. at 115 (a single suggestive photo identification made two days after the crime deemed reliable). Under these circumstances, the identification was highly reliable, and the evidence should be admitted for the jury to determine its worth in light of any allegedly suggestive police techniques.  *See Biggers,*

409 U.S. at 201 (pre-trial identification was properly submitted to the jury despite allegations of suggestiveness).

## IV. Response to Warren's Motion to Suppress Fruits of Search Warrants (ECF No. 138)

### A. Legal Standard

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than a preponderance of the evidence, *see Gates*, 462 U.S. at 235. *See also United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").

The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *Bynum*, 293 F.3d at 197. Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

"Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664. The reviewing court is not to conduct a *de novo* determination of probable cause but, instead, must

determine whether the magistrate judge had a substantial basis to conclude that probable cause existed at the time the search warrant was issued. *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990).

Moreover, "the affidavit need not dot every "i", cross every "t" or "close" every inferential "loop." *United States v. Orozco,* 41 F.4th 403, 410 (4th Cir. 2022). Warrant applications do not have to include:

> a 'magic incantation' from the affiant that, 'in my training and experience, [there is a nexus between the suspected crime and evidence I want to search].' To put it bluntly, no such requirement exists. Indeed, a magic-words requirement for warrant affidavits runs headlong into the Supreme Court's clear instruction that we should not add '[t]echnical requirements of elaborate specificity' into the warrant-application process, and 'should not invalidate warrants by interpreting affidavits in a hyper technical, rather than commonsense, manner.'

*Id.* (quoting *Gates*, 462 U.S. at 235–36).

Indeed, the affidavit "need not directly link the evidence sought with the place to be searched." *United States v. Jones*, 942 F.3d 634, 639 (4th Cir. 2019). It need only supply enough facts for a neutral magistrate, who may make reasonable inferences to fill in any logical gaps, to find the required nexus. *See id*. at 639–40. As stated clearly and concisely in *Orozco,* "[w]arrant applications are commonsense documents." *Orozco*, 41 F.4th at 411.

Even where a search warrant is found to be lacking, a court should not suppress the evidence if executing officers relied on the warrant in good faith. *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, the Court should not suppress evidence obtained through a warrant, even a "subsequently invalidated" warrant, unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n. 23.

### B.        Argument

Warren has moved to suppress the fruits of five search warrants: 1) a July 17, 2018 Baltimore County warrant to search the person of David Warren; 2) a September 18, 2018 warrant to search the Instagram account "LA_Meshawn"; 3) a September 25, 2018 warrant to search historical cell site records for phone number 443-453-8277; 4) an April 21, 2022 warrant to search three iCloud accounts associated with Warren; and 5) a May 11, 2022 warrant to search a Google account associated with Mr. Warren.  ECF No. 138 at 2.

As an initial matter, the government does not intend to introduce at trial any evidence obtained pursuant to warrants numbered 1, 4, and 5 above.  We, therefore, have not addressed those warrants below.

With respect to the September 18, 2018 warrant to search the Instagram account "LA_Meshawn," the defendant notes what he believes to be a discrepancy between when the warrant was issued and when the records were actually produced to the government.  ECF No. 138 at 4-5.  But no such discrepancy exists; the defendant overlooked a second warrant (which was produced in discovery) that was later authorized for that same "LA_Meshawn" Instagram account.  On January 23, 2020, Magistrate Judge J. Mark Coulson authorized a warrant to search five Instagram accounts, including "LA_Meshawn."  Ex. G (under seal).  In February 2020, in response to that warrant, Instagram produced the records referenced in Warren's motion.  We explain below that both warrants were amply supported by probable cause and meet the particularity requirement of the Fourth Amendment.

Defense counsel also argues that they were unable to locate in discovery a search warrant for the historical cell site records for Warren's phone number 443-453-8277.  ECF No. 138 at 5.  However, those records were obtained by Baltimore County detectives in September 2018 by way of a court order under 18 U.S.C. § 2703(d), not a search warrant.  The application and order were

both produced in discovery.  As explained below, the use of the court order was authorized by the functional equivalent of a warrant and was supported by probable cause.

### 1.      September 18, 2018 Instagram Warrant

On September 18, 2018, the Honorable Julie L. Glass, a Baltimore County Circuit Court judge, authorized a warrant to search the Instagram account "LA_Meshawn," believed to be used by David Warren.  Ex. H.  Baltimore County Detective O'Shea sought the warrant in connection with his investigation into the attempted murder of J.B. on June 27, 2018.

Warren argues generally that the warrant is not supported by probable cause, and specifically, that it relies in "large part upon the unconstitutional warrantless search and seizure of Mr. Warren on May 2, 2018."  ECF No. 138 at 4.  His claims are meritless.

As the government has detailed in Section I.B.2., the seizure of evidence from Warren on May 2, 2018 was entirely lawful for all the reasons discussed above.  But it is also simply false to say that the September 2018 Instagram warrants relied in "in large part" on the seizure from that arrest.  The warrant affidavit details the investigation into the J.B. shooting and explains how Warren was identified as a suspect.  Investigators reviewed surveillance footage from the area of the shooting and saw a blue Honda Accord with Maryland Registration 6DF7581 leaving the scene of the shooting.  That vehicle was registered to Shaquan Bell.  Investigators listened to jail calls that Warren made to Bell and learned that they appeared to have been in a relationship.

Moreover, the affidavit describes Warren's arrest on August 16, 2018 by BPD for possession of a Glock 22 .40 caliber handgun that was located within the marron Toyota Avalon that he occupied that day.  The Glock was tested for ballistic comparison and investigators determined that it was the gun that fired the shell casings recovered at the scene of the J.B. shooting.  In short, investigators outlined for the judge that Warren was in possession on August

16, 2018 of the handgun used in the shooting of J.B., the crime they were investigating.  None of that has anything to do with Warren's arrest on May 2, 2018.  The combination of that evidence and the fact that investigators learned that the suspect car in the shooting, a blue Honda Accord, was registered to Warren's girlfriend and that Warren was occupying it when he was arrested on May 2, 2018, provided ample probable cause supporting the Instagram warrant.

Warren also argues that the warrant does not establish any nexus between Warren's Instagram account and the crime under investigation.  Not so.  Detective O'Shea explains in the affidavit that the Instagram wall posts and messages could provide detectives with information or motive regarding the crime under investigations. Ex. H at 4.  He also notes that reviewing the Instagram returns could assist in identifying people with information about the crime under investigation.

Finally, Warren is incorrect that the warrant is overbroad.  In fact, the warrant is limited both temporally and in scope.  The judge authorized law enforcement to review Instagram records from 6/1/2018 to 8/16/2018, only a two-and-a-half-month period that was right around the time of the crime under investigation.  *Id*. at 5.  Moreover, the review was limited to review of evidence related to the commission of Assault in the First Degree and Attempted Murder in the First or Second Degree. *Id*. at 6.

Accordingly, the Instagram warrant was supported by probable cause and sufficiently particularized.  There is no basis to suppress the warrant.

### 2.      January 23, 2020 Instagram Warrant

On January 23, 2020, United States Magistrate Judge J. Mark Coulson authorized a warrant to search the Instagram records for five accounts, including David Warren's account "LA_Meshawn."  Ex. G (under seal).  Warren has not challenged this warrant, but to the extent

that he does, there is no doubt that the warrant is supported by probable cause and is not overbroad. The warrant affidavit explains that the FBI was investigating the Trained to Go ("TTG") and Young Go Getters ("YGG") gangs since September 2015. Id., ¶ 4. It details the YGG organization and explains how each Instagram account referenced in the warrant is used by a member or associate of the gang. It also notes that a confidential source told investigators that members and associates of the gang use Instagram direct messaging to communicate with each other to discuss criminal activities and to avoid phone surveillance. *Id.* The affidavit specifically describes Warren's role in the criminal activity. Investigators learned from a different confidential source that Harrison paid Warren to murder Chanette Neal and Justice Allen, the sister and mother of one of Harrison's rivals, Raytawn Benjamin. Id., ¶ 17. The confidential source told investigations that Warren made that admission and told the confidential source that Harrison paid him $25,000 for the murders. *Id.* Warren further relayed to the confidential source that when he was in the house, Warren and his associates had Justice Allen call Raytawn Benjamin to summon him to the house. *Id.* After Benjamin did not answer, Neal and Allen were killed. That information was corroborated when investigators identified on Allen's phone an outgoing call to Benjamin just prior to the murders. *Id*.

The warrant affidavit also connects the "LA_Meshawn" Instagram account to Warren, noting that the profile pictures of that account match Warren. *Id.*, ¶ 28.d. Investigators also knew that Warren's nickname was "Meshawn." *Id.* In short, there was more than enough probable cause to believe that the Instagram records included evidence of the crimes under investigation, violations of 18 U.S.C. § 1962 (Racketeering Influence Corrupt Organizations Act), 18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering), 18 U.S.C. § 922(g) (Felon in Possession of a Firearm), and 18 U.S.C. § 924(c) (Use of a Firearm in Furtherance of a Crime of Violence). *Id*. at

10. The warrant is also sufficiently particularized.  The Attachment B limits the search to evidence of the offenses under the investigation and within the timeframe April 17, 2017 through May 15, 2019.  In short, there is no basis to suppress the fruits of this warrant.

### 3.    September 24, 2018 State Court Order for Telecommunication Records

As discussed above, Warren has not yet moved to suppress the September 24, 2018 order authorizing the disclosure of telecommunication records for the electronic device with the number 443-453-8277, a known number used by David Warren.  But there is no basis to suppress the order since it was authorized by the functional equivalent of a warrant.

Baltimore County Circuit Court Judge Paul Hanley signed the order on September 24, 2018.  Ex. I.  The order was requested by a Baltimore County detective investigating the murder of John Eversley on July 26, 2018.  As discussed above, on August 16, 2018, David Warren was located within a marron Toyota Avalon, and officers recovered a Glock 22 .40 caliber handgun from within the car.  The handgun was later tested and determined to have been used in a number of murders and attempted murders in Baltimore City and Baltimore County, including the attempted murder of J.B., the murder of John Eversley, and the murder of Brian McKemy.

Investigators later plotted the cell-site information received in response to this order and discovered that Warren's phone was located in the area of 42 North Gorman Avenue at the time Chanette Neal and Justice Allen were killed *(*Overt Act #24).  The government intends to introduce that evidence at trial.

Despite the application and order being fashioned as an order "under Title 18 USC §2703(d)," it is readily apparent the application and court order meet all the requirements of a warrant under Federal Rule of Criminal Procedure 41.  The Supreme Court has "distilled three separate components of the warrant requirement."  *Dalia v. United States*, 441 U.S. 238, 255

(1979).  First, "[w]arrants must be issued by neutral, disinterested magistrates."  *Id.*  Second, those applying for a warrant "must demonstrate . . . their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense."  *Id.* (internal quotation marks omitted).  Third, "warrants must particularly describe the things to be seized, as well as the place to be searched."  *Id.* (internal quotation marks omitted).  An order that meets these requirements satisfies the Fourth Amendment's warrant requirement even if it goes by another name.  *Id.* at 256 (holding that a "court order" was a valid warrant "issued in full compliance with . . . traditional Fourth Amendment requirements").

Here, the order satisfied the Fourth Amendment's requirements.  It was issued by a neutral magistrate—a state judge.  There is a lengthy supporting affidavit that sets forth probable cause, including that Warren was in possession of the gun that was determined to be involved in the J.B. and John Eversley shootings in Baltimore County.  Ex. I at 2-3.  It is clear on the face of the documents that the affiant and the judge believed that a probable cause standard was necessary. In the order the Court found the following:

> there is ***probable cause*** to believe the records and information sought are relevant and material to an ongoing criminal investigation of a crime of Murder … and I am satisfied that there is ***probable cause*** to believe that the records and information described are within the control of the above described entity and that ***probable cause*** for issuance of this Court Order exists, as stated on the Application and Affidavit.

*Id.* at 5 (emphasis added).

While perhaps not artfully worded, the court mentions the probable cause standard three times in a single sentence.  Moreover, the affidavit is detailed and easily surpasses the probable cause standard.  A judge found probable cause sufficient to support the order, and that finding is afforded "great deference."  *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (internal

quotation marks omitted).   As to particularity, the order authorized investigators to obtain electronic device location information for a specific phone for a limited period.

In short, the order authorizing disclosure of the telecommunication records, including cell-site information, satisfies the Fourth Amendment's warrant requirement.   There is no basis to suppress evidence obtained through this order.[7]

Even assuming *arguendo* that the Court finds that the order did not meet the warrant requirements, the exclusionary rule should not apply because the investigators relied on the order in good faith.   *See Leon*, 468 U.S. at 922.   The detective sought this order only a few months after the Supreme Court decided *Carpenter v. United States*, 138 S.Ct. 2206, 2221 (2018), where the court held that cell-site information must be acquired via a warrant.   The detective applied for an order based on a probable cause standard and a "reasonably well trained officer" would not have known that a formalistic requirement to apply for a warrant was required, rather than an order that was still supported by probable cause.

---

[7] Additionally, at the time of this order, Maryland law authorized courts to issue "an order" authorizing law enforcement to "obtain location information from an electronic device." Md. Code Ann., Crim. Proc. § 1-203.1(b)(1) (2018).   Importantly, the law required the requesting officer to swear, upon a written affidavit, that a factual basis existed for finding probable cause that the location information was or would lead to evidence of a crime.   Id. §§ 1-203.1(b)(1)(ii), (b)(2).   It also required that a resulting order "describe with reasonable particularity[] the type of electronic device," the "user of the electronic device," and "the grounds for obtaining the location information," among other things.   Id. § 1-203.1(b)(3) (emphasis added).   The statute expressly incorporated all the warrant requirements.   *See Whittington v. Maryland*, 230 A.3d 148, 166 (Md. Ct. Sp. App. 2020) (finding that the statute "embodies all of the warrant requirements inhering in the Fourth Amendment.")   The order issued by Judge Hanley certainly complied with all these requirements as well.

V.   **Response to Warren's and Harrison's Motions to Suppress Evidence from Cell Phone Searches (ECF No. 108 and 135)**

A.   **Legal Standard**

In *United States v. Pratt*, the Fourth Circuit highlighted, "[a] seizure that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.'" 915 F.3d 266, 271 (4th Cir. 2019) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).   "To determine if an extended seizure violates the Fourth Amendment, [courts] balance the government's interest in the seizure against the individual's possessory interest in the object seized." *Pratt*, 915 F.3d at 271. The "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" not perfection. *United States v. Burton*, 756 F. App'x 295, 300 (4th Cir. 2018) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). And there is no bright line rule that a delay in obtaining a warrant of a particular length is *per se* unreasonable.

In evaluating the government's interests, courts consider whether the government "exercise[d] diligence" in its investigation. *Id.* at 271.  In *United States v. Reaves*, this Court found that an almost one-month delay in obtaining a search warrant to search cell phones was reasonable since government investigators worked "diligently" to obtain a warrant.  Case No. JKB-20-0443, 2022 WL 717451, at *2 (D. Md. Mar. 10, 2022).   "Furthermore, a 'delay' in securing a warrant can be justified by 'overriding circumstances,' *Pratt*, 915 F.3d at 272, such as law enforcement's need to 'attend to other and higher law enforcement priorities.'" *United States v. Kamara*, 2023 WL 8357946, at *3 (E.D. Va. Dec. 1, 2023) (*quoting United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013).

In evaluating an individual's possessory interest, courts in this District consider whether the defendant "strongly resisted a search and seizure, [] remains free from police custody, [and]

maintains an undiminished interest in the item that the Government has seized." *United States v. Dorsey, et al.*, Case No. RDB-18-0347, ECF No. 109 at 8-9 (D. Md. Aug. 13, 2019) (*citing Pratt*, 915 F.3d at 271-72). "[A]n individual who is incarcerated, and therefore has no access to a seized item, has a significantly diminished possessory interest in that item." *Id.* at 9 (*citing United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015).

## B.     Harrison's Motion (ECF No. 108)

Harrison argues that evidence from the cellphone seized from him on July 23, 2018 should be suppressed for two reasons: 1) the initial seizure was unreasonable and 2) the delay between seizure and search of the cell phone was unreasonable. His arguments are unavailing. Law enforcement had probable cause to seize his phone—Harrison was the target of a shooting and law enforcement knew at the time that he was the leader of the Young Go Getters ("YGG"), a gang known for engaging in drug dealing and violence. Law enforcement had probable cause to believe that evidence of motive for the shooting would exist on his phone. Additionally, the delay was entirely reasonable. There is no evidence that Harrison ever requested his phone following seizure; he effectively abandoned it. And throughout the period of delay, law enforcement was working on numerous, consequential investigations.

### 1.     Relevant Facts

On July 23, 2018, at approximately 12:40 a.m., Harrison walked into Sinai Hospital for treatment. He told hospital staff that he was driving north on I-83 when he was shot multiple times, including in the abdomen, bicep, and arm. BPD Detective David Kincaid, a detective within the Citywide Shooting division at the time, took over primary responsibility of the investigation. He responded to Sinai Hospital. Detective Kincaid will testify that Harrison refused to provide information on the incident; Harrison said he did not remember anything from the shooting nor

what he did before the shooting.  Pursuant to the investigation, officers seized Harrison's property, including $3,360 and a black cell phone.

Detective Kincaid then provided Sgt. Joseph Landsman, a TFO with the FBI Baltimore Safe Streets Violent Gang Task Force, with Harrison's phone.  He also provided the FBI with a draft warrant affidavit for Harrison's phone.  Harrison was known to investigators at the time as the leader of the YGG gang and as someone who associated with the violent Trained To Go ("TTG") gang.  At the time that Sgt. Landsman received Harrison's phone, Sgt. Landsman was occupied with numerous investigations, as well as the trial of Montana Barronette and other members and associates of the TTG gang.  The defendants were convicted on October 31, 2018 after a 24-day trial.  Sgt. Landsman was a lead investigator on that case. Sgt. Landsman will testify that the work preparing for and conducting the trial was substantial.  Sgt. Landsman had numerous responsibilities, including witness preparation and evidence gathering.  Sgt. Landsman was also working at the time on an investigation of the Young Finesse Kings ("YFK") gang, which included a Title III Wiretap investigation.

Much of Sgt. Landsman's investigatory work at the time related in some way to Davante Harrison, but he will testify that it was not until around April 2019 where the investigation into acts of violence orchestrated by Harrison picked up steam.  Around that time, he learned from two sources who provided information that would be admissible in court that Harrison was responsible for paying hitmen to murder his rivals and their family members. Indeed, those two sources will testify in the upcoming trial.  On April 11, 2019, Sgt. Landsman applied for a warrant that was signed by Baltimore City Judge L. Robert Cooper.  Ex. J (under seal)

The government anticipates that Detective Kincaid will corroborate Sgt. Landsman's testimony.  Only a week after the July 23, 2018 shooting of Harrison, Detective Kincaid was

assigned as a TFO with FBI Baltimore Safe Streets for a 6-month period.  He'll testify that during that six-month period, he was focused on the TTG trial and a wiretap investigation.  He did not specifically investigate Harrison at that time.

Critically, neither Sgt. Landsman nor Detective Kincaid received any indication that Harrison ever requested the return of his cell phone seized on July 23, 2018.  Detective Kincaid was the lead detective on the shooting, and Sgt. Landsman was the officer who took custody of the phone.  Both will testify that they have been contacted in the past in other cases when individuals requested the return of their phones (or other property).  That did not happen in the case of Harrison.  He never asked for his phone back, nor any of his property seized on July 23, 2018, including several thousand dollars in cash.

The government intends to introduce significant evidence from Harrison's cell phone at trial.  For example, on March 14, 2018, Harrison received a message on his cell phone which included a photograph that depicted David Warren brandishing an assault rifle.  The message wrote, "I'm a young bitch with a lot of power don't make me shut down your hood."  The sender added: "delete this after you see it."  Additionally, after Harrison's rivals, Ryan Brunson a/k/a "2raw" and Raytawn Benjamin a/k/a "Hangy," went on Instagram Live on April 2, 2018, and accused Harrison of being a "rat," Harrison's sister texted him.  She wrote, "[t]hat 2raw n**** all on the life [*i.e.*, Instagram Live] trynna day [sic] you a rat…"  Harrison replied, "I know.  Don't worry it's going be all good."  Two days later, on April 4, 2018, Raytawn Benjamin's mom and sister were murdered in their home (Overt Act 24).  Following the murders, Harrison exchanged messages over his cell phone with his girlfriend and the mother of his child about moving out of town out of fear that they would be targeted for violence in retaliation.

2.    **Argument**

Harrison claims that the officers seized his phone on July 23, 2018 without a legal basis. That argument is meritless for two primary reasons. First, Harrison was shot at numerous times, and it was known to investigators that Harrison was the leader of a violent gang disputing with others in Baltimore. Given that, there was probable cause to believe that evidence related to the shooting, including the nature of Harrison's disputes with others, would exist on the cellphones. Additionally, officers had probable cause to believe that the cell phone contained evidence related to Harrison's other known criminal activity. Cell phones contain significant information about an individual's dealings, including criminal dealings, in the form of messages, photos, and location information. Accordingly, officers had probable cause to seize Harrison's cell phone.

Next, Harrison argues that the delay between the seizure of his phone on July 23, 2018 and the search of the phone on April 11, 2019 was unreasonable. As noted above, in assessing whether a delay is unreasonable, courts balance the defendant's possessory interests with the government's interest in the evidence. *Pratt*, 915 F.3d at 271.

Here, the balancing can start and end with the defendant's lack of any possessory interest in the phone. At no point, despite being out of jail during that timeframe, did Harrison ever ask for his phone back despite his conclusory claim in his motion. And he had the ability to do so. The homicide file in the April 2018 double murder on Gorman Avenue indicates that Harrison was represented around that time by an attorney. Harrison's attorney called investigators following those murders and informed them that Harrison was not interested in speaking with law enforcement. There is no evidence that Harrison, or his attorney, ever reached out to BPD or the FBI for his phone. Harrison or his attorney could have done so. Indeed, his attorney did contact BPD on behalf of Harrison just months prior to the shooting in July 2018. And yet there is no evidence that he, any other representative of Harrison, or Harrison himself asked BPD or the FBI

47

for the phone.  Harrison effectively abandoned the phone, as if he threw it out of a car window.  The law is well established that a person who voluntarily abandons property . . . is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995).   This principle applies to cellphones, too. *See United States v. Smalls*, 944 F.3d 490, 504 (4th Cir. 2019) ("In tossing his phone, he relinquished his reasonable expectation of privacy in it as well.").  By declining to ask for his phone back, and by getting a new phone after its seizure, Harrison abandoned his interest in the phone.   In *Dorsey*, Judge Bennett found that a defendant who was "*not detained* between December 31, 2015 and August 9, 2016" abandoned his phone by failing to "contest its seizure or otherwise seek its return." *Dorsey*, 2019 WL 3804113, at *13.  Harrison was similarly not detained for the 9-month delay, and similarly failed to request the return of his phone.  In short, Harrison's possessory interest in the phone was virtually non-existent.  He made no efforts to get it back; he essentially abandoned it to law enforcement. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (noting that defendants who never sought return of the property could not show that delay adversely affected Fourth Amendment rights).

Considering Harrison's diminished possessory interest in the phone, even a slight showing of government interest should tip the scale in favor of the government.  But here, the government's interest is significant.  First, for the reasons stated above, there was probable cause to believe that the phone would contain evidence of the non-fatal shooting under investigation, including information regarding Harrison's rivals that may have been responsible for the shooting.  Second, investigators knew that Harrison was the leader of a gang engaged in drug trafficking and violent crime.  Again, there was probable cause to believe that Harrison's phone would contain evidence of that activity.  Finally, despite the 9-month delay, the government was diligent.  Sgt. Landsman

will testify, as noted above, that he was working on other significant matters and that the Harrison investigation did not take off until around April 2019.  Investigators at the FBI took custody of the phone but were not sitting on their hands.  They were focused on important and weighty matters. Additionally, as the phone warrant affidavit indicates, in April 2019, right before seeking the warrant, investigators heard from two sources that Harrison was responsible for hiring hitmen to murder his rivals and their family members.

The balancing in this case weighs decisively in favor of the government, primarily due to Harrison's lack of a possessory interest.  But even assuming that the delay was unreasonable (which it was not), suppression is not the appropriate remedy.  The Supreme Court "ha[s] repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 140–41 (2009).  Instead, courts should consider "the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial costs." *Id*. at 141.  Therefore, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. United States*, 564 U.S. 229, 238 (2011) (*quoting Herring*, 555 U.S. at 143).  Exclusion is not warranted in cases where "police act with an objectively reasonable good-faith belief that their conduct is lawful," or "when their conduct involves only simple, isolated negligence." *Id*. (internal quotations omitted).

At least one court in this District has held that an "officers' delay in obtaining a search warrant [], even if ultimately found to have run afoul of the Constitution, does not require suppression because the delay was attended by good faith." *Dorsey*, 2019 WL 3804113 at *19. The court continued, "where the possessory interest is so slim, and infringement of that interest so

slight, this Court may safely conclude the government agents acted in good faith by delaying their pursuit of a search warrant." *Id*. at 20.

Here, law enforcement seized Harrison's phone months before *Pratt* was decided[8] and there is no evidence to suggest that the investigators were acting deliberately or recklessly. Rather, they were working diligently on significant cases, while continuously developing evidence of Harrison's criminal activity, and there was no indication that they were impeding in any way upon Harrison's possessory interests since he never asked for the phone back.

## C.    Warren's Motion (ECF No. 135)

Warren moves to suppress the evidence obtained from three cellphones: 1) a phone seized from him on May 2, 2018 pursuant to his arrest; 2) an iPhone seized from a maroon Toyota Avalon searched on August 16, 2018; and 3) a black LG phone seized from that same vehicle that day. ECF No. 135 at 2. Warren argues that the evidence from the phones should be suppressed given the delay between seizure and law enforcement obtaining a search warrant, because the warrants lacked particularity and were overbroad, and because the warrant affidavits failed to establish probable cause.

As an initial matter, the government does not intend to introduce evidence from the black LG phone seized on August 16, 2018. With respect to the iPhone seized that day from the Avalon, Warren lacks standing to challenge the warrant for the simple fact that it was not his phone. The phone belonged to Wayne Prince, Warren's co-defendant who pled guilty.

Warren's arguments to suppress the phone seized from him on May 2, 2018 are meritless. The delay was reasonable. Warren lacked any possessory interest in the phone as he was in prison for the vast majority of the time period between seizure and the search warrant authorization.

---

[8] The Fourth Circuit issued its opinion in *Pratt* on February 8, 2019. 915 F.3d 266.

Conversely, the government's interest was significant—it was seized from him incident to arrest and over time investigators were building evidence of Warren's involvement in violent crime. The phone in question was seized from Warren less than one month after he took part in the double murder at Gorman Avenue on April 4, 2018 (Overt Act 24). Moreover, the warrant is not overbroad; it is specifically limited to evidence related to murder. Finally, the affidavit provides ample evidence supporting probable cause.

### 1.   David Warren Phone Seized on May 2, 2018

#### i.   Relevant Facts

As described in Section I.B.2., Warren was arrested on May 2, 2018 by BPD officers for the unlawful possession of ammunition. Incident to that arrest, Detective Romeo seized a silver iPhone from Warren's person. The phone was submitted to ECU. On August 16, 2018, Warren was again arrested, this time for possession of a firearm that was ultimately determined to have been used in a number of shootings in Baltimore City and Baltimore County from March through August 2018, including the murder of Brian McKemy on August 7, 2018 and the non-fatal shooting of J.B. on June 27, 2018 in Baltimore County. Warren was ultimately convicted for the shooting of J.B. He has been incarcerated since August 16, 2018.

Sgt. Landman will testify that law enforcement's investigation into Warren's role in the double murder on Gorman Avenue progressed over time. Sgt. Landsman detailed that progression in the warrant affidavit for the phone seized on May 2, 2018. *See* Ex. K. Sgt. Landsman will testify that there were certain key breaks in the investigation in 2020, including that on October 16, 2020, he took possession of a .357 caliber handgun recovered by the Maryland Department of Transportation Authority in October 2019. That firearm was a ballistics match to .357 caliber shell casings found inside the residence of 42 North Gorman on April 4, 2018. Investigators discovered that the firearm matched in appearance a firearm displayed in a photograph on David Warren's

Instagram account "LA_Meshawn." The photograph was taken only hours prior to the double murder on April 4, 2018.  It was after that discovery that Sgt. Landsman decided to seek a warrant for the phone seized from Warren on May 2, 2018, only 28 days after the murder of Chanette Neal and Justice Allen.  On October 22, 2020, Baltimore City Circuit Court Judge Catherine O'Malley authorized the warrant.  Ex. K.

Detective Romeo, who seized the phone from Warren, and Sgt. Landsman, who later took possession and authored the warrant affidavit, will both testify that at no point did Warren ask for the phone.  Warren was familiar with Detective Romeo, who patrolled the Eastern District where Warren set up shop and had arrested Warren on numerous occasions.  At no point between May 2, 2018, and when Detective Romeo was again involved in Warren's arrest on August 16, 2018, did Warren ask him for the phone.  Detective Romeo and Sgt. Landsman will testify that in the past they have been contacted by ECU when defendants requested the return of property.  Here, no such contact was made.  Moreover, Warren was incarcerated following his arrest on August 16, 2018, and has not been released since.

The government intends to introduce significant evidence from that cell phone at trial, including the photograph of Warren with the murder weapon on April 4, 2018 and critical text messages that Warren sent and received prior to, and following, the attempted murder of J.A. on February 23, 2018 (Overt Act 16).

## ii.   Argument

Turning first to Warren's argument that the delay between seizure on May 2, 2018 and the search warrant in October 2020 was unreasonable.  There is no doubt that an over two-year period is lengthy and likely longer than this Court typically sees.  But the reasonableness of the delay

turns on the particular circumstances, and here, the balancing test set out in *Pratt* weighs decisively in the government's favor.

In evaluating an individual's possessory interest, courts consider whether the defendant "strongly resisted a search and seizure, [] remains free from police custody, [and] maintains an undiminished interest in the item that the Government has seized." *Dorsey,* 2019 WL 3804113 at 8-9 (*citing Pratt*, 915 F.3d at 271-72). "[A]n individual who is incarcerated, and therefore has no access to a seized item, has a significantly diminished possessory interest in that item." *Id.* at 9 (*citing United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015).

Here, Warren has established no possessory interest in the cellphone. There is no evidence that he asked for it in the three months between his arrests on May 2 and August 16, 2018. *Johns*, 469 U.S. at 487 ("Respondents do not challenge the legitimacy of the seizure of the trucks or the packages, and they never sought return of the property. Thus, respondents have not even alleged, much less proved, that the delay in the search of the packages adversely affected legitimate interests protected by the Fourth Amendment."). As noted above, Warren and Detective Romeo had numerous run-ins and at no point did Warren seek the return of his property. Once Warren was in custody on August 16, 2018, he had no use for the cellphone because he was in prison. Warren's possessory interest in the cellphone was severely diminished.

The government's interest, on the other hand, is significant. The phone contains substantial evidentiary value related to violent crimes. It was seized from Warren incident to arrest, and in light of the information that individuals keep on their cell phone, there was probable cause to believe that it contained evidence of his criminal activity. And as noted above, from the point of seizure until the phone warrant was authorized, investigators were filling out the picture of Warren's involvement in murders and non-fatal shootings between March and August 2018.

Sgt. Landsman's affidavit for the search warrant details that process, culminating in law enforcement connecting Warren to the Gorman Avenue murder weapon in October 2020. Sgt. Landsman worked diligently throughout that period on various investigations, including on his investigation into Warren's role as a contract killer for Harrison. Sgt. Landsman did not just sit on the phone; he "exercise[d] diligence" throughout the relevant time period. *Pratt*, 915 F.3d at 271. There was no unreasonableness in that delay.

In short, the *Pratt* balancing test decidedly favors the government. But even if the delay was unreasonable (which it was not), for the same reasons discussed above in Section V.B.2., the evidence should not be suppressed in light of the good-faith doctrine. Warren's possessory interest was "so slim," and the Court "may safely conclude the government agents acted in good faith by delaying their pursuit of a search warrant." *Dorsey*, ECF No. 109 at 20.

Next, Warren contends that the cell phone warrant is not supported by probable cause and is overbroad. Not so. The warrant application notes that the phone contains "evidence related to the murder of Chanette Neal and Justice Allen, and the search warrant itself limits the search to "evidence related to murder." *See* Ex. K at 4. And the affidavit contains considerable evidence to support a probable cause finding that Warren was engaged in the act of murder. For example, the affidavit explains that historical cell-site information placed Warren at the scene of the double murders at Gorman Avenue, and he posed with the firearm used in the murders just hours earlier that day. Moreover, because Warren had a selfie-style photograph on his social media account of the firearm, it stood to reason that Warren took that photograph with his cell phone. *See United States v. Ventresca*, 380 U.S. 102, 108 (1965) (finding that the statement of probable cause need not be written with "[t]echnical elaborate specificity"); *United States v. Bynum*, 293 F.3d 192, 197

(A "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant.").

The warrant to search Warren's phone seized incident to his arrest on May 2, 2018, less than a month after his involvement in the double murder at Gorman Avenue, was supported by probable cause and sufficiently particularized.  Moreover, the delay was not unreasonable, given the lack of any possessory interest for Warren weighed against the government's significant interest in the cell phone.

### 2.      Wayne Prince's Phone Seized on August 16, 2018

Warren also moves to suppress the iPhone seized from the Toyota Avalon on August 16, 2018 by Detective Romeo.  The ATF investigation and arrest of Warren is described in detail in Section I.A.4.  Warren also made a statement that day, discussed in Section II.B.3.  Critically, Warren told detectives that numerous individuals were in and around the Avalon that day, and that when law enforcement converged, everyone except for him ran.

As a threshold matter, Warren lacks standing to challenge the warrant authorized on September 25, 2020 by Baltimore City Circuit Court Judge Flynn Owens.  Ex. L.  At the time, investigators believed that it might be Warren's phone, but when it was downloaded, it was determined that it was in fact Wayne Prince's pone. While there was evidence that Warren borrowed the phone from Prince on occasion, the returns indicated that it was Prince's phone and he was the person who predominantly possessed it.  The Apple IDs associated with the phone are Wayneprince100@yahoo.com, Murray.jb98@icloud.com, and Wayneprince20@icloud.com. The subscriber for the cell phone was Shafel Prince, Wayne Prince's mother.   Messages and photographs also reveal that it was Prince's phone.

Fourth Amendment rights "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134. The defendant bears the burden of showing that he had a legitimate expectation of privacy in the area searched, by establishing that he had either an ownership or possessory interest in the property. *United States v. Castellanos*, 716 F.3d 828, 833–34 & n.4 (4th Cir. 2013). Warren has not demonstrated that he has any "legitimate expectation of privacy" in Prince's cell phone. Warren's occasional use of Prince's phone does not establish a legitimate expectation of privacy in the device. Since it was not his phone, he would have been aware that Prince could have done whatever he wanted with the phone, including consenting to a law enforcement seizure and search. Given that reality, he had no reasonable expectation of privacy and, therefore, he lacks standing to challenge the search of the phone.

Even if the Court finds that Warren has standing (which he does not), the warrant should not be suppressed for all of the reasons discussed above regarding the warrant seized from Warren on May 2, 2018. Warren has been in prison continuously from the day it was seized. And the government's interest is significant. It was seized from the Toyota Avalon on August 16, 2018. Nine days earlier, that car was used during the shooting at Woodlea Avenue where Brian McKemy was murdered. Also seized from the Avalon that day was a Glock .40 caliber handgun, the same handgun used during the shooting at Woodlea Avenue. Investigators were working diligently throughout the relevant time frame to piece together Warren's involvement in various violent

crimes perpetrated in 2018.  Accordingly, the government's interest in that phone was significant.

The warrant should not be suppressed.[9]

## VI.   Response to Harrison's Motion to Suppress Tangible, Derivative Evidence and Statements Pursuant to Federal Rule 12(b)(3) (ECF 112)

Harrison moves to suppress any evidence seized from a leather Dolce & Gabbana "man

bag," a Toyota Camry, and 111 W. Heath Street, Apartment 513, Baltimore, MD.  Harrison also

moves to suppress any statements he made on November[10] 25, 2019, in violation of the Fourth,

Fifth, and Sixth Amendments.  For the reasons stated below, Harrison's motions should be denied.

### A.   Relevant Facts

On August 20, 2021, Harrison was convicted in the United States District Court for the

District of Maryland of conspiracy to distribute controlled substances, possession with intent to

distribute heroin, possession of a firearm by a prohibited person, and possession of a firearm in

furtherance of a drug trafficking crime arising out of events that occurred on November 25, 2019.

CCB-19-575.  On that date, federal agents executed search warrants for Harrison's person and for

the residence located at 111 W. Heath Street, Apartment 513 in Baltimore.  Ex. N (under seal)

(Search Warrants and Affidavit).  Probable cause for the search warrants was established through

---

[9] Notably, a prior warrant for this very cell phone was authorized by Judge A. David Copperthite on September 11, 2019, only a few weeks after it was seized from the Avalon on August 16, 2018. Ex. M (under seal).  An ATF agent sought that warrant as it related to ATF's investigation into Warren and his drug trafficking organization, as described in Section I.B.4 above.  The download of the phone following authorization of the warrant had been provided in discovery, and the government just located the signed warrant.  Warren has not challenged that warrant.  There is no indication that Sgt. Landsman was aware of this warrant when he applied for the state court warrant in September 2020.

[10] The opening paragraph of defendant's Motion to Suppress (ECF 112) states that Harrison moves to suppress evidence seized and statements made on "September 25, 2019."  This appears to be a typo in that the facts contained in the motion occurred on November 25, 2019.

various means, including confidential source information, physical surveillance, pole camera footage, and a canine scan of a target vehicle that was parked behind the W. Heath Street address.

Using court authorized cellphone and vehicle tracking information, agents observed Harrison exit an apartment building in Cockeysville. They approached and detained Harrison, who was wearing a satchel over his shoulder. Agents executed the search warrant for Harrison's person and located a cellphone and a set of keys on his actual person. Agents removed the over-the shoulder Dolce & Gabbana bag and searched it, recovering a Glock firearm with an extended magazine and U.S. currency. Sgt. Landsman immediately advised Harrison of his *Miranda* right, at which time Harrison made unsolicited comments comparing his Glock firearm to the one carried by police. Harrison also said something to the effect of "it was stupid to walk outside with a gun." Agents asked Harrison if they could search the rental vehicle and he agreed, adding, "you're going to search it anyway." The vehicle, a Toyota Camry, had been rented in the name of "Deanna Haney," Harrison's girlfriend and a resident of 2107 Kalb Manor Road—Harrison's residence and a location searched earlier by an investigative team. Inside the vehicle's center console, investigators located a clear cellophane bag containing distribution quantity of controlled substances.

In Harrison's prior case before the Honorable Catherine Blake, he filed a motion to suppress, challenging the search of the rental vehicle. Notably, Harrison did not challenge the search of the bag on his person from which agents recovered a firearm. Rather, Harrison's only challenge was that he denied giving consent to search the rental vehicle from which agents recovered controlled substances. CCB-19-575, ECF No. 63. After a motions hearing conducted on July 7, 2021, the court found that the agents adequately advised Harrison verbally of his

*Miranda* rights and that Harrison provided knowing and voluntary consent to search the rental vehicle.  The court denied the motion.  CCB-19-575, ECF No. 70.

### B.  Argument

Harrison's claims are all without merit and should be denied.  The search of the satchel worn over his shoulder was permissible given that the bag was an extension of Harrison's person, for whom agents had a warrant to search.  With respect to the search of the rental vehicle, Harrison is collaterally estopped from re-litigating the exact same issue already ruled upon by Judge Blake in a case that arose out of the same events that occurred on November 25, 2019.  Should this court find that Harrison is not collaterally estopped from relitigating the exact same issue here, the motion should still be denied as Harrison gave the agents on scene consent to search.  If the court concludes that the evidence from the rental vehicle was unlawfully obtained, the evidence is still admissible under the inevitable discovery doctrine as agents had ample probable cause to obtain a search warrant.  With respect to the statements blurted out by Harrison about the gun found in the satchel, these statements were not in response to any questions by police and therefore not in violation of Harrison's constitutional rights.

### 1.  The search warrant for 111 W. Heath Street, Apartment 513, and Harrison's person was supported by probable cause.

The affidavit established probable cause to believe that evidence of criminal activity would be found by searching specific residences including 111 W. Heath Street, Apartment 513 and specific persons including Harrison.  Harrison asserts that the affidavit misled the magistrate judge because it contained information that the affiant knew was false, but he fails to specify any alleged falsehood, stating only that "[t]he basis for probable cause was misleading and slanted opinions were created without a basis."  ECF 112 at 5.  Harrison seems to argue that the warrant was issued based solely on conclusory statements of "CS-1" and the affiant.  Harrison's characterization is

wildly inaccurate and completely ignores observations and information gathered during the investigation.

Evidence obtained from Harrison's person should not be suppressed because the evidence was seized pursuant to a facially valid search warrant, supported by probable cause, and issued by a neutral magistrate.  In reviewing a search warrant application, a magistrate judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause may be established through information from any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip which has been corroborated, *Gates,* 462 U.S. at 241.   The court should look at the "totality of circumstances" in determining assessing the reliability of informant information.  *Id*. at 241.  This "totality of the circumstances analysis is more in keeping with the practical, common-sense decision demanded of the magistrate."  *Massachusetts v. Upton,* 466 U.S. 727, 732 (1984) (rejecting the lower court's approach in dissecting bits and pieces of information in isolation).

A court reviewing a judge's assessment of probable cause must accord his or her decision "great deference," and should not invalidate a warrant by interpreting an affidavit in a "hypertechnical, rather than a commonsense, manner."  *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 510 U.S. 983 (1993) (*quoting Gates,* 462 U.S. at 236).  The law requires only that an affidavit demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir.

2011) (quoting United *States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994).  That standard is amply satisfied here.

Here, a commonsense reading of the search warrant affidavit for Harrison's person and the W. Heath Street apartment demonstrate that the magistrate judge had a substantial basis for concluding the warrants were supported by probable cause.  The affidavits set forth enough information to form a considerable basis that a search would uncover evidence of wrongdoing— namely, evidence of drug trafficking activity.  Contrary to Harrison's assertion, the probable cause finding was not based solely on the conclusory statements of the confidential source and affiant. First, the affidavit detailed the information provided by CS-1, whose track record and reliability were included, namely that Harrison was a cocaine supplier in Baltimore.  Ex. N, Affidavit p. 8. The information provided by CS-1 was corroborated in various ways.  Harrison's rap lyrics describe factual drug trafficking activities and other violent crimes.  As detailed in the affidavit, in one video Harrison raps with another individual, Damont Brown, whom agents learned from another confidential source, CS-2, ran a drug shop for Harrison at Braddish Avenue and North Avenue.  Ex. N, Affidavit p.8-10.  According to the affidavit, on one occasion the two men were also seen leaving the 111 W. Heath Street address together.  *Id*. at p. 19.  Agents corroborated Brown's drug trafficking activities through physical surveillance, pole camera footage, and a jail call in which Brown described the drug shop to an inmate.  *Id*. at 8-11.

The affidavit also included a wealth of information about Harrison's movements and activities during the drug trafficking investigation.  Investigators observed him traveling to and from various locations, including the W. Heath Street address, making quick stops indicative of a drug or money transaction, and conducting what appeared to be countersurveillance.  Ultimately, investigators conducted a canine scan on a target vehicle that was parked in the rear of the W.

Heath Street building and received a positive alert for the presence of controlled substances in the car.  All these facts corroborated the information provided by CS-1 with respect to Harrison and even CS-2 with respect to Brown, establishing probable cause to search Harrison's person and the residence.

> **2.    The search of the shoulder bag was lawful because it was part of Harrison's person.**

The search of the Dolce and Gabbana bag was lawful as agents had a search warrant for Harrison's person authorizing them to search for and seize controlled substances and paraphernalia, among other items.  The bag Harrison wore over his shoulder was essentially so closely related to the concept of his person that it was reasonable and permissible for agents to remove and search its contents pursuant to the warrant.

In *United States v. Graham*, officers obtained a search warrant for the defendant's person and apartment authorizing police to seize evidence of controlled substance crimes.  638 F.2d 1111 (7th Cir. 1981).  Officers waited outside of defendant's apartment building until they saw him arrive in a vehicle and they approached him as he exited, stating that they had a search warrant for his person.  *Id*. at 1112.  Like Harrison, the defendant was wearing a shoulder bag at the time he was stopped by police.  *Id*.  One of the officers removed the shoulder bag from the defendant's person and searched its contents, locating a small quantity of marijuana and an incriminating U.S. Treasury check.  *Id*.  The defendant challenged the seizure of those items, arguing that the officers exceeded the scope of the search warrant, which he alleged was only for his person.  In concluding that the search of the shoulder bag was in fact within the scope of the warrant, the court stated,

> …it is our opinion that a shoulder purse carried by a person at the time he is stopped lies within the scope of a warrant authorizing the search of his person. The human anatomy does not naturally contain external pockets, pouches, or other places in which personal objects can be conveniently carried. To remedy this anatomical deficiency clothing contains pockets. In addition, many individuals carry purses or

shoulder bags to hold objects they wish to have with them.  Containers such as these, while appended to the body, are so closely associated with the person that they are identified with and included within the concept of one's person.

*Id.* at 1114.

As agents approached Harrison to execute the search warrant for his person, it was reasonable for them to identify and include the Dolce &Gabbana shoulder bag as part of Harrison's person.  The warrant authorized agents to search for and seize evidence of drug activity, evidence that could have easily and conveniently been carried in Harrison's pants pocket or shoulder bag.  Notably, Harrison does not cite any case supporting his argument that a shoulder bag is not an part of the person.  There was no Fourth Amendment violation here.

### 3.   Harrison is precluded from relitigating the issue of consent after having already had a full and fair opportunity in a previous case.

In just three sentences, Harrison challenges the search of the Toyota Camry, claiming that he did not give the officers consent.  ECF 112 at 4.  Harrison is precluded from re-litigating this issue as he was the defendant in a previous case in this district arising out of the same facts on November 25, 2019, and had a full and fair opportunity at a previous motions hearing on the issue of consent.

The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit.  *In re Corey*, 583 F.3d 1249, 1251 (10th Cir. 2009).  In criminal prosecutions, as in civil litigation, the issue-preclusion principle means that an issue of ultimate fact determined by a valid and final judgment cannot be litigated between the same parties in a future lawsuit.  *Bravo-Fernandez v. United States*, 580 U.S. 5, 7-8 (2016). It prevents a litigant from taking two bites at the apple, thus conserving judicial resources and providing consistent decisions. *Id.  See United States v. Clark*, 906 F.3d 667, 671 (7th Cir. 2018). This principle of issue preclusion, also known as collateral estoppel, applies in federal

criminal cases. *See Ashe v. Swenson*, 397 U.S. 436, 443 (1970).  For the defense, asserting collateral estoppel or issue preclusion protects against a second prosecution for the same offense after conviction or acquittal.  *Bravo-Fernandez*, 580 U.S. at 9.  Offensive issue preclusion is raised by the government when seeking to preclude re-litigation of an issue already decided against a defendant in a prior proceeding.

In order to succeed with an issue preclusion argument, the asserting party must establish that the "the issue to be precluded must have been actually and necessarily decided in the prior case." *United States v. Arterbury,* 961 F.3d 1095, 1103 (10th Cir. 2020) (*citing Willner v. Budig,* 848 F.2d 1032, 1034 (10th Cir. 1988) (per curiam)).  Additionally, the party against whom issue preclusion is invoked "must have had a full and fair opportunity in the earlier case to litigate the issue to be precluded."  *Id*. (citation omitted).  In *United States v. Benkahla*, the Fourth Circuit addressed the use of defensive collateral estoppel by a criminal defendant who was acquitted of attending a jihadist training camp located in Afghanistan. 530 F.3d 300 (4th Cir. 2008).  Benhahla was later charged with falsely denying that he attended such a camp, and he claimed that collateral estoppel barred the subsequent prosecution.  *Id*. at 306.  The court had to determine whether the two trials involved an "identical" issue "necessarily adjudicated" in the first, *United States v. Nash*, 447 F.2d 1382, 1386 (4th Cir.1971); or whether an "identical" issue was "actually" and "necessarily decided" in the first trial, after "a full and fair opportunity to litigate" and a "final and valid" judgment, *United States v. Fiel*, 35 F.3d 997, 1006 (1994); or again whether "certain facts were necessarily determined in the first trial" that "constituted ultimate issues" in the second, *United States v. Yearwood*, 518 F.3d 220, 229 (4th Cir.2008) (quotation omitted).  *Benkahla*, 530 F.3d at 307.  Ultimately, the court in *Benkahla* concluded that the two trials did not involve an identical issue as the first investigation and trial, which was specific to whether the defendant

attended a training camp in Afghanistan.  Because the government was still actively investigating whether the defendant and others attended jihadist training elsewhere it was permissible for the government to pursue a false statement charge.  *Id.* at 308.  These factors used to consider defensive criminal collateral estoppel appear to be similar to the factors other courts examine in determining whether to apply *offensive* criminal collateral estoppel to preclude a defendant from re-litigating a suppression ruling.  *United States v. Holmes*, 699 F. Supp. 2d 818, 835–36 (E.D. Va. 2010), aff'd, 670 F.3d 586 (4th Cir. 2012).

In *Holmes*, the government raised issue preclusion or offensive collateral estoppel and argued that the defendant should not be permitted to re-litigate a motion to suppress that was ruled upon in an earlier prosecution.  Holmes was originally charged in a federal indictment with charges involved sexual abuse of a minor.  *Id*. at 824.  The indictment was dismissed because he was still an active military member subject to a military court martial.  *Id*.  Later that same year after Holmes was discharged, he was federally indicted a second time in the same district, again charged with sexual abuse of a minor.  Among the motions litigated was Holmes' motion to suppress statements, which was denied after a hearing.  *Id*.  Holmes entered a guilty plea but prior to being sentenced, the court dismissed the indictment based on a venue issue.  *Id*.  A month later, the defendant was federally indicted a third time in the same district for the same charges. *Id*.  The government filed a motion to preclude a re-litigation of the motion to suppress statements.  In denying the motion, the court reasoned, "the Government cannot show that there was a final and valid judgment after a full and fair opportunity to litigate, as the indictment on which the court denied the first suppression motion was later dismissed….the subsequent granting of the motion to dismiss on venue grounds meant that the suppression ruling, which could not be appealed, did not result in a final and valid judgment." *Id*. at 835–36 (E.D. Va. 2010), aff'd, 670 F.3d 586 (4th Cir. 2012).

The facts in this case are distinguishable.  Harrison was a party in the case before Judge Blake.  He had a full and fair opportunity to litigate the issue of consent and in fact testified at the motions hearing.  Judge Blake's ruling on the matter did result in a final and valid judgment on the issue and the case proceeded to trial.  In fact, Harrison timely appealed the consent issue among others and the Fourth Circuit affirmed Judge Blake's ruling.  Ex. O (unpublished opinion No. 22-4205).  *See United States v. Jones*, 43 F.4th 94, 103 (2d Cir. 2022)(precluding a criminal defendant from relitigating a suppression motion—so long as the defendant had a full and fair opportunity to litigate the issue once—is not per se unconstitutional); *Laaman v. United States*, 973 F.2d 107 (2d Cir. 1992)(a prior decision by another court on a motion to suppress is not ordinarily reconsidered in the absence of substantial new evidence or extraordinary circumstances).  Harrison should be precluded from re-litigating the exact same motion for which he previously received an adverse ruling in the matter before Judge Blake.

### 4.      Harrison gave consent for agents to search the rental vehicle.

If the Court permits Harrison to re-litigate the search of the Toyota Camry, the motion should be denied because Harrison provided a knowing and voluntary consent to the search.  There are a few well-recognized exceptions to the Fourth Amendment's general warrant requirement.  One such exception is consent.  *See Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001).  Where, as here, a defendant challenges the existence of consent to search, the court consider the totality of the circumstances and determine whether consent was present, knowing, and voluntary.  *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 557 (1980).  Factors relevant to this determination include the defendant's characteristics, such as age, maturity, education, intelligence, and experience; and the conditions under which consent was given.  *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (citations omitted).  Such conditions include officer conduct; time,

place, and duration of the encounter; the number of officers present; any show of force; "friendly conversation" or small talk; and the issuance of *Miranda* warnings. *Id.*; *United States v. Boone*, 245 F.3d 352, 363 (4th Cir. 2001). Although Harrison was detained at the time he gave consent, that fact does not automatically render consent involuntary. Indeed, consent given while detained or while otherwise in custody may nevertheless be voluntary. *Id.* at 362-363. Finally, the government must prove knowing and voluntary consent by a preponderance of evidence. *Mendenhall,* 446 U.S. at 557.

Based on the totality of these and other facts, the government will establish by a preponderance of the evidence that Harrison provided knowing and voluntary consent for agents to search the rental vehicle. Harrison was 25 years old when he was approached and detained by the agents on the sidewalk in public. It was approximately 1:40 p.m. He knew that agents were executing a search warrant on his person because they seized items from him and the bag that he wore over his shoulder. He volunteered spontaneous statements about his Glock firearm that agents seized from his person. Harrison clearly was not scared, intimidated, or coerced by the agents present. His criminal history at the time included a prior felony drug conviction from 2013 as well as numerous additional contacts with the criminal justice system. As agents testified at the motions hearing in 19-575-CCB, Harrison's demeanor was relaxed and cordial. Ex. P (Transcript) at 15. When the agents asked Harrison about searching the Toyota Camry, the implications of consenting were obvious and known to Harrison given the existence of the search warrant, the items recovered from Harrison's person, and the immediate *Miranda* advisements. *See United States v. Tyson*, 360 F. Supp. 2d 798 (E.D. Va. 2005) (noting defendant was "well aware of the purpose of the search" after agents disclosed existence of drug investigation). The search of the Toyota Camry was lawful given Harrison's knowing and voluntary consent to search it.

### 5.      Inevitable Discovery

Even if this Court concludes that Harrison did not give agents consent to search the Toyota Camry, the government will establish by a preponderance of the evidence that agents would have obtained a search warrant and inevitably discovered the controlled substances in the car.  Under the inevitable discovery doctrine, inadmissible evidence may nevertheless be admitted if the prosecution can prove that the information would have been discovered by lawful means.  *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Bullette,* 854 F.3d 261, 266-67 (4th Cir. 2017).  Officer DeLorenzo testified at Harrison's previous motions hearing that had Harrison declined to give officers consent, they would have obtained a search warrant for the vehicle.  As part of their investigation into a violent drug trafficking organization, agents had been lawfully obtaining court authorized vehicle tracking information from the Toyota Camry, which they knew Harrison to be driving.  When agents stopped and detained Harrison to execute the search warrant on his person, they recovered a loaded firearm and almost $10,000 in U.S. currency.  Given that the agents reasonably perceived that Harrison was walking to the Toyota Camry at the time he was stopped carrying a loaded firearm and large amount of cash, and that agents had reason to believe that Harrison was using the Toyota Camry as part of his drug trafficking activities, there was sufficient probable cause to believe that evidence would be found in the Toyota Camry.

### 6.      Harrison's statements about his firearm are admissible because he was not subject to police interrogation.

"Interrogation" for Miranda purposes means "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Applicable to Harrison's case, volunteered statements by a defendant while in custody are not implicated by *Miranda*.  *Id*. at 300.  Spontaneous or volunteered statements that are not the product of interrogation or its functional

equivalent are not barred by *Miranda,* even if the defendant is in custody when the statements are made." *United States v. Williams*, 16 F. App'x 90, 92 (4th Cir. 2001).

Here, Harrison's statements about his firearm were made in response to officers discovering the weapon in his bag, not police interrogation or its functional equivalent. While the agents *had* advised Harrison of his *Miranda* warnings, they had not yet asked him any questions when Harrison blurted out comments about his Glock weapon. As such, his statements were not the product of a custodial interrogation or its functional equivalent that would implicate the Fifth Amendment. The statements were also voluntarily as the agents made no threats or improper inducements to Harrison. Agents approached him in public and in the middle of the afternoon. They told him that they had a warrant for his person and upon seizing his weapon, Harrison felt comfortable enough to make a joke by comparing his Glock weapon with those carried by the agents. Harrisons statements were knowing and voluntarily made and should be admitted at trial.

## VII. Response to Harrison's Motion to Preclude Government From Introducing Evidence As Set Out in Overt Act 41 (ECF 110)

Harrison was previously charged and convicted in this district for conspiracy to distribute controlled substances, possession with intent to distribute controlled substances, and various firearms offenses. That federal case included facts alleged in Overt Act 41. Harrison moves to preclude the government from introducing evidence as set forth in Overt Act 41 on two grounds. First, Harrison claims that the facts alleged in Overt Act 41 are barred by the Double Jeopardy Clause of the Fifth Amendment. Second, Harrison asserts that there is no relevance to the overt act evidence, and it is therefore inadmissible under Federal Rules of Evidence 401 and 403. This motion should be denied.

### A.    Relevant Facts

The indictment alleges that Harrison was part of a racketeering conspiracy that began in or about 2014 continuing through the date of the indictment.  The indictment further alleges that members of the conspiracy were BGF members or associates who engaged in various acts such as murder, robbery, witness tampering and drug trafficking (to include distribution and possession with intent to distribute a controlled substance, and conspiracy to distribute a controlled substance) to achieve the objectives of the enterprise (BGF).  ECF No. 1 at ¶ 10.  The indictment also alleges that as part of the manner and means of the racketeering conspiracy, BGF members and associates used, carried, possessed, brandished, and discharged firearms for use in their criminal activities.  ECF No. 1 at ¶ 12(d) and 12(e).  The indictment further alleges that members distributed and conspired to distribute controlled substances throughout Baltimore City and Maryland.

The government alleges that Harrison completed several overt acts during and in furtherance of the charged racketeering conspiracy.  Relevant to this motion, Overt Act 41 alleges that on or about November 25, 2019, in the 10300 block of Gelding Drive in Cockeysville, Maryland, Harrison possessed with intent to distribute heroin and unlawfully possessed a loaded Glock 23 .40 caliber handgun bearing serial number WKE393.  ECF No. 1 at ¶ 13(41).  As discussed above, on August 20, 2021, Harrison was convicted in in his prior federal case.  CCB-19-575.  A portion of that case related to Harrison's conduct on November 25, 2019 that is alleged in Overt Act 41 in the present indictment.

### B.    Argument

#### 1.    Admitting evidence of a predicate act for which a defendant has already been prosecuted does not violate double jeopardy.

Harrison moves to preclude the introduction of "any and all" weapons or drug distribution violations that were the subject of a prior federal conviction on the grounds that it would be a

violation of the Double Jeopardy Clause, which protects individuals from twice being subject to trial for the same offense and protects against multiple punishments for the same offense.  U.S. Const. amend. V.  Harrison's motion is sprinkled with legal principles such as "*Blockburger* test" and "totality of circumstances test," yet he fails to address how double jeopardy claims are analyzed in the context of a racketeering offense and ignores well established caselaw on the issue. Courts have repeatedly held that a substantive racketeering offense or a racketeering conspiracy offense and its underlying predicate racketeering acts are separate offenses for double jeopardy purposes.  *See United States v. Arnoldt*, 947 F.2d 1120 (4th Cir. 1991).

In *Arnoldt*, the defendant argued, similar to Harrison, that use of his prior convictions as predicate acts in a RICO prosecution violated the double jeopardy clause because the government needed to prove offenses for which he had already been convicted in order to prove an essential element of the RICO conspiracy.  Noting that racketeering cases are "complex" and "multi-layered" involving criminal acts "occurring at different times in different places," the court ruled that successive prosecutions for a RICO offense and its underlying offenses are not violative of double jeopardy.  *Id*. at 1126-1127.  *See also, Garrett v. United States*, 471 U.S. 773 (1985)(not a violation of the double jeopardy clause to prosecute a continuing criminal enterprise offense after a prior conviction for one of the predicate offenses).

Harrison's case falls squarely in line with the issues presented in *Arnoldt* and *Garrett.*  He has presented no reasons or exceptions that would justify this Court reaching a different conclusion.  His double jeopardy claim must fail.

>    2.    **Harrison's gun and drug possession conduct in November 2019 is probative of Harrison's involvement in the conspiracy and not unduly prejudicial.**

Harrison moves to exclude the evidence alleged in Overt Act 41 on the grounds that the evidence fails to "meet the minimum requirements for relevancy," and that there is no nexus between the charged racketeering conspiracy and the conduct alleged in Overt Act 41.  More specifically, Harrison argues that there is no connection between Harrison's acts on November 25, 2019 and the BGF enterprise.  His motion fails to articulate with any specificity his grounds for relying on Federal Rules of Evidence 401 and 403.

Rule 401 states that evidence is relevant if a) it has any tendency to make a fact more or less probable than it would be without the evidence; and b) the fact is of consequence in determining the action.  Fed. R. Evid. 401.  But the analysis does not end here.  Rule 403 governs those instances when relevant evidence may be excluded—if its probative value is substantially outweighed by unfair prejudice, the potential for confusing the issues or misleading a jury, or if the evidence is cumulative.  Fed. R. Evid. 403.

As indicated previously, the indictment alleges that the charged defendants, including Harrison, were members and associates of BGF and that the charged racketeering conspiracy began in 2014 and continued through and including the date of the indictment.  ECF 1 at ¶ 10.  This period included Harrison's possession of the handgun and controlled substances in November of 2019.  Further, and perhaps more importantly, in the "Manner and Means" section of Count One, the government alleges that Harrison and his confederates agreed to "maintain … weapons and firearms," and that they "carried [and] possessed … firearms," in connection with their criminal activities.  *Id.* at ¶12(d) and 12(e).  Thus, Harrison's possession of the firearm and controlled substances in November of 2019 was both during the period of the charged conspiracy and consistent with manner and means through which it was carried out.  It is therefore intrinsic

to the crime charged meaning it is direct evidence of a necessary component of the racketeering offense.

Moreover, Harrison's possession of a firearm and a distribution quantity of heroine November 2019 is highly probative of the racketeering conspiracy alleged in the indictment. Harrison is alleged to have hired BGF hitmen to murder his rivals. Throughout the course of 2018 and into 2019, he was involved in a violent, public "beef." Indeed, Harrison was himself shot at in July 2018. Individuals involved in violent disputes will often carry firearms for protection. Moreover, the evidence at trial will establish that Harrison paid significant sums of money for the "hits" he contracted. The fact that he had income from unlawful drug dealing is probative of him having money to fund the "hits." Therefore, evidence that Harrison possessed a firearm and controlled substances in November of 2019 has probative value with respect to his involvement in the racketeering conspiracy.

In *United States v. Stokes,* the government introduced evidence relating to incidents that involved the use or possession of firearms and occurred during the time alleged for the racketeering enterprise. 64 Fed. Appx. 352, 356 (4th Cir. 2003). In concluding that the evidence was admissible intrinsic evidence, the court noted that the government was required to prove the existence of the enterprise and its manner, means and the goals, which involved drug distribution, carrying firearms, and committing acts of violence. *Id*. "[T]his evidence tended to prove the existence of both a drug conspiracy and a racketeering enterprise." The same is true in Harrison's case with Overt Act 41. Evidence of Harrison's gun and drug activity on a date included in the alleged conspiracy is intrinsic admissible evidence that tends to prove the existence of the racketeering conspiracy. Furthermore, its probative value is not substantially outweighed by any unfair prejudice. In a case involving significant violence, there is nothing particularly prejudicial about

evidence of gun and drug possession, especially when it is intrinsic evidence probative of the conspiracy.

## VIII.   Response to Harrison's Motion to Sever (ECF No. 107)

Harrison is properly joined with his co-defendants under Federal Rule 8(b).  Harrison and his co-defendants are charged in a single conspiracy count. There is no basis for Harrison's claim that he was only a minimal participant in the conspiracy, but even if he was that would not be a basis for severance. Furthermore, his co-defendants statements implicating him in the conspiracy do not warrant severance since the statements were non-testimonial and made in furtherance of the conspiracy.  The Confrontation Clause is simply not applicable. Harrison's motion to sever his trial should be denied.

### A.        Legal Standard

It is well-settled that federal courts prefer joint trials of defendants who are indicted together, absent "special circumstances."  *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981); *Zafiro v. United States*, 506 U.S. 534, 538 (1993).  Two or more defendants may be charged in a single indictment, even if all defendants are not charged in each count of the indictment, "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. Crim. R. P. 8(b).  When a party is properly joined under Rule 8 and is seeking severance, that party must establish that "*actual prejudice* would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal."  *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted) (emphasis added).  Speculative allegations as to possible prejudice are not enough to establish a basis for severance.  *See United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978).

Severance is a matter within the trial court's discretion. *United States v. West*, 877 F.2d 281, 287 (4th Cir. 1989). Courts have the ability to sever properly joined trials "or provide any other relief that justice requires" "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Fed. Crim. R. P. 14(a); *Zafiro*, 506 U.S. at 539. Even where actual prejudice is shown, severance is not mandatory; the trial court wields discretion how to best tailor appropriate relief. *Zafiro*, 506 U.S. at 538. Claims of potential prejudice are generally addressed through limiting instructions rather than severance, which creates an unnecessary burden and inefficiency for the court, the government, and the witnesses by requiring the presentation of the same case on multiple occasions. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

Instead of the exceptional remedy of severance, the court may address any risk of prejudice through "less drastic measures, such as limiting instructions," which "often will suffice." *Zafiro*, 506 U.S. at 539; *see also Najjar*, 300 F.3d 466. There is no reason to believe that proper instructions—as well as separate verdict sheets—in the present prosecution will not adequately safeguard the rights of defendants subject to proper joinder. *Cf. Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions[.]").

## B.   Argument

Harrison is properly joined in a single-count conspiracy case with his co-defendants. He has not identified any specific trial rights that will be compromised warranting severance, a drastic measure that would impose a significant strain on judicial resources. Any possible prejudice could be remedied through limiting instructions or other measures. The government anticipates that the court will properly instruct the jury to weigh separately the evidence as to each defendant and there is no reason to suspect the jury will do otherwise. Further, each defendant will be entitled to his

75

own verdict sheet and ability to argue regarding the evidence specific to him.  Therefore, to the extent evidence may be admissible against some defendants and not others, and the defendants have varying degrees of culpability, a limiting instruction and separate verdict sheets are the proper way to address these concerns.  Moreover, the fact that co-defendants' statements are prejudicial because they inculpate Harrison in a conspiracy to participate in a racketeering enterprise does not warrant severance.  The Confrontation Clause is not violated when a co-defendant makes non-testimonial statements to a non-law enforcement third-party.  Harrison is simply wrong about the law and the Court should deny his severance request.

> ### 1.   The Defendants are Properly Joined Pursuant to Federal Rule of Criminal Procedure 8(b).

Warren and Harrison, the two defendants standing trial, are charged with a single count of conspiracy to participate in a racketeering organization.   Being alleged as members and/or associates in the same racketeering organization, Harrison is properly joined and should be tried with Warren.  *Reavis*, 48 F.3d at 767; *see also United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996) (efficiency and judicial economy support joint trials of co-conspirators).   Furthermore, although Harrison may be implicated in fewer racketeering acts, Rule 8(b) does not require that each co-defendant be charged with every act.  *Brugman*, 655 F.2d at 543.  "Participation" as used in Rule 8(b)'s joinder analysis "does not require 'participation' in each transaction of the series." *Id.*   Indeed, a case involving a conspiracy is precisely the type of case in which co-conspirators should be tried together, given that much of the government's evidence will pertain to all defendants and their activities related to the criminal enterprise conspiracy.  *See Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999).  Especially here where the allegations are that Harrison paid Warren to target and murder rivals.  The witnesses, evidence, and theory for much of the case against Harrison and Warren are not only the same, but they are

also so intertwined that separate trials would render almost identical presentations for large portions of the trials.  Therefore, Harrison and Warren are properly joined under Rule 8(b).

> ### 2.   Severance is Not Warranted Given the Admissibility of Evidence Against Co-Defendants in a Single Trial, Notwithstanding Differing Degrees of Culpability.

Harrison is not entitled to severance simply because he believes that the evidence against Warren is stronger than it is against him.  *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *United States v. Zelaya*, 908 F.3d 920, 928-929 (4th Cir. 2018); *Akinkoye*, 185 F.3d at 197.  Nor can severance be justified because some evidence admitted against one defendant may not be necessarily applicable to another defendant, a circumstance that Rule 8(b) already assumes may arise.  *Brugman*, 655 F.2d at 543.

In this case, the government will introduce evidence at trial of all the defendants' involvement in the conspiracy alleged in Count One.  Therefore, this is not the type of case where multiple defendants "are tried in a complex case…with markedly different degrees of culpability" that would require severance because of heightened prejudice to the defendants.  *Zafiro*, 506 U.S. at 539.  Put another way, for the racketeering conspiracy, the government will present the same evidence to establish the racketeering organization alleged in the Indictment, its participants, its methods and means, and acts of violence related to its existence.  If severance were granted, the government would essentially be required to present the same evidence at two separate trials.  Doing so would create repetitive trials and would be a completely unnecessary waste of judicial resources.

Here, Harrison speculates that the admissibility of differing evidence is likely to prejudice his right to a fair trial.  The Defendant fails to identify any concrete evidence that will be admissible as to Warren and so prejudicial to him that his right to a fair trial will be compromised.  However,

even if he did identify such evidence, it is not sufficient to justify severance. *See Akinkoye*, 185 F.3d at 197 ("A defendant is not entitled to severance . . . because the evidence against one defendant is not as strong as that against the other."). Purely speculative and unsubstantiated assertions "that there would be evidence admitted against co-defendants that would be inadmissible against [the defendant], and the spillover effect of the evidence" is insufficient to warrant severance. *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002).

Instead of the exceptional remedy of severance, the court may address any risk of prejudice through "less drastic measures, such as limiting instructions," which "often will suffice." *Zafiro*, 506 U.S. at 539; *see also Najjar*, 300 F.3d 466. As discussed above, proper instructions and separate verdict sheets will safeguard the rights of Harrison (and Warren). *Cf. Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Therefore, because there is no risk of prejudice identified in *Zafiro* that may not be remedied through limiting instructions or other measures, there is no basis to sever Harrison's and Warren's trial.

### 3. Severance is Not Warranted As the Confrontation Clause Does Not Apply to Non-Testimonial Co-Conspirator Statements.

Harrison is not entitled to a severance simply because inculpatory co-conspirator statements are admissible at trial. The Defendant argues that the Confrontation Clause as explained in *Bruton v. United States*, 391 U.S. 123 (1968) provides a barrier to the use of Rule 801(d)(2)(E) when a co-conspirator's statements implicate others in the conspiracy. He further alleges that certain statements implicating the defendant were not made in furtherance of the conspiracy. Harrison is mistaken on both claims.

It has been well-established since the 19th century that the government can introduce co-conspirator statements from conspirators who do not testify. *United States v. Gooding,* 24 U.S. 460, 468-69) (1872) (admitting into evidence, through the co-conspirator, the declarations of

defendant who illegally engaged in the slave trade).  Fast forward almost two hundred years and the Supreme Court again upheld the admission of co-conspirator statements.  *See Bourjaily v. United States,* 483 U.S. 171, 183 (1987) ("To the extent that these cases have not been superseded by the Federal Rules of Evidence, they demonstrate that the co-conspirator exception to the hearsay rule is steeped in our jurisprudence").  Before the government can introduce a co-conspirator statement, it must establish by a preponderance of the evidence both the existence of a conspiracy and that the statements were made in furtherance of that conspiracy.  *Bourjaily,* 483 U.S. at 175-76.  However, testimonial statements, such as admissions of a non-testifying defendant made to law enforcement after an arrest, would violate the Confrontation Clause as to co-defendants. *Bruton*, 319 U.S. 123, 135-36.  That principle applies to statements made in situations where a reasonable person in the declarant's position would anticipate the statement being used in investigating and prosecuting crime.  *See Davis v Washington,* 547 U.S. 813 (2006) (victim statements to police after emergency passed were testimonial); *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) (expert report certificates are testimonial affidavits that fell within the core class of statements implicated by the Confrontation Clause).

Here, Harrison lists three statements believed to be violative of either the Federal Rules of Evidence or the Confrontation Clause.  As a preliminary matter, none of the identified statements were made to law enforcement or in anticipation of investigation or litigation.  They were non-testimonial; therefore, the Confrontation Clause is simply not at issue.

The first statement the Defendant identifies is a recorded jail call between co-conspirator Wayne Prince (also a co-defendant) and an inmate in August 2018.  Prince made this statement during the course of the conspiracy as alleged in the indictment.  Prince boasted of his association with Harrison to the listener.   The government will present evidence that BGF members routinely

boast of violent acts, narcotics distribution, and association with others, to bolster the status of the enterprise and their role within the enterprise.  Additionally, within that same jail call, Prince essentially vouched for Harrison in response to the inmate alleging that Harrison "told" [i.e. that he spoke with law enforcement].  Prince responded, "and 2raw [Harrison's rival' didn't?"  He then said, "I know the whole thing, my n***a, I be with those n***as 24/7 now." His statement was intended to bolster Harrison and justify Prince's association with him.  Accordingly, Prince's statement was made during and in furtherance of the conspiracy, and therefore falls squarely within the admissible framework of Fed. R. Evid. 801(d)(2)(E).

The other two statements identified by Harrison are comments that co-conspirator Warren (also a co-defendant) made to a female in April and August 2018.  As with Prince's statement, Warren's comments are made during the indicted timeframe of the enterprise.  And like Prince's statement, Warren is bragging to the female that he is "waiting on a bag," in other words that he was expecting payment for acts of violence he completed as a member of BGF and on behalf of Harrison.  This non-testimonial statement made by a co-conspirator during and in furtherance of the conspiracy is admissible and does not implicate the Confrontation Clause.[11]

## IX.  Response to Harrison's Motion to Exclude Rap Music (ECF No. 109)

Harrison moves to preclude the introduction at trial of rap videos and lyrics.  Harrison's motion cites a number of law review articles, and has a footnote regarding the Court's previous ruling in *United States v. Gerald Johnson*, 16-cr-363-JKB[12], but fails to acknowledge a highly relevant Fourth Circuit opinion dealing with the very issue he has raised: whether, in the context

---

[11] Since the statements are admissible as co-conspirator statements and do not violate the Confrontation Clause, the Court does not need to even consider redacting portions of the statements that reference Harrison.

[12] *See* ECF 395.

of a RICO conspiracy case, a rap video in which the defendant discusses the same types of criminal activity with which he is charged should be excluded from evidence pursuant to Fed. R. Evid. 403. *See United States v. Recio*, 884 F.3d 230, (4th Cir. 2018).  Here, the government only intends to introduce rap videos that fit safely within that framework.  Harrison's motion should be denied.

### A.    Legal Standard

Evidence is relevant when "it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. "The basic standard of relevance…is a liberal one." *Daubert v. Merrell Dow,* 509 U.S. 579, 587 (1993).  All incriminating evidence is, by definition, prejudicial.  Relevant evidence is only excludable if it is "*unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence."  *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008) (emphasis in original).

That the defendant's statement was a rap lyric is of no consequence to this analysis. "[T]here is no exception for art in the Federal Rules of Evidence."  *United States v. Herron,* 2014 WL 1871901 at *4 (E.D.N.Y. May 8, 2014).  Courts have repeatedly held that there is nothing inherently improper about the use of rap lyrics as evidence.  *See United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (rap lyrics were relevant and probative value was not substantially outweighed by their prejudicial effect); *United States v. Belfast,* 611 F.3d 783, 820 (11th Cir. 2010) (rap lyrics were relevant and probative); *United States v. Stuckey*, 253 Fed. App'x. 468, 482 (6th Cir. 2007) (unpublished) (rap lyrics properly admitted because the acts described therein were "precisely what the government accused [defendant] of doing"); *United States v. Foster*, 939 F.2d 445, 456-57 (7th Cir. 1991) (rap lyrics showed defendant's knowledge of the drug trade).

Indeed, the Fourth Circuit has upheld a ruling in which rap lyrics were admitted to demonstrate the defendant's animosity to an enemy and gang association, finding that such

evidence was relevant and probative and that the probative value was not substantially outweighed by danger of unfair prejudice. *United States v. Thomas*, 490 Fed.App'x. 514, 521-22 (4th Cir. 2012) (unpublished). In *Thomas*, a RICO prosecution of Tree Top Piru Bloods members from Baltimore City, the government introduced a video entitled "Stop Snitching 2," in which the defendant, Thomas, rapped about being a Bloods member as well as his involvement in drug dealing. 490 Fed. Appx. 514, 521 (4th Cir. 2012). The video also depicted Thomas handling a firearm. *Id.* In a unanimous opinion affirming Thomas's conviction, the Fourth Circuit rejected Thomas's argument that the video was unfairly prejudicial. "Although *Stop Snitching 2* did show Thomas talking about being a gang member, discussing drugs, and handling a firearm," the Court explained, "there is no unfair prejudice in showing Thomas on a video discussing and doing the very things with which he was charged and as to which other substantial evidence had also been presented." *Id.* at 522.

Even more recently, the Fourth Circuit upheld the government's use of a rap lyric posted on a defendant's social media account as an adoptive admission, and specifically citied that the social media post's probative value was not substantially outweighed by a danger of unfair prejudice as it was introduced to describe only the type of conduct of which the defendant was accused. *Recio*, 884 F.3d at *235 (4th Cir. 2018). The Court further opined that "[l]yrics … authored by a defendant can be relevant if they match details of the alleged crime." *Id.*

**B.    Argument**

With this guidance in mind, the government turns to the videos it anticipates offering at trial as part of the case-in-chief.[13] For each video we note (i) whether the video is alleged as an overt

---

[13] The government has outlined below a number of the rap videos that it anticipates introducing at trial, but given that trial is still months away, there is the possibility that additional videos will be used. The government will certainly notify counsel of their intent to introduce additional rap videos well before the motions in limine deadline.

act in furtherance of the conspiracy charged; (ii) a summary of the probative lyrics and/or statements by Harrison; and (iii) the connection between those lyrics and/or statements to the charge and facts in this case.  As a preliminary matter, all the videos/songs/lyrics the government intends to admit at trial were authored by Harrison.  This is exactly like the videos/lyrics this Court admitted in the *Johnson* case.  *Gerald Johnson*, 16-cr-363-JKB, at ECF 395, paragraph 5a-f.  In *Johnson*, the Court allowed three videos to be admitted in its entirety; other videos were ordered to be edited to exclude any appearances or statements by other individuals.  The Government seeks the same ruling in this matter.

### 1.   Overt Act 17 – "Shooters" released February 23, 2018

The government intends to play Harrison's song "Shooters" referenced in the Indictment in Overt Act 17.  The song was released the same day that Warren, a BGF member and contract killer hired by Harrison, attempted to murder J.A., a rival of Harrison.  The next day, Harrison posted a video to Instagram where he rapped along to the following lyrics from "Shooters":

> …Breaking news I just signed the top shooter in the city to a deal.  All them years he signed to me, a lot of n** get killed.  If he get caught, don't stress about it, his lawyer going on my bill.  If somehow he lose at trial, got one word appeal."

Harrison added, "I'm signing n***s," and "come over and get your biggest payday."

A cooperating witness will testify that shortly after "Shooters" was released, co-defendant and BGF member Wayne Prince confirmed that the lyric quoted above was a reference to Warren.  Similarly, on April 4, 2018—the day he murdered Raytawn Benjamin's mother and sister – Warren participated in a recorded jail call, in which an associate asked whether "Shooters" was a tribute to him (*i.e.*, Warren).  The associate asked, "Salute, you heard me?"  Warren laughed and responded, "Yeah, the mixtape hard.  There's so much going on in the streets; that's all I'm saying.  That mixtape hard!"  Accordingly, the evidence will establish that the song generally, and the

lyrics above specifically, were an homage to Warren, Harrison's co-defendant and a hired contract killer.

Moreover, the song is replete with the very activities that the government believes Harrison engaged in during the conspiracy.  For example, Harrison raps:

> I got them shooters with me.  And we ain't never squashing no beef.  Once you cross the line. You ain't coming back.  It's on sight when we meet.  When I tell my dogs that I have bread on you, them young boys trying to eat…now you resting in peace.

These lyrics speak for themselves and mirror the government's theory that Harrison paid people ("I have bread (money) on you") to have rivals killed ("never squashing no beef…now you resting in peace").  Harrison released this song in February 2018 right around the time he "signed" Warren up as a "shooter"; by August 2018 three innocent people were dead after Warren and others tried to murder rivals marked by Harrison.

### 2.   Overt Act 24 and 31 – "War" released February 23, 2018

The government intends to play Harrison's song "War" because the government believes witnesses will testify that the song is about Harrison's beef with rival rapper Ryan Brunson, a/k/a. "2Raw".  Overt Act 24 and 31 are Harrison's attempts to gain the upper hand in the beef.  Specifically, Overt Act 24 is the attempt murder of Raytawn Benjamin, an associate of Brunson, which resulted in the murder of Benjamin's mother and sister; Overt Act 31 is the attempt murder of Brunson resulting in the killing of Brian McKemy.

The following are relevant lyrics from the song:

> "Yeah, we want war with 'em…got them choppers with me…they goin' drop you silly, 'cause I just dropped a fifty, we want war with 'em, we want war with 'em, we want war with 'em…n** disrespect the gang now I want him now.  I give my youngin a lil dub and tell him gun 'em down.  We aint pulling no pistols we tote hundred rounds."

The government anticipates that witnesses will discuss how arguments (beefs) are frequent amongst gangs and especially in the rap community.  A jury could conclude that Harrison is talking about precisely this when he raps, "we want war with 'em" and "n** disrespect the gang now I want him."  The lyrics also address Harrison's willingness to pay for the "war": "I just dropped a fifty" and "I give my younin' a lil dub (gun) and tell him gun 'em down."

### 3.        Overt Act 37 – "I" released October 29, 2019

A contested issue at trial will be whether Harrison is a member or associate of BGF.  The government alleges Harrison's association with BGF, inclduing in Overt Act 37 of the Indictment. In "I, YGG Tay" Harrison answers the question by explaining,

> "I run with apes and gorillas; that's 'cause I'm from the zoo.  Get money, play with them pistols; ain't nothing else to do…and I'm always on the go with that gangsta sh** and going back and forth with no n** just get him hit; BOOM-BOOM…I'm from Baltimore where our problems get solved by bustin' Pow-Pow."

 The government anticipates that witnesses will testify that "apes and gorillas" are common names and symbols for BGF.  Further, the lyrics "I'm always on the go with that gansta sh**" supports the government's theory that Harrison aligned himself with the gang to "just get him hit," in other words to "hit" or kill his rivals.  The lyrics further relate to the allegations in this case: "I'm from Baltimore where our problems get solved by bustin' POW-POW".  These lyrics are part and parcel of the trial: Harrison had rivals targeted for murder.

### 4.        Overt Act 1, 3, and 41 – "Errday" released April 9, 2016

Overt Act 1 alleges that Harrison partnered with a BGF member to supply heroin and cocaine to street-level "shops" in Baltimore City between 2014 and 2016.  Evidence that he was rapping about drug distribution during that time period is certainly relevant and probative,

especially because Harrison never stops interacting with the drug trade.  Overt Act 41 describes Harrison's possession of heroin with the intent to distribute in 2019.

In "Errday," Harrison raps alongside Damont Brown, a/k/a "YGG Dre," about what it takes to be a successful drug dealer and the collateral damage surrounding the trade.  For instance, he raps: "On the block like errday, totin' Glocks like errday.  Gettin' cash done errday, I risk my life like errday."

The accompanying video illustrates important tools of the trade like individuals with firearms, extended magazines, and significant quantities of cash. The video also includes a deceased co-conspirator the jury will hear about—Darius Singleton, also known as "YGG Scratch."  Singleton was one of Harrison's deputies.  Before and after the murder of Brian McKemy on August 7, 2018, Warren and Prince messaged with Singleton to arrange a meeting. The government will argue that their messages also related to Warren and Prince collecting their payment for the murder.

The government anticipates that witnesses will testify about how Harrison and his associates operated their drug shops, explaining that people had to be selling "on the block like errday" in order to make a profit.  Witnesses will also discuss that the shop members had to "tot[e] Glocks" in order to keep the territory, product, and proceeds, safe.

### 5.    The Lyrics Are Relevant.

The above-referenced lyrics and statements have significant probative value in this case.  Unlike the rap video in *Thomas*, which was introduced pursuant to Fed. R. Evid. 404(b), *see Thomas*, 490 Fed. Appx. at 521, the videos featuring Harrison are *intrinsic* to the government's case.  Indeed, these four videos expressly tie in with overt acts in furtherance of the racketeering conspiracy.  Further, as in *Thomas,* the videos depict Harrison rapping or talking about the very

types of criminal activity – murders, shootings, drug dealing, and indeed, associating with BGF – with which he is charged in this case, and with respect to which the jury will see and hear significant additional evidence.  *See id.* at 522 ("there is no unfair prejudice in showing [a defendant] on a video discussing and doing the very things with which he was charged and as to which other substantial evidence had also been presented").  No defendant should be permitted to brag about murdering others, dealing drugs, and associating with a violent gang, while at the same time preventing a jury from hearing and seeing his statements by hiding behind scholarly articles regarding poetic and political expression. Harrison's rap lyrics are highly probative of the charged criminal conduct in this case.

### 6.      The Lyrics are Not Unduly Prejudicial.

As explained above, the probative value of the lyrics is significant—they make the likelihood of Harrison's commission of the crimes more probable.  Conversely, the danger of unfair prejudice is minimal, as the portions of the songs that the government seeks to admit will describe the same conduct as that with which the Defendant is charged.  *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (court could not say that the content of the video at issue was "more inflammatory or more prejudicial than the charged crimes").  Contrast this to the facts of *United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011), cited by Harrison.  There, the violence and profanity contained in the rap song far exceeded that of the lyrics at issue here.  Additionally, in *Gamory*, the song was not only inadmissible hearsay, but it was offered as evidence of a fact not seriously contested at trial.  *Id.* at 493.

In fact, most, if not all, of the cases cited by Harrison either incorrectly characterize the holdings or are completely distinguishable from the instant case.  For example, the holding in *United States v. Stephenson*, 550 F.Supp. 3d 1246 (M.D.Fla. July 23, 2021) was particular to the

evidence the government intended to use during the trial rather than a principled position by the court that all such evidence should be banned.  Similarly, the court in *United Staes v. Bey*, No. Cr 16-290, 2017 WL 154006 (E.D. Pa. Apr. 29, 2017), ruled that in a trial for a discrete, single day event, offering multiple videos and rap lyrics recorded before the crime was unnecessary.  Neither case is controlling here and more important, neither case pronounces a total ban of such evidence. And in *United States v. Williams,* No. 3:13-CR-00764-WHO-1, 2017 WL 4310712 (N.D. Cal. Sept. 29, 2017). the court did not exclude the government's use of rap videos during trial.  Rather, the court ruled that one video was admissible only as to the defendant who authored/rapped the song.  The court also left open the question of whether other such evidence would be allowed after the government made a better record, "[t]he government must isolate each statement it seeks to introduce and establish how each statement furthers the objectives of the conspiracy."  *Id.* at *6. In fact, not even the *Johnson* court outright banned rap lyrics as implied by the defendant.  Rather, it ruled that "if the court is satisfied that the clip is limited to the relevant portions of the evidence, it will be admitted".  *United States v. Johnson,* 469 F.Supp.3d 193, 221-22 (S.D.N.Y 2019 (citing *United Staes v. Herron*, No. 10Cr0615, 2014 WL 1871909, at *5 (E.D.N.Y. May 8, 2014)).

But none of these cases are binding, and in fact, the defendant fails to identify the leading Fourth Circuit case on the matter, *United States v. Recio*, 884 F.3d 230 (2018).  In *Reico*, the court held that limited use of rap lyrics are probative especially when adopted or authored by a defendant and match details of the crime.  *Id.* at 235.  Further, "the fact that a defendant posted lyrics about engaging in certain conduct makes it more probable that the defendant in fact engaged in that conduct".  *Id.*

And that is exactly what is at issue in Harrison's case.  Harrison is accused of paying for others to commit acts of violence; he is also accused of dealing drugs and associating with BGF.

Harrison doesn't just adopt a lyric like the defendant in *Recio*, he *actually wrote* the lyrics about what he did.  Harrison's motion should be denied.

## X.    Response to Harrison's Motion to Dismiss Sentencing Enhancements and Alternatively to Sever (ECF No. 113)

The sentencing enhancements related to Harrison should not be dismissed because they are not multiplicitous of the overall RICO conspiracy.  Each murder conspiracy alleged in the indictment as a sentencing enhancement is a separate conspiracy under Maryland law that Congress did not intend to be subsumed by the RICO conspiracy.  However, even if the conspiracies merged under state law for sentencing purposes, they are still chargeable under state law and, therefore, are properly pled racketeering activities that would expand Harrison's potential punishment beyond RICO's 20-year statutory cap.

### A.    Relevant Facts

The indictment alleges Harrison's involvement in three separate murder plots, that are both listed as over acts and sentencing enhancement.

One such murder occurred on or about June 29, 2014.  In that instance, Harrison paid a BGF member to murder Terrell Jarrett because Harrison believed that Jarrett owed him money for a supply of narcotics that Harrison provided on consignment.  ECF 1, at ¶13(3).  Harrison supplied the BGF member, John Harrison, a/k/a "Binky," with $10,000 and a gun, which he used to shoot Jarrett to death in the 1300 block of Ward Street in Baltimore City.  *Id*.  The Indictment lists this incident as both an overt act and a sentencing enhancement.  ECF 1, at ¶13(3), Notice of Enhanced Sentencing, ¶1.

Years later, on April 2, 2018, Harrison learned via Instagram that two members of a rival organization, Ryan Brunson and Raytawn Benjamin, had used the Instagram "Live" feature to publicly accuse Harrison of cooperating with law enforcement.  ECF 1, at ¶13(23).  Harrison

denied the accusations in an Instagram post of his own. *Id.* On April 4, 2018, one of Harrison's co-defendants, David Warren, and unindicted coconspirators sought to locate and murder Benjamin at a residence occupied by Brunson's mother and sister, Chanette Neal and Justice Allen. ECF 1, at ¶13(24). Not finding Benjamin inside the residence, Warren and the unindicted coconspirators murdered Neal and Allen using a .357 caliber handgun. Harrison later paid Warren for committing the murders. *Id.* The indictment also lists this incident as both an overt act and a sentencing enhancement. ECF 1, at ¶13(24); Notice of Enhanced Sentencing, ¶6.

On August 7, 2018, in the 4500 block of Woodlea Avenue, Warren, another co-defendant, Wayne Prince, and an unindicted coconspirator attempted to murder Brunson at a home owned by Brunson. ECF 1, at ¶3(31). Not finding Brunson, Prince and the unindicted coconspirator murdered one of the construction workers, Brian McKemy, using a .40 caliber handgun. *Id.* They also shot a second construction worker, R.P., in the head. R.P. survived the attack. *Id.* Harrison later paid Warren and Prince for their role in the attack at R. Br.'s home. Id. at 34. The indictment also lists this incident as both an overt act and a sentencing enhancement. ECF 1, at ¶13(24); Notice of Enhanced Sentencing, ¶7.

Harrison now moves to dismiss the sentencing enhancements and, alternatively, to sever his trial from his coconspirators under Rule 14 of the Federal Rules of Criminal Procedure. ECF No. 113. His motion should be denied.

**B.   Argument**

**1.   The Plain Language of 18 U.S.C. 1963(a) Authorizes A Maximum Penalty Of Life Imprisonment For Committing Conspiracy To Murder As Part Of a RICO Conspiracy.**

The RICO conspiracy statute, 18 U.S.C. § 1962(d), makes it a crime to conspire to violate any of the three substantive provisions of RICO, which are set forth in 18 U.S.C. § 1962(a), (b), and (c). *See* 18 U.S.C. § 1962(d). Relevant here, Section 1962(c) prohibits "any person employed

by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Therefore, to prove that a defendant conspired to violate RICO, the government must show:  (1) "that an enterprise affecting interstate commerce existed;" (2) "that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise;" and (3) "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts."  *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012).

RICO's penalty provision, Section 1963(a), provides that "[w]hoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)…."  18 U.S.C. § 1963(a).  The term "racketeering activity," in turn, is defined by Section 1961(1) and includes "any act or threat involving murder, … which is chargeable under State law and punishable by imprisonment for more than one year."  *Id*. § 1961(1)(A).  The Fourth Circuit recently explained that this definition "necessarily includes not only first-degree murder, but also conspiracy to commit first-degree murder."  *United States v. Simmons*, 11 F.4th 239, 259–60 (4th Cir. 2021).

In many cases, the maximum penalty for a RICO conspiracy conviction is 20 years of imprisonment.  But, in light of Section 1963(a)'s parenthetical clause, where the government proves an underlying predicate offense that itself carries a maximum penalty of life in prison, Section 1963(a) authorizes a maximum sentence of life imprisonment.  *See United States v. Garcia*, 474 F. App'x 909, 911–12 (4th Cir. 2012) (unpublished) (affirming the defendant's 384

month sentence for a RICO conspiracy conviction where "the jury found beyond a reasonable doubt that first-degree murder was an object of the RICO conspiracy"); *United States v. Flores*, 572 F.3d 1254, 1268 (11th Cir. 2009) (citing Section 1963(a) and noting that "[l]ife sentences are expressly permitted for RICO conspiracy …"); *United States v. Fernandez*, 388 F.3d 1199, 1259-61 (9th Cir. 2004) (affirming a life sentence for a RICO conspiracy conviction where a jury found that the defendant conspired to murder three people).  Of course, under *Apprendi v. New Jersey*, 539 U.S. 466 (2000), the government must prove the facts necessary to increase the statutory penalty from the default maximum of 20 years to the enhanced maximum of life imprisonment. *See United States v. Nguyen*, 255 F.3d 1335, 1343 (11th Cir. 2001) (describing the impact of *Apprendi* on sentencing enhancements under Section 1963(a) for RICO conspiracy convictions).

Under a plain reading of 1963(a) and its parenthetical clause, the three murder conspiracies related to Harrison and listed as sentencing enhancements in the indictment would each properly expand the penalty for the RICO conspiracy beyond the 20-year statutory cap if a jury finds that the government proved the facts underlying each murder conspiracy beyond a reasonable doubt. Each murder conspiracy alleged in the sentencing enhancements is a racketeering activity because it is an "act or threat involving murder" chargeable under Maryland law.  *See* Md. Code Ann., Crim. Law §§ 1-202, 2-201.  Murder in Maryland has a maximum penalty of a life sentence.  *Id*. Similarly, the Fourth Circuit has also recognized that conspiracy to commit first-degree murder in Maryland is punishable by life imprisonment, justifying a sentence over 20 years for RICO conspiracy.  *Simmons*, 11 F.4th at 260 (citing *Gary v. State*, 341 Md. 513, 520–21 (1996), which held that Maryland's conspiracy statute authorized a life imprisonment sentence for conspiring to commit first-degree murder).   Therefore, all three sentencing enhancements related to the Defendant are properly pled in the Indictment and should not be dismissed.

### 2.    The Multiplicity Doctrine Does Not Apply Because the RICO Conspiracy Does Not Subsume The Murder Conspiracies To Become The Same Offense And There Is No Risk Of Multiple Punishments.

The crux of Harrison's argument appears to be that the three murder conspiracies related to him alleged in the sentencing enhancements all merge with the overall RICO conspiracy, such that he could not be separately charged or receive separate sentences for the murder conspiracies under Maryland law.  Therefore, the defense posits, the murder conspiracies listed as sentencing enhancements are multiplicitous of the overall RICO conspiracy and not a separate, chargeable "racketeering activity" that could expand the Defendant's RICO sentence beyond 20 years imprisonment.  This argument fails for multiple reasons.  First, the three murder conspiracies are not subsumed by the RICO conspiracy.  Each conspiracy to murder is, in fact, a distinct conspiracy chargeable under state law that is separate from the RICO conspiracy.  Additionally, while Congress intended to permit multiple punishments for RICO conspiracy and the underlying predicate racketeering offenses, there is no danger of that happening in this case because Harrison is only charged in a one-count indictment of RICO conspiracy and not of the substantive predicate offenses.  The only purpose of the sentencing enhancements in the indictment is to create three opportunities for a jury to find that Harrison participated in certain racketeering acts that would expand his punishment beyond RICO's 20-year statutory cap.

> *i.    RICO Conspiracy and Maryland Conspiracy to murder are separate offenses.*

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be put twice in jeopardy of life or limb." U.S. Const. amend. V. As that clause relates here, it "protects against multiple punishments for the same offense." *United States v. Ayala*, 601 F.3d 256, 266 (4th Cir. 2010) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).  A multiplicitous indictment violates this due process protection where "a

defendant may be given multiple sentences for the same offense." *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993). However, "when a defendant violates more than one statute in a single course of conduct, a court may impose multiple punishments without violating the Double Jeopardy Clause if the legislature authorizes it to do so." *Ayala*, 601 F.3d at 265 (citation omitted). The "only task is to determine whether Congress intended to impose multiple punishments." *Id*. (quoting *United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008)).

To determine whether an indictment is multiplicitous, the Fourth Circuit employs the *Blockburger* test. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Since *Blockburger*, the Supreme Court has repeatedly emphasized that, at least in cases where cumulative punishments are imposed in a single prosecution, the *Blockburger* rule is a tool of statutory construction used to determine legislative intent. *Garrett v. United States*, 471 U.S. 773, 778–79 (1985). The "'exclusive focus' is 'upon the elements of the statutory provisions in question,' not the particular facts of the underlying case." *Ayala*, 601 F.3d at 265 (*quoting United States v. Allen*, 13 F.3d 105, 109 n.4 (4th Cir. 1993)). To the extent comparison of the two crimes reveals proof of a distinct element, "multiple punishments are presumed to be authorized absent a clear showing of congressional intent." *Id*. (citation omitted).

The elements of RICO conspiracy and Maryland murder conspiracy make it clear that they are separate offenses. To prove that a defendant conspired to violate RICO, the government must show: (1) "that an enterprise affecting interstate commerce existed;" (2) "that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of

94

the enterprise;" and (3) "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012).  By contrast, to convict a defendant of conspiracy to commit murder under Maryland law, the government must prove: (1) that the defendant entered into an agreement with at least one other person to commit the crime of murder; and (2) that the defendant entered into the agreement with the intent that the murder be committed.  MPJI-Cr 4:08; *Savage v. State*, 226 Md. App. 166, 174–75 (Md. Ct. Sp. App. 2015).  While the elements of the RICO conspiracy focus on the enterprise and an agreement *to engage in the affairs of the enterprise*, which can but need not include murder, the predicate state law conspiracy requires an agreement *to commit murder*.  This is because a RICO conspiracy is not a conspiracy to commit the alleged predicate racketeering acts; rather, it is a conspiracy to participate in the affairs of an enterprise through a pattern of racketeering.  Since the RICO conspiracy charge and the murder conspiracy sentencing enhancements require proof of a fact or element that is not part of the other, the former does not subsume the latter, and there is no double jeopardy or multiplicity violation.

The Defendant cites *Tracy v. State*, 319 Md. 452 (1990) and *Enzewa v. State*, 82 Md. App. 489 (Md. Ct. Sp. App. 1990) in support of his contention that the RICO and murder conspiracies merge into one conspiracy that could not be properly charged under Maryland law.  These cases, however, are inapposite.  In *Tracy*, the state alleged that the codefendants conspired to murder their victim first with a knife, and after attempting and failing to stab the victim, the co-defendants agreed to use a gun to murder the victim.  *Tracy*, 319 Md. at 459.  This all occurred during the same course of conduct, and the object of the conspiracy remained the same—to kill the victim. *Id*.  The Maryland Court of Appeals held that there was only one conspiratorial agreement and that it was irrelevant that the codefendants changed the mode of committing the crime in the middle of

the crime.  *Id*. at 460.    Similarly, in *Enzewa*, the co-defendants were charged with conspiracy to import heroin and conspiracy to distribute heroin based on a wiretap investigation that resulted in a single seizure of heroin in New York.  *Enzewa v. State*, 82 Md. App. At 498.  The Maryland Court of Special Appeals, however, held that there was only one conspiracy because both were arguably alternative modes of committing the same conspiracy.  *Id*. at 503.

Neither *Tracy* nor *Enzewa* deal with enterprise conspiracy.  Rather, in both cases, the court found that there was only one conspiracy because the defendants' conduct was essentially one single course of conduct based on one discrete set of events, and the two conspiracies charged by the state were simply alternative modes for committing the single crime.  This is different from this case, where the sentencing enhancements are based on three separate agreements to commit murder that occurred between 2014 and 2018, involved some but not all the co-defendants and other unindicted co-conspirators, and all had different objectives.  All three events are clearly separate conspiracies that are not based on one single course of conduct.  These conspiracies are also separate from the RICO conspiracy, which the indictment alleges occurred between 2014 and 2021 and involved all defendants agreeing to conduct the affairs of BGF.  The murder conspiracies are not alternative modes for committing the RICO conspiracy because both involve fundamentally different types of agreements with different objectives.

ii.    *Congress intended multiple punishments for RICO Conspiracy and the underlying racketeering acts.*

The RICO conspiracy also does not subsume the murder conspiracies alleged in the sentencing enhancements because Congress intended RICO conspiracies to be punished separately from state law offenses.  Congress made that intention clear by stating that RICO's purpose is "to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."

*United States v. Devine*, 40 F.4th 139, 151 (4th Cir. 2022), cert. denied, 143 S. Ct. 790, (2023)(citing Pub. L. No. 91-452, 84 Stat. 922, 923 (1970)).  In fact, the RICO statute cautions that "[n]othing in [it] shall supersede any provision of Federal, State, or other law imposing criminal penalties ... in addition to those provided for [here]." *Id.* (quoting Pub.L. No. 91–452, § 904(b), 84 Stat. 947).  By creating a new federal offense with "enhanced sanctions and new remedies" that does not supersede state criminal laws, Congress intended to impose multiple punishments on a defendant who through a single course of conduct—in this case, conspiracy to murder—violated both the federal RICO statute and the state common law.  *United States v. Truglio*, 731 F.2d 1123, 1129 (4th Cir. 1984), overruled on other grounds by *United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996)("The clear legislative intent expressed concurrently with the enactment of RICO is to permit, perhaps even to encourage, courts to impose cumulative sentences for RICO offenses and the underlying crimes.").

Courts around the country have long upheld separate convictions for RICO conspiracy and the underlying predicate racketeering activity when it is charged separately.  *See also United States v. Garcia*, 754 F.3d 460, 474 (7th Cir. 2014) (punishing RICO conspiracy and extortion conspiracy separately); *United States v. Ayala*, 601 F.3d 256, 265 (4th Cir. 2010) (punishing RICO conspiracy and VICAR conspiracy separately); *United States v. Luong*, 393 F.3d 913, 915-17 (9th Cir. 2020) (punishing RICO conspiracy and Hobbs Act robbery conspiracy separately); *United States v. Deshaw*, 974 F.2d 667, 671-72 (5th Cir. 1992) (punishing RICO conspiracy and drug conspiracy separately).  Even if the RICO conspiracy and murder conspiracy sentencing enhancements failed the *Blockburger* test, courts have nonetheless found no double jeopardy violation.  For example, in *United States v. White*, the D.C. Circuit concluded that "although the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments are authorized."  116 F.3d 903,

932 (D.C. Cir. 1997).  In *United States v. Kragness*, the Eighth Circuit concluded that the RICO conspiracy charge and the non-RICO conspiracy charge were the same offense under *Blockburger*, but "Congress nonetheless intended to allow multiple punishments for RICO conspiracies and conspiracies to commit the underlying predicate offenses."  830 F.2d 842, 864 (8th Cir. 1987).

Because Congress intended to have multiple punishments for RICO conspiracy and any underlying state offenses, including conspiracies, that constitute a racketeering activity, the Defendant's argument that the RICO conspiracy subsumes the state conspiracies must fail.

> ###### iii.    There is no possibility of multiple punishments in this case.

Not only does the multiplicity doctrine not apply in the case because the RICO conspiracy does not subsume the sentencing enhancement murder conspiracies, but the multiplicity doctrine also does not apply here because there is no possibility that Harrison will be subjected to multiple sentences, which is "principal danger created by multiplicity." *See United States v. Colton*, 231 F.3d 890, 910 (4th Cir. 2000) (emphasis added) (citing 1A Charles Alan Wright, Federal Practice and Procedure 154, at 87, (3d ed. 1999)).  Here, the indictment alleges one count of RICO Conspiracy, for which the defendant can receive only one punishment.  While the overt acts and sentencing enhancements discuss three separate murder conspiracies, the defendant is not being substantively charged for those murder conspiracies.  The purpose of including the sentencing enhancements is only to enhance the RICO conspiracy charge and the potential sentence to beyond the statutory cap of 20 years, thus punishing the use of murder conspiracies to further the purposes of the organization.  Each murder conspiracy is one chance to expand the statutory cap and allow the sentence as a whole to go beyond 20 years, not a chance to add a separate punishment for the murder conspiracies on top of the RICO conspiracy.

iv.   *Defendant's argument would fundamentally change RICO Law.*

To take the defense's theory to its natural conclusion would mean that the government could never charge a state law conspiracy as either a sentencing enhancement or as a predicate racketeering act because the RICO conspiracy would always subsume the underlying racketeering act conspiracy.  This would vittate the purpose of the RICO statute and be contrary to settled law.

The term "racketeering activity" is defined the same in the RICO statute regardless of whether it is used in relation to predicate acts or sentencing enhancements.  *See* 18 U.S.C. §§ 1961(1); 1962; 1963(a).  The only tangible difference is that sentencing enhancements are always going to be racketeering acts that carry a maximum penalty of life in prison.  Therefore, under defense's theory, if the RICO conspiracy subsumes conspiracies alleged as sentencing enhancements, the same would be true for predicate racketeering acts.  Courts around the country, however, have repeatedly rejected that position and held that state law conspiracies can serve as predicate racketeering acts without being considered improper "conspiracies to conspire."  *See, e.g., United States v. Thomas*, 490 Fed.Appx. 514, 517 (4th Cir. 2012) (finding conspiracy to commit murder as a proper predicate racketeering act); *United States v. Scott*, 642 F.3d 791 (9th Cir. 2011) (including conspiracy to murder as predicate act); *United States v. Pungitore*, 910 F.2d 1084, 1135 (3d Cir. 1990) (finding conspiracy to murder and attempted murder in violation of state law proper were RICO predicates); *United States v. Ruggiero*, 726 F.2d 913, 919 (2d Cir. 1984) (conspiracy to murder in violation of state law is an "act or threat involving murder" under 18 U.S.C. § 1961(1)(A)).  Similarly, courts have upheld sentences over 20 years where the underlying sentencing enhancement is a state law conspiracy.  *See United States v. Fernandez*, 388 F.3d 1199, 1259-61 (9th Cir. 2004) (affirming a life sentence for a RICO conspiracy conviction where a jury found that the defendant conspired to murder three people).

In sum, the multiplicity doctrine is inapplicable in this case.  It is clear from the elements of the offenses that Congress intended the RICO conspiracy to be a separate and independent offense from the conspiracies to murder alleged in the sentencing enhancements. To suggest otherwise would upend not only the purpose of the RICO statute but also years of settled case law. Even if the conspiracies were not separate and merged as the Defendant suggests, there is no double jeopardy or multiplicity issue because there is no risk that the Defendant will be subjected to more than one sentence even though doing so would be permissible and in line with congressional intent.

### 3. The Three Murder Conspiracies Are Proper Sentencing Enhancements Under 18 U.S.C. 1963(a) Because They Are Chargeable Under Both State Pleading Rules and The Federal Law Definition.

Even if the Defendant was right that he could not be separately *convicted* for the RICO and predicate murder conspiracies under state law because the conspiracies merge, the three murder conspiracies alleged in the sentencing enhancements remain *chargeable* based on state rules for pleading multiple conspiracies and how the courts have defined the term under federal law.

The Defendant is incorrect that a prosecutor cannot charge multiple conspiracies under Maryland law.  ECF 113, ¶17.  In *Ezenwa v. State*, 82 Md.App. 489, 501 (Md. Ct. Sp. App. 1990), one of the cases relied upon by the Defendant, the Maryland Court of Special Appeals makes it clear that prosecutors *can* plead multiple conspiracies in an indictment that may ultimately merge into one overarching conspiracy.  The court noted that while the indictment may be multiplicitous, "such a defect is a pleading defect and, consequently, not fatal to the indictment." *Id*.  That is because "no matter how many mini-conspiracies a defendant is convicted of, he will only be sentenced for a single maxi-conspiracy." *Rudder v. State*, 181 Md. App. 426, 451–52 (2008).  In making the point that a multiplicitous pleading is not ipso facto fatal and that all that is required is

that all manifestations of a single conspiracy be brought together at sentencing time, *Ezenwa* quoted with approval from *United States v. Maryland State Licensed Beverage Association*, 240 F.2d 420, 421 (4th Cir. 1957):

> If the evidence showed that there was only one conspiracy, the judge would impose only one punishment; but *this is no reason for requiring dismissal of one of the counts in the early stages of the case*; and parties should not be allowed thus to try their case in advance and by piecemeal.

82 Md. App. at 501.  Accordingly, a conspiracy is chargeable under Maryland pleading rules even if it were later deemed to be multiplicitous of other conspiracies alleged in the indictment. That is an issue for sentencing.

The murder conspiracies are also "chargeable" as the term is defined under federal RICO law.  RICO provides that "racketeering activity" refers to any of a number of federal or state crimes.  *See* 18 U.S.C. § 1961(1).  Its references to federal law in §1961(1)(B)-(F), are specific citations to various statutes by name or by United States Code title and section.  The references to state law in § 1961(1)(A) are not to chapter and verse but, instead, according to RICO's legislative history, "[t]he state offenses are included by generic designation."  H.R. Rep. No. 91–1549, at 56 (1970).  Courts construing RICO have found that the references to state law only serves a definitional purpose—i.e., to generally identify the kind of activity made illegal by RICO.  *United States v. Salinas*, 564 F.2d 688, 690 (5th Cir. 1977); *accord United States v. Bagaric*, 706 F.2d 42, 62-63 (2d Cir. 1983); *United States v. Frumento*, 563 F.2d 1083, 1087 n.8 (3d Cir. 1977).  This is, in part, to avoid inconsistencies in federal RICO law and avoid an outcome where the same criminal act could be the basis of a RICO violation in one state but not in another simply because the state laws differ slightly even though the generic definition of the crime does not differ from state to state.  *United States v. Paone*, 782 F.2d 386, 393–94 (2d Cir. 1986); *Bagaric*, 706 F.2d 42, 62–63 (2d Cir. 1983).

Courts from around the country have addressed the issue of "chargeability" as it relates to substantive racketeering activities and found that even when the state was not able to charge and convict a defendant for multiple racketeering acts based on certain state laws, the acts still counted as separately chargeable racketeering activities for RICO's purposes.  For instance, in *United States v. Friedman*, 854 F.2d 535, 565 (2d Cir. 1988), the Second Circuit refused to dismiss a RICO indictment where the government used as two RICO predicate acts two crimes that could not engender separate convictions under state law.  In *Friedman*, the defendant claimed that the two bribes he was charged with making could not constitute separate predicate acts since under state law the bribes at issue could only constitute a single offense. *Id*.  The court assumed that the defendant had correctly stated the state law but nevertheless held that the two bribes could constitute separate RICO predicate acts because the state law at issue did not change or affect the definition of bribery.  Similarly, in *United States v. Licavoli*, 725 F.2d 1040, 1046–47 (6th Cir. 1984), the Sixth Circuit held that murder and conspiracy to murder could serve as two separate predicate racketeering acts even though the defendants could not have been charged with and punished for both crimes under Ohio law.

The Defendant's argument that a crime cannot be a racketeering activity because a state court prosecutor could not "charge" the crime has also been raised and rejected in the context of state statutes of limitations.  Even when the state statute of limitation has run on a state crime that is being offered as a predicate racketeering offense such that a prosecutor could no longer charge the state crime, courts have still held that the offense was still "chargeable" within the meaning of 18 U.S.C. § 1961(1)(A).  *Licavoli*, 725 F.2d at 1047; *United States v. Malatesta*, 583 F.2d 748, 758 (5th Cir. 1978), cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United*

*States v. Davis*, 576 F.2d 1065, 1066–67 (3d Cir. 1978), cert. denied, 439 U.S. 836 (1978); *United States v. Forsythe*, 560 F.2d 1127, 1134 (3d Cir. 1977).

Here, whether the RICO and murder conspiracies merge only affects sentencing and double jeopardy. It does not change the generic state law definition of murder. If looked at individually, each of the three sentencing enhancements related to the conspiracies to murder alleged in this case was an act involving "murder" that could be chargeable and punishable under Maryland law. *United States v. Simmons*, 11 F.4th 239, 259–60 (4th Cir. 2021)(finding that conspiracy to commit first-degree murder was a racketeering activity as defined by Section 1961(1)). Even if Maryland conspiracy law required the three conspiracies to merge with the overarching RICO at sentencing such that they could not be separately punished, the three conspiracies would remain "chargeable under State law" for the purposes of RICO and constitute separate racketeering activities because the rule does not affect the definition of murder. *Friedman*, 854 F.2d at 566.

Because the murder conspiracies alleged in the sentencing enhancements are acts or threats involving murder that are chargeable under state law that carry the potential for a life sentence, they are properly pled racketeering activities that would expand the penalty for the Defendant beyond RICO's 20-year statutory cap.

### 4.  There Is No Need to Certify A Question To The Maryland Supreme Court.

The Supreme Court of Maryland may answer a question of law certified to it by a federal court if: (1) "the answer may be determinative of an issue in pending litigation in the certifying court;" and (2) "there is no controlling appellate decision, constitutional provision, or statute." Md. Code Ann., Cts. & Jud. Proc. § 12-603.

"It is well established that the decision to certify a question to the Supreme Court of Maryland is not obligatory and rests in the sound discretion of the federal court." *Aarow Elec. Sols.*

*v. Tricore Sys., LLC*, No. CV JKB-22-2363, 2023 WL 6161897, at *3 (D. Md. Sept. 21, 2023).

"Just because a question of law qualifies for certification ... does not mean the Court *must* certify

it." *Doe v. Chesapeake Med. Sols., LLC*, Civ. No. SAG-19-2670, 2020 WL 917061, at *4 (D. Md.

Feb. 26, 2020) (emphasis in original).  Certification is not necessary where the federal court can

"render a reasoned and principled conclusion."  *Simpson v. Duke Energy Corp.*, 191 F.3d 448

(Table) (4th Cir. 1999) (concluding that the district court below did not err in denying certification

"[b]ecause there exists sufficient sources of [state] law for us to render a reasoned and principled

conclusion"); *see also Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (explaining

that, even where "Maryland's courts have not interpreted the statute[,]" the court can "look first to

its plain meaning to determine whether [it] can deduce [the statute's] import without certifying a

question").

     As discussed above, it is clear from available state and federal law that the murder

conspiracies alleged as sentencing enhancements are chargeable racketeering activities that carry

the possibility of a life sentence under Maryland law and are legally separate offenses from the

RICO conspiracy.  Further, the Defendant's argument hinges on whether the murder conspiracies

are "chargeable" racketeering activities under RICO.   This is a question of federal law.

Accordingly, there is no need to certify the question to the Maryland Supreme Court as the defense

suggests.

### 5. There Is No Cause to Sever Harrison's Trial From His Co-Defendants.

     For all the reasons discus above in Section VII, severance is not warranted in this case.

Additionally, this case is similar to *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012).  In

*Dinkins*, three defendants were tried together on charges relating to murdering government

witnesses, murdering a coconspirator, and various narcotics and weapons offenses stemming from

the defendants' involvement in a drug-trafficking conspiracy.  The defendants moved to have separate trials; however, the district court denied severance.  Defendants appealed, arguing that they suffered prejudice from the joint trial because the jury was presented with evidence of multiple murders, akin to a "blizzard of violence," even though each murder was not attributable to every defendant.  *Dinkins*, 691, F.3d at 367.   The Fourth Circuit affirmed the district court's denial of severance, holding that while each defendant was not charged with the same murder, every defendant was charged with a murder in furtherance of their drug conspiracy, resulting in no prejudice from trying them together.  *Id.* at 368.

Like in *Dinkins*, it is immaterial that Harrison did not engage in every criminal act alleged in the indictment and that the government will present evidence of at trial.  Because the defendants are charged with participating in violent acts, including murder and murder conspiracy, as part of a RICO conspiracy, a joint trial presents no prejudice to Harrison. Harrison's vague assertions in his motion of prejudice are insufficient to meet the demanding standard for severing a trial.

Furthermore, as discussed above, even if Harrison were to suffer some prejudice from a joint trial, the prejudice could be mitigated by limiting instructions.  *See Dinkins*, 691 F.3d at 368 (stating that severance is a drastic remedy and any prejudice that may occur from a joint trial can be remedied with limiting instructions).  For instance, if necessary, the Court could instruct the jury that when considering the sentencing enhancements to focus on the individual culpability of each defendant. *United States v. Lazo*, 816 F. App'x 752, 759-60 (4th Cir. 2020) (affirming the district court where it did not sever defendants' trial and gave limiting instructions that focused the jury on each defendant's individual culpability).  Harrison does not present any reason why, if there is some risk of prejudice, the drastic remedy of severance is necessitated here, and a jury instruction would not be the more appropriate remedy.

C.      **Conclusion**

The three murder conspiracies related to Harrison are properly pled as sentencings enhancements that would expand the Defendant's potential punishment beyond RICO's 20-year statutory cap.   These sentencing enhancements should not be dismissed because they are not subsumed by, and therefore not multiplicitous of, the overall RICO conspiracy.   Each murder conspiracy is also chargeable under state law based on state rules for pleading multiple conspiracies and how the courts have defined "chargeable" under federal RICO law.   Accordingly, there is no need to certify any question to the Maryland Supreme Court.

XI.    **Response to Warren's Request for Notice of Rule 404(b) Evidence (ECF No. 143)**

Warren moves to require the government to disclose its intention to introduce evidence of other bad acts, pursuant to Federal Rule of Evidence 404(b).

First, the government does not intend to present any Rule 404(b) evidence in this case.   It is the government's position that each of the overt acts listed in Count One of the indictment were committed in furtherance of the charged racketeering conspiracy, and each piece of evidence presented in the government's case-in-chief at trial will be used to establish the defendant's participation in the charged racketeering conspiracy.

Evidence of "other crimes" should be distinguished from "evidence of uncharged conduct [arising] out of the same series of transactions as the charged offense, or [evidence that] is necessary to complete the story of the crime on trial."  *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (approving evidence of criminal conduct involving uncharged individuals which took place a year before the charged conspiracy period, *without* recourse to Rule 404(b)).

However, should the Court determine that any such act is not within the scope of charged conduct, the government will seek admission of the evidence pursuant to Federal Rule of Evidence 404(b).   Either way, notice has been provided pursuant to Rule 404(b) as requested by the

defendant.  The government has produced voluminous discovery relating to murders, shootings, assaults, drug trafficking offenses, and firearms offenses committed by the defendants that it intends to prove at trial.  At this time, the government does not intend to use any evidence in its case-in-chief that has not been produced in discovery.

**XII.    Response to Warren's Motion for Disclosure of Materials Related to Law Enforcement Witnesses (ECF No. 144)**

Warren seeks the disclosure of "all information tending to impeach any law enforcement officer or agent the Government may seek to call as a witness at any hearing or trial in this case." ECF No. 144 at 1.  Specifically, Warren requests early disclosure of *Giglio* material related to law enforcement witnesses.  *Id*. at 2.

The government is required under *Brady v.* Maryland, 373 U.S. 83 (1963), to produce exculpatory evidence material to the defendant's guilt.  Additionally, under *Giglio v. United States*, 405 U.S. 150 (1972), the government must produce information that could be used to impeach a key witness.  *Id*. at 154.

The government is not aware of, nor has the defendant cited, any legal obligation that the government produce *Giglio* material months in advance of trial.  The government certainly recognizes the breadth of this case, and that it will call many law enforcement witnesses at trial. But at this stage, the government does not yet know who all those witnesses will be.  Accordingly, the defendant's motion should be denied.

That being said, the government will work with the defendants to ensure that they have enough time to review *Giglio* material for law enforcement witnesses prior to any hearing and trial. As is done in other cases in this district, the government will endeavor to produce to the defendants what are referred to as "IAD Summaries" well in advance of the typical one-week before trial deadline for *Giglio* material.  Those IAD Summaries will assist the defendants in identifying any

IAD matters that they believe would constitute *Giglio* material.  The government will then produce to the defendants all the underlying documents and media, which can be voluminous.

## XIII.    Response to Warren's Motion to Join and Adopt Motions by Other Co-Defendants (ECF No. 145)

Although the government does not object to the adoption of motions of general applicability, it is respectfully requested that Warren be required to particularize his basis for adopting co-defendants' motions to the extent they are relying on different facts or authorities. Otherwise, the government is left in the impossible position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *cf. United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975) (defendants who failed to present specific grounds for suppressing evidence at motions hearing could not raise claims for the first time during trial).

## XIV.    Response to Warren's Motion for Leave to File Additional Motions (ECF No. 146)

The government takes no position on this motion.  However, to the extent Warren is allowed to file additional motions, the government respectfully requests that Warren provide a basis for the delayed motion and that the government be given at least two weeks to respond.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the

defendants' pre-trial motions.

Respectfully submitted,

Erek L. Barron
United States Attorney


By: _____/s/_____
Ari D. Evans
Patricia McLane
Kim Y. Hagan
Assistant United States Attorneys
36 South Charles St., 4th Floor
Baltimore, Maryland 21201
Tel.: (410) 209-4800

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of May, 2024, a copy of the foregoing Government's Consolidated Motions Response was electronically filed with the Court using the CM/ECF system and served to all counsel of record.


_____/s/_____
Ari D. Evans
Assistant United States Attorney