# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.     JKB-22-439** |
| **DAVID WARREN, et al.,** | |
| **Defendants.** | |

## GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY

The United States of America, by its undersigned counsel, respectfully submits this Notice of Supplemental Authority for the Court's consideration.

In preparing for the motions hearing in the above-captioned case, the Government came across an opinion relevant to the Defendant's Motion to Suppress Rap Music.  ECF No. 109.  On June 12, 2024, the Fourth Circuit Court of Appeals issued an opinion in United States v. Banks which upheld the admission of music lyrics and videos that illustrated connections between conspiracy members; showed knowledge of crimes committed by members; and detailed specific acts committed by the defendant.  *See* No. 19-4620, 2024 WL 2947272, at 26-29 (4th Cir. June 12, 2024).  The court held that when considering the admissibility of music lyrics, the rule issued in United States v. Recio, 884 F.3d 230, 235 (4th Cir. 2018) applied, "recognizing that such evidence 'can be relevant if [it] match[es] details of the alleged crime' or 'show[s] a defendant's knowledge or motive'".

The Banks opinion is attached to this Notice for the Court's consideration.

Respectfully submitted,

EREK L. BARRON
United States Attorney

By:      /s/
              Ari D. Evans
              Kim Hagan
              Patricia McLane
              Assistant United States Attorneys
              36 South Charles Street
              Baltimore, Maryland 21201
              (410) 209-4800

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4620**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

RANDY BANKS, a/k/a Dirt,

        Defendant – Appellant.

**No. 19-4826**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

JAMAL LOCKLEY, a/k/a T-Roy, a/k/a Droid,

        Defendant – Appellant.

**No. 20-4193**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

CORLOYD ANDERSON, a/k/a Bo,

       Defendant – Appellant.

————————————

**No. 20-4250**

————————————

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

SHAKEEN DAVIS, a/k/a Creams,

       Defendant – Appellant.

————————————

**No. 20-4266**

————————————

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

DANTE D. BAILEY, a/k/a Gutta, a/k/a Almighty, a/k/a Wolf,

       Defendant – Appellant.

————————————

Appeals from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge. (1:16-cr-00267-CCB-5; 1:16-cr-00267-CCB-8; 1:16-cr-00267-CCB-11; 1:16-cr-00267-CCB-20; 1:16-cr-00267-CCB-1)

————————————

Argued:  May 7, 2024                              Decided:  June 12, 2024

---

Before AGEE and WYNN, Circuit Judges, and Gina M. GROH, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Agee wrote the opinion in which Judge Wynn and Judge Groh joined.

---

**ARGUED:**  Stuart A. Berman, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland; Lauren Nicole Beebe, ALLEN OVERY SHEARMAN STERLING US LLP, Washington, D.C.; Gerald Thomas Zerkin, Richmond, Virginia; Carmen D. Hernandez, LAW OFFICES OF CARMEN D. HERNANDEZ, Highland, Maryland, for Appellants. Jefferson McClure Gray, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Allen H. Orenberg, THE ORENBERG LAW FIRM, PC, Potomac, Maryland, for Appellant Jamal Lockley.   Adam B. Schwartz, ALLEN OVERY SHEARMAN STERLING US LLP, Washington, D.C., for Appellant Dante Bailey.  Erek L. Barron, United States Attorney, Brandon K. Moore, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

AGEE, Circuit Judge:

Five members and associates of a Baltimore-based gang appeal multiple components of their convictions and sentences. As discussed below, because Shakeen Davis' two felon-in-possession convictions were obtained in violation of *Rehaif v. United States*, 588 U.S. 225 (2019), we reverse those convictions and remand for entry of a corrected judgment. As for all the other challenged convictions and sentences, we affirm.

## I.

Recounted in the light most favorable to the Government, the evidence adduced at trial showed the following: Over a decade ago, Dante Bailey founded Murdaland Mafia Piru (MMP) as a branch of the Bloods gang operating throughout Baltimore City and County, Maryland. The so-called "5200 boys" operated alongside MMP members, earning their moniker from the 5200 block of Windsor Mill Road, which was considered MMP's headquarters. MMP had a hierarchical structure and adopted many features of the Italian mafia. Bailey was its "Don" or "Godfather." Subordinates operated MMP's extensive drug-trafficking operation involving the distribution of heroin, cocaine, cocaine base, fentanyl, marijuana, and other controlled substances. MMP required non-gang members who wanted to distribute drugs in its territory to pay "taxes."

In addition to MMP's drug-trafficking endeavors, it also undertook various enforcement measures—often violent ones—to ensure its operations ran smoothly and to maintain control of its territory. Bailey (and MMP generally) took any sign of disrespect seriously, leading to punishment of MMP members and non-members alike. In furtherance

4

of its operations, MMP members and affiliates were responsible for the attempted murders and murders of multiple individuals.

Federal, state, and local authorities investigated MMP's illicit activities for many years, eventually amassing extensive evidence against a network of street-level dealers all the way to Bailey himself. This evidence took many forms, from recorded controlled buys and surveillance footage to wiretap conversations, cellphone data, and the statements of cooperating witnesses.

The investigation into MMP led to indictments charging over two-dozen defendants with a Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy, a narcotics conspiracy, and related offenses. All but six individuals pleaded guilty. At issue before us is the appeal from the joint, six-week trial against five defendants: Dante Bailey, Shakeen Davis, Corloyd Anderson, Jamal Lockley, and Randy Banks.[1]

Bailey was convicted of conspiracy under RICO, in violation of 18 U.S.C. § 1962(d); conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), (2); and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. For these four convictions, Bailey was sentenced to concurrent terms of life imprisonment. Bailey was also convicted of possession of a firearm and ammunition as a

---

[1] A sixth defendant, Sydni Frazier, was initially part of this trial, but was severed after his attorney could not proceed in the joint trial. He was subsequently convicted in a separate trial and his appeal is pending in this Court, Case No. 22-4368, but it is not part of this appeal.

convicted felon, in violation of 18 U.S.C. § 922(g), for which he received a 20-year sentence, to run concurrent to the life sentences.

Davis was convicted of both conspiracies, for which he was sentenced to a term of 300 months' imprisonment for each count, to run concurrent to each other. In addition, he was convicted of two counts of possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g), for which he was sentenced to 120 months' imprisonment, to run concurrent to the sentence for the conspiracies. Davis was also convicted of one count of distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, for which he received a 240-month sentence, to run concurrent with the previously mentioned sentences. Lastly, Davis was convicted of one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), for which he received a 60-month term of imprisonment, to run *consecutive* to his other sentences.

Anderson was convicted of both conspiracies, for which he received a sentence of 264 months' imprisonment on each count, to run concurrent to each other. He was also convicted of one count of possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g). But in light of the Supreme Court's later-issued decision in *Rehaif*, the Government stipulated to the dismissal of that conviction.

Lockley was convicted of both conspiracies, for which he was sentenced to a 360-month term of imprisonment on each count, to be served concurrent to each other. In addition, he was convicted of one count of distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, for which he was

6

sentenced to 120 months' imprisonment, to run concurrent to the sentences for the conspiracy convictions.

Lastly, Banks was convicted of the narcotics conspiracy, for which he was sentenced to a total term of 216 months' imprisonment. The jury returned a verdict of not guilty on the RICO conspiracy charge.

After trial, but before the Defendants' sentencing hearings, it came to light that one of the law enforcement officers who had been part of the investigation had—many years prior and in an unrelated incident—obtained proceeds from the sale of controlled substances seized at the scene of a crime. That (now-former) officer later pleaded guilty to an offense arising from the investigation into that misconduct. And because this former officer had been the affiant on several wiretap applications and search warrants during the MMP investigation, the Defendants moved for a new trial, arguing that the officer's misconduct tainted evidence that had been obtained and introduced against them. The district court denied the motion, concluding that the former officer's misconduct did not implicate the trial evidence or otherwise undermine confidence in the verdict.

The Defendants noted timely appeals, and we consolidated their cases for briefing and oral argument. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

On appeal, the Defendants raise fifteen discrete issues challenging their convictions and sentences, and even more arguments in support of those issues. We note at the outset

7

that we have considered all these arguments, even if we do not directly address them in the discussion that follows.

### A.  Challenges to the Trial and Convictions

#### 1.    Motion for New Trial

The Defendants argue that the district court erred in denying their motion for a new trial based on former Baltimore City Police Officer Ivo Louvado's role in the MMP investigation. We review the denial of a motion for a new trial for abuse of discretion. *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010).

#### a.    Background Facts

The record shows that in 2009, while Louvado was a police officer, he and other corrupt police officers "stole and resold three kilograms of cocaine," splitting the proceeds of the sales between them. *United States v. Bailey*, No. CCB-16-267, 2022 WL 1451653, *1 (D. Md. May 9, 2022). Direct evidence of Louvado's crime came to light in April 2019, during the middle of the MMP trial and as a result of a separate investigation into corruption within the Baltimore City Police Department. Following a confidential investigation, Louvado was charged in March 2020 with one count of lying to investigators about the drug theft. He pleaded guilty to that offense in November 2020. *Id.* at *4.

Louvado became involved in the MMP investigation while he was on a detail with the federal Bureau of Alcohol, Tobacco, and Firearms (ATF). Before addressing his specific role, we note its context within the broader investigation that led to this trial: State and local authorities had been investigating MMP for a long time before the ATF joined the investigation, and the ATF's investigation predated Louvado's own involvement. This

extensive "pre-Louvado" investigation spanned numerous law enforcement entities and involved traffic stops, searches, seizures, wiretaps, and intercepted jail calls that already implicated numerous MMP members, including Bailey, Davis, and Lockley, in the charged conduct. *Id.* at *2.

As for Louvado's role in the investigation, the Government identified—and the Defendants do not dispute—that after Louvado joined the MMP investigation, he acted "outside the presence of other officers" on just two occasions. *Id.* On the first occasion, he was the sole law enforcement officer to check a confidential informant before a controlled buy that was itself recorded. But this particular controlled purchase was not introduced into evidence at trial. *Id.* On the second occasion, "Louvado surveilled Lockley as Lockley exited his home, got into a car, and drove away." *Id.* But this entire surveillance was captured on video recording, and it was not a material part of the evidence against Lockley.

In addition to those two occurrences, Louvado was the direct or cross-referenced law-enforcement signatory for several search warrants and wiretap authorizations during the MMP investigation. *See id.* at *2–3. For example, he applied for warrants to search Frazier's and Davis' cell phones and Davis' Instagram account. He applied for warrants to search several MMP-associated locations, including Lockley's home, Anderson's home and business, and Davis' home. And he was the sole affiant to obtain authorization to wiretap the phones of two other co-conspirators. On each of these occasions, however, the probable cause underlying the applications and affidavits was based on information that did not originate from or otherwise involve Louvado. Instead, the probable cause to obtain the requested authorizations originated from independent evidence, including recorded

controlled buys, publicly available social media posts, and arrests for other specific offenses.

As the investigation into MMP continued, a separate federal investigation began looking into corruption within the Baltimore Police Department's Gun Trace Task Force. Louvado had never been a member of that task force, but in July 2017, a witness in that investigation admitted to stealing money during a 2009 drug search. He named two other officers who had also participated in the theft. He did not name Louvado as a participant in the theft, but he implied that Louvado may have participated by mentioning that Louvado had purchased a boat shortly after the theft. *Id.* at *4.

The following month, the task force investigators met with the MMP trial team to summarize what they knew at that point—that no one had identified Louvado as someone who had stolen drug money, that Louvado had not yet been questioned, and that they had no evidence of his participation in the theft (for example, his financial records did not point to having received large cash deposits around that time). *Id.*

In March 2018, another witness in the task force investigation relayed his second-hand impression that Louvado had been involved in the 2009 drug theft. But that witness had not been present and could not otherwise corroborate his suspicion, so investigators still had no direct evidence that Louvado had committed a crime. *Id.*

During May 2018 and February 2019 interviews with task force investigators, Louvado denied knowing about any relevant criminal activity. *Id.*

In April 2019, a witness for the task force investigation provided the first concrete evidence of Louvado's criminal involvement. Namely, he admitted seeing Louvado steal drugs in February 2009. *Id.*

At that time, the MMP trial was in its third week. Investigators reported this evidence to supervisors, but the U.S. Attorney's office determined that the MMP trial attorneys had no *Giglio*[2] obligation to disclose the witness's statement about Louvado for three reasons: "(1) Louvado was not a trial witness; (2) the information in [Louvado's affidavits and applications] was independently verifiable; and (3) the [task force] investigation was still underway with potential covert steps to be taken." *Id.*

The investigation into Louvado's criminal conduct culminated in a March 2020 criminal information against him for lying to investigators about the drug theft, and he pleaded guilty to that offense months later.

### b.    Governing Law

The Defendants argued in favor of a new trial because of Louvado's separate criminal acts under two separate theories. First, they alleged that they satisfied Federal Rule of Criminal Procedure 33, which authorizes a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." When considering whether to grant relief under Rule 33, courts look to five factors to determine whether "justice" demands a new trial: "(a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the

---

[2] *Giglio v. United States*, 405 U.S. 150 (1972).

movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *Robinson*, 627 F.3d at 948 (cleaned up).

Second, and independently, the Defendants asserted that a *Brady* and *Giglio* violation warranted a new trial. Those cases state that a defendant's due-process rights are violated when the prosecution suppresses evidence "favorable to an accused" or for impeachment purposes. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio*, 405 U.S. at 153–54. To secure a new trial under this theory, a defendant must show that (1) the undisclosed evidence was favorable to him; (2) it was material, i.e., caused him prejudice; and (3) the prosecution possessed the evidence, yet failed to disclose it. *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001).[3]

c.   Analysis

The Defendants cannot prevail under either theory to a new trial because they cannot show at least one element common to both: that evidence relating to Louvado's criminal misconduct was material. Though the precise ambit of what materiality entails varies

---

[3] We have never held that *Brady* and *Giglio* apply to evidence bearing on the warrant-application stage as opposed to evidence admitted at trial. To the contrary, when previously confronted with a similar argument, we observed that caution should be exercised before "importing the panoply of *Brady* protections from trial practice into warrant application proceedings." *United States v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990). We need not elaborate on the different concerns at issue or definitively reject the applicability of *Brady/Giglio* to the warrant-application stage to resolve this case. The lack of materiality is so clearly shown, even in the unlikely event that *Brady/Giglio* would apply in this context, that it is unnecessary to address this threshold point.

according to the particular pathway to relief, the concept generally requires the Defendants to demonstrate that not knowing about Louvado's crime at the time of the trial somehow prejudiced them. *Compare Robinson*, 627 F.3d at 950 (holding that evidence of police misconduct is not material for purposes of a Rule 33 motion for a new trial when it "says little about [a defendant's] guilt or innocence on the[] [charged] counts"), *with United States v. Fulcher*, 250 F.3d 244, 254–55 (4th Cir. 2001) (holding that newly discovered evidence was material for purposes of a Rule 33 motion because it went to the heart of the defendants' defense); *compare also Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (stating, for purposes of *Brady* claims, that "evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"), *with United States v. Bagley*, 473 U.S. 667, 680 (1985) (holding that, for *Giglio* purposes, impeachment evidence is immaterial if "failure to disclose it would be harmless beyond a reasonable doubt").[4] At bottom, the Defendants argue that Louvado tainted the

---

[4] The Defendants' *Brady*/*Giglio*-based argument isn't a true *Brady*/*Giglio* claim because the newly discovered evidence is not exculpatory and, while it may have been of some theoretical impeachment value, Louvado did not testify at their trial. To argue around this problem, they assert materiality that had Louvado's misconduct been disclosed earlier, they would have sought a *Franks* hearing to challenge the admissibility of the evidence obtained as a result of the search warrants and wiretap authorizations that he played a role in obtaining. *See Franks v. Delaware*, 438 U.S. 154 (1978). Even accepting this look-through approach, during a *Franks* hearing, the defendant carries the burden of showing materiality, which in this context requires showing that the omitted information undermines the probable-cause determination. *See United States v. Moody*, 931 F.3d 366, 371 (4th Cir. 2019) ("[T]he defendant must show materiality—that is, that the false statements were necessary to the finding of probable cause. A district court may not hold a *Franks* hearing where, after stripping away the allegedly false statements, the truthful portions of the warrant (Continued)

trial evidence because had he disclosed his own criminal conduct from 2009 in the affidavits and applications he signed, no judge would have approved those requests. That may well be true, but it does not satisfy the Defendants' burden of showing materiality.

To be clear, the Defendants do not identify any evidence that Louvado manufactured nor do they claim that he was ever in a position to manufacture evidence against them such that a fair inference of manufactured evidence could arise. Their briefing does not assert that he had a history of that type of misconduct in other cases. Nor do they argue that the affidavits or applications Louvado signed contained any false statements or omissions bearing directly on the probable-cause determination needed to grant the requests. Their argument thus does not align with the circumstances in which we and other courts have held that an investigating officer's own misconduct cast sufficient doubt on the case against the defendant so as to warrant a new trial. *See United States v. Fisher*, 711 F.3d 460, 466 (4th Cir. 2013) (recounting the "highly uncommon circumstance[]" presented "in which gross police misconduct goes to the heart of the prosecution's case" because a law enforcement officer described events in a search warrant affidavit that did not occur and described statements by a confidential informant who "had no connection to the case"); *see also Milke v. Ryan*, 711 F.3d 998, 1000–01, 1018 (9th Cir. 2013) (holding that evidence of a police officer's undisclosed "long history of lying under oath and other misconduct" was

---

application would still support probable cause." (cleaned up)). Thus, the same materiality problem thwarts the Defendants' ability to show the likely success of a *Franks* motion. *See United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) (concluding that an affiant's omission of a confidential informant's past unreliability was material because the informant's statements were essential to establish probable cause and so the informant's reliability was important when assessing the existence of probable cause).

material to the verdict because the evidence at "trial was, essentially, a swearing contest between" the defendant and the police officer, making the officer's "credibility . . . crucial to the state's case").

Instead, the purported basis for a new trial is entirely unrelated to (1) the evidence establishing probable cause for any evidence obtained as a result of the wiretaps or searches, *and* (2) the evidence introduced to establish the Defendants' guilt at trial. Their sole point in raising Louvado's criminal conduct is to argue that he was a corrupt officer with suspect credibility. (And since he did not testify at trial, Louvado's credibility only comes into play in this case to the extent it swayed a judge to issue the requested warrants and wiretap authorizations. Put differently, they assert that no judge who knew this information about Louvado would have approved a request bearing his signature.) But we have previously held that evidence which is "merely impeaching" "does not generally warrant the granting of a new trial." *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993). To the contrary, "motions for a new trial based on impeaching evidence discovered after trial should be granted 'only with great caution and in the most extraordinary circumstances," as "'[t]here must be a real concern that an innocent person may have been convicted.'" *Id.* at 1360 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d. Cir. 1992)). That principle from the Rule 33 context is also consistent with the Supreme Court's recognition in the *Giglio* context that when the Government's case does not depend on a particular government witness, then undisclosed information that would impeach that witness is immaterial as it does not create a reasonable probability of a different result at trial. *Strickler v. Greene*, 527 U.S. 263, 292–96 (1999). And both this Court and our sister

15

circuit courts have recognized under similar circumstances that the materiality requirement is not satisfied when a law enforcement officer's misconduct is tangential to the evidence establishing a defendant's own culpability. *E.g.*, *Robinson*, 627 F.3d at 950, 952–53 (holding that a new trial was not warranted under either Rule 33 or *Brady/Giglio* because the misconduct evidence "would do little to undermine the largely separate investigation's result" and did not "cut into a somewhat thin and entirely circumstantial government case," while also observing the strength and independence of the government's evidence gleaned "from other sources"); *United States v. Jones*, 399 F.3d 640, 647–48 (6th Cir. 2005) (holding the same because evidence that members of the investigating law-enforcement unit had "engaged in widespread misconduct" did not prejudice the defendant "[g]iven the overwhelming evidence of guilt"); *United States v. Williams*, 985 F.2d 749, 757 (5th Cir. 1993) (holding the same because evidence that the crime lab chemist "pilfer[ed] drugs from the lab" did not call into question evidence that the substance the defendants possessed was "cocaine or crack" when the stolen drugs were of a different kind and were entirely unrelated to the defendants' case).

In this case, the district court reasonably concluded that Louvado played only a minor role in the MMP investigation as a whole and that his unrelated prior criminal conduct—while serious—did not call into question the evidence against the Defendants or the validity of their convictions. Indeed, the bulk of the Government's case at trial did not involve Louvado at all. Of the small part of the Government's case that Louvado had a minor role in, he was either accompanied by other law enforcement officers or documentary evidence corroborated events. And the one controlled buy during which

16

Louvado was unaccompanied for a time with the confidential informant was not introduced at trial. Moreover, each time Louvado played a role in obtaining a search warrant or wiretap authorization, the probable cause establishing the basis for those requests was based on third-hand evidence unrelated to Louvado personally. He may have signed the requests, but that personal attestation mattered little to the underlying support for obtaining authorization to proceed. As the district court aptly observed in describing the limited impeachment value Louvado's misconduct had, "there is a wide gap between deliberate but tangential omissions about an affiant's general credibility and deliberate falsehoods with real factual nexus to the case itself." *Bailey*, 2022 WL 1451653, at *7. Further, "[e]xcluding any declarations from Louvado as to his personal honesty or including the omitted information about the 2009 theft still leaves sufficient confidential informant and other information to justify probable cause for the wiretaps and searches." *Id.* at *9.

Because Louvado's criminal misconduct was immaterial to the evidence establishing the Defendants' criminal culpability, the district court did not err in denying their motion for a new trial.

### 2.   Motion to Enforce Plea Agreement (Bailey)

Just days before the trial began, Bailey moved for enforcement of a plea agreement that would have avoided exposing him to a mandatory sentence of life imprisonment. The district court denied the motion after finding that there had been no meeting of the minds between Bailey and the Government and thus no plea agreement. At the broadest level, the court looked to the communications as a whole and concluded that none set out essential terms of an enforceable plea agreement. For further support, the court observed that the

Government's emails had repeatedly indicated that certain of its offers "were contingent on [four other] defendants pleading guilty, which did not happen." J.A. 7688. In addition, the court pointed out that the Government's emails showed that the Government framed its discussions in contingent language that had to be submitted to supervisors for approval, which was never given.

On appeal, Bailey reiterates his belief that the Government failed to honor either of two offers that he contends he accepted. In view of that perceived breach, he argues that the district court committed reversible error in proceeding to trial rather than holding the Government to its word.[5] First, Bailey asserts that the Government offered a plea deal for 27-40 months' imprisonment in August and October 2018, which he supposedly accepted in October 2018. Second, he claims that the Government offered him another plea deal for a "straight" term of 37 months' imprisonment in January 2019, which he contends he accepted the following month.[6]

---

[5] Alternatively, Bailey argues that the circumstances presented show that trial counsel was ineffective in failing to procure a signed plea agreement and that this error is "conclusively establishe[d]" on the record such that it is cognizable on direct appeal. *See United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010). We disagree that he has met this high standard and so reject this argument.

[6] On appeal, Bailey relies on two affidavits from trial counsel that were submitted *after* the district court denied his motion and which were not part of any motion to reconsider the court's decision. At oral argument, we explored with counsel the unusual posture in which those affidavits were made part of the district court record and questioned the propriety of considering them on appeal. Ultimately, we need not resolve this question. The bulk of their contents was already provided to the district court as part of the motion and hearing process. And even if we considered their additional contents, the district court still did not err in determining that a plea agreement did not exist.

We disagree. The district court did not err in concluding that the parties never entered into an enforceable plea agreement. "[J]udicial interpretation of plea agreements is largely governed by the law of contracts." *United States v. Martin*, 25 F.3d 211, 216–17 (4th Cir. 1994). While oral agreements can be made, we have strongly "suggest[ed] that lower courts require all . . . plea agreements be reduced to writing." *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir. 1997). Before a plea agreement can be enforced, then, the party seeking enforcement must show that a binding contract has been formed. And "[t]he essence of contract formation is . . . a meeting of the minds of the contracting parties." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (cleaned up).

Turning to the first alleged "agreement," emails exchanged between the relevant parties throughout August and October 2018 show initial negotiations and Bailey's attempt to "accept" an offer on terms that did not reflect the Government's most recent offer. Rather than recite all the permutations of the partially documented discussions, we focus on the evidence of where everyone stood just before Bailey allegedly accepted a plea deal "on or around October 9, 2018." Opening Br. 42. In an October 5 email from the AUSA, the Government rejected Bailey's "counter proposal," stating that it "would accept a plea to a range of 27-40, or a straight 37, <u>if</u> [four co-defendants] plead guilty. Unfortunately, they are all still at the table at this point." J.A. 6580. The AUSA then acknowledged that this position was "not what you want to hear" and expressed her willingness to talk further. J.A. 6580. Later that evening, in response to Bailey's counsel asking if the AUSA could "write up the 27 to 40 [agreement] for [Bailey's counsel] to take to [Bailey]" on Monday,

19

October 8, when she planned to visit him, the AUSA apologized and said that she "can't get approval for a plea by Monday." J.A. 6581. Bailey's counsel continued to push for a written plea agreement to take to Bailey on Wednesday, October 10, but the AUSA again indicated that she was "sorry to say I'm not going to be able to get you a plea offer in time for tomorrow's visit." J.A. 6582. On October 10, Bailey's counsel apparently discussed the terms of a *potential* plea deal with Bailey, communicating later that day to the AUSA that "we cleared 27 to 40 with our client who asked us to request a specific number – 35 or 37. He knows you will be asking for 40. Our understanding was that 35 was 'No' and 37 was only if we could get the others to take the offer made to them. . . . We believe there is a much better chance . . . if . . . the plea is done. We could have had a signed deal . . . last week and still can get one if we could get something to sign!!" J.A. 6583. Bailey's counsel closed the email by saying, "We feel like we have a sure thing that keeps slipping away as the time passes." J.A. 6583.

All this to say, before Bailey is even alleged to have accepted any offer, his counsel had heard multiple times from the AUSA that there was no firm offer to present to Bailey. Bailey's counsel's own statements to the AUSA at the time reflect her recognition of that basic fact: the parties were still discussing the terms and no final agreement had been reached. In fact, Bailey's counsel was continuing to tweak terms on October 10 when she sought the Government's approval of a *different* term of imprisonment than the range Bailey had purportedly "cleared" earlier that day. On this record, the district court did not err in determining the parties never reached a meeting of the minds such that there was any plea deal for Bailey to accept "on or around October 9."

We reach the same conclusion as to the negotiations that took place in January 2019, which culminated with Bailey's purported "acceptance" on February 18, 2019. The record shows that *after* the Government communicated to Bailey's counsel that it would *not* offer a plea to thirty-seven years' imprisonment unless four other co-defendants pleaded guilty, Bailey's counsel unilaterally drafted a document incorporating standard language of a plea agreement in that district. The document stated that the parties agreed to a thirty-seven year term of imprisonment without mentioning anything about the deal being contingent on other co-defendants pleading guilty. On February 18, 2019, Bailey and his counsel signed this document. Counsel then sent the document, along with a letter recounting the plea negotiations, to the Government. Particularly instructive here, the letter acknowledges that the Government's most recent communication had said "that although we had reached agreement on the terms of a plea agreement for Mr. Bailey, you would not extend a formal written offer unless and until [four co-defendants] pled." J.A. 6589. The letter asked the Government to "agree that permitting Mr. Bailey to plead guilty to the terms on which we have agreed is the appropriate resolution of the charges against him, whether or not his co-defendants plead, and that you will execute the agreement we are providing." J.A. 6589. The record could not be clearer—Bailey sought to unilaterally change the conditions under which the Government had indicated it would be willing to accept a plea deal. Plainly there was no meeting of the minds. Bailey could not "accept" a plea based on terms the Government never offered to him. And the Government never accepted the terms Bailey presented to it.

21

Because a plea agreement was never formed, the district court properly denied Bailey's motion to enforce a (non-existent) plea agreement.

### 3. *Rehaif* Error (Davis)

This trial took place before the Supreme Court issued its decision in *Rehaif*, so neither the district court nor the parties had the benefit of that ruling, which "brought a sea change to [§ 922(g)(1)] cases." *United States v. Gallman*, 57 F.4th 122, 130 (3d Cir. 2023). In *Rehaif*, the Supreme Court held that the statutory term "knowingly" applied to the defendant's conduct *and* status. 588 U.S. at 229. And as had been the situation in so many cases brought before *Rehaif* was decided, the jury here was not specifically instructed that the Government had to come forward with proof that those defendants charged with a § 922(g)(1) offense knew that they fell within a class prohibited from possessing firearms.

Although the Government moved to dismiss Anderson's § 922(g)(1) conviction after <u>*Rehaif*</u>, it did not do the same with respect to Davis' two § 922(g)(1) convictions (Counts 16 and 30). Nonetheless, at sentencing, the Government noted the possibility that Davis' § 922(g)(1) convictions may be reversed on appeal in light of *Rehaif* and it asked the district court to specify whether it would have imposed the same sentence for Davis' convictions on the other counts regardless of whether his § 922(g)(1) convictions were later reversed on appeal. The district court readily agreed to do so, stating that it would impose the same sentence, irrespective of any *Rehaif* error as to Davis' § 922(g)(1) convictions.

On appeal, the parties agree that *Rehaif* error occurred. Their dispute is limited to whether Davis can establish relief on plain-error review, specifically whether the error affected his substantial rights. *United States v. Barronette*, 46 F.4th 177, 198 (4th Cir.

2022) (reiterating that this requires a defendant to show "a reasonable probability that, but for the error, the outcome of the proceeding would have been different"). On this point, since *Rehaif*, the Supreme Court has recognized that the mere fact that a defendant has a prior felony conviction is not dispositive to proving whether he knew of his status, though "common sense" suggests that an individual who is a convicted felon "*ordinarily* knows he is a felon." *Greer v. United States*, 593 U.S. 503, 506, 508 (2021) (emphasis added). That typical scenario gives way, however, when the defendant "can make an adequate showing on appeal that he would have presented evidence in the district court that he did not in fact know he was a felon when he possessed firearms." *Id.* at 509.

In assessing whether a defendant satisfies plain-error review in a *Rehaif* context, our decision in *United States v. Barronette* is instructive. There, we held that a § 922(g)(1) defendant had satisfied his burden on plain-error review of a *Rehaif* error. The defendant had prior state-law convictions for offenses classified as misdemeanors under state law but which met the technical requirements to be classified as felonies for purposes of § 922(g)(1). 46 F.4th at 198–99. Although the defendant had been sentenced to more than one term of imprisonment over one year long, most of the sentences had been suspended such that he served only one stint in prison that lasted slightly more than one year. *Id.* at 199. In those circumstances, we concluded that "there [was] a lack of record evidence that [the defendant] knew that he was convicted of a state crime [that met the federal definition of a felony for § 922(g)(1) purposes], especially when his crimes were labeled as misdemeanors," leading us to hold that "the *Rehaif* error affected his substantial rights"

and satisfied plain-error review. *Id.*; *see also id.* at 200–01 (distinguishing *Greer* and explaining this conclusion further).

*Barronette* counsels the same result here. While that defendant had multiple prior convictions that met the federal definition of a "felony," Davis had a single prior state conviction that did so. In both *Barronette* and here, the state conviction was labeled under state law as a "misdemeanor." And while the defendant in *Barronette* had actually served time in prison for more than one year, Davis' entire sentence had been suspended. Given *Barronette*'s conclusion, Davis has shown even more clearly "that, but for the *Rehaif* error in the jury instructions, there is a reasonable probability that a jury would have acquitted him" of the § 922(g)(1) counts. *Greer*, 593 U.S. at 510; *see also Barronette*, 46 F.4th at 198–201.[7]

Despite Davis satisfying the other elements of plain-error review, we only afford relief "if the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Barronette*, 46 F.4th at 201 (cleaned up). As we did in *Barronette*, we hold the *Rehaif* error had a serious effect on Davis' § 922(g)(1) conviction. Specifically, Davis has shown "why a jury in an error-free trial might have reasonable doubts as to the knowledge-of-felon-status element, thus calling into question whether a jury would have convicted [him] had they been required to find beyond a reasonable doubt that he knew at

---

[7] Arguing against this result, the Government points to a single jailhouse phone call in which Davis stated that he had stashed firearms in the woods but was not going to retrieve them because of a police presence. The Government asks too much of that evidence to cast it as proving that Davis knew of his felon status at the time this statement was uttered.

the time of his" possession offense that he also knew of his felon status. *Id.* (cleaned up). These circumstances combine to effect "a miscarriage of justice" should we affirm his § 922(g)(1) convictions. *Id.* (citation omitted). We therefore reverse Davis' § 922(g)(1) convictions (Counts 16 and 30).

The question then becomes the scope of our remand instruction. Given the sentencing transcript, we believe justice is best served by remanding for entry of an amended judgment without the need for a plenary resentencing. During sentencing, the district court specifically engaged the question of whether it would impose the same sentence if the § 922(g)(1) convictions were reversed. It unequivocally responded that it would impose the identical sentence regardless of this outcome, stating:

> [A]bsolutely, Counts 16 and 30, if for some reason those 10-year sentences had to be vacated, I would still believe that the 25 years on the other counts, followed by the five years on Count 32, would be reasonable and sufficient without being greater than necessary.

J.A. 6527. Reviewing the nature of Davis' remaining convictions and the district court's explanation at sentencing for the sentence it imposed, we conclude that this statement adequately addresses the basis for Davis' sentence and eliminates the need for resentencing.

### 4. Admissibility of Evidence

The Defendants raise various objections to the district court's rulings authorizing the admission of certain evidence at trial. First, all of the Defendants challenge on plain-error review the district court's decision to allow the Government to admit certain music videos, music lyrics, and social media posts created by the Defendants, which they claim

did not prove any element of any offense and were unfairly prejudicial under Federal Rule of Evidence 403. Next, Bailey argues that the district court abused its discretion in allowing the introduction of expert testimony concerning a "match" in firearms evidence because that testimony conflicted with the district court's pre-trial ruling limiting the scope of the expert testimony. Lastly, Davis and Anderson argue that because their felon-in-possession convictions cannot stand under *Rehaif*, evidence that was admissible only in support of that offense—namely, evidence of their felon status—was otherwise unfairly prejudicial and requires vacatur of their remaining convictions.

a.  Music Videos, Lyrics, & Social Media Evidence

The Government introduced into evidence music videos, lyrics, and social media posts generated by and depicting the Defendants and others, which the Defendants contend on appeal were irrelevant and unduly prejudicial because they did not prove any element of any offense and were inherently inflammatory. They argue that this evidence should not have been admitted under a proper assessment of Rules 401, 402, and 403. And they argue that the error prejudiced them such that their convictions should be vacated and the case remanded. We disagree.

As an initial matter, we note two procedural concerns before turning to the merits. First, the parties disagree on whether this issue was preserved in the district court and how that affects our standard of review. We need not resolve that question, however, because even assuming that the Defendants adequately preserved the issue when Davis (acting alone) raised it in a motion in limine, they have not demonstrated the district court abused its discretion in allowing the admission of this evidence.

26

Second, we note that by attacking distinct categories of evidence in cursory fashion on appeal, the Defendants have painted their challenge with such a broad brush that they arguably fell short of the requirements of Federal Rule of Appellate Procedure 28(a), which requires meaningful engagement with the record and applicable case law. *See* Fed. R. App. P. 28(a)(8); *see Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (noting that to adequately raise an issue on appeal, parties are required to take more than "a passing shot at [an] issue"). Instead, the Defendants challenge the admissibility of everything from social media posts and images to music videos and lyrics collectively, using only a few examples to support their sweeping argument that the admission of this evidence wholistically impacted the entire trial. We need not rely on this procedural deficiency, however, and instead employ a similarly broad-brush approach rather than a piece-by-piece review. Undertaking this review, we discern no error in the district court's decision to admit these categories of evidence.

The challenged evidence was not clearly irrelevant nor was it unfairly prejudicial. First, it met the "relatively low" threshold for establishing relevancy in that it had "'*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995) (quoting Fed. R. Evid. 401 (emphasis added)). In the specific context of social media posts and music lyrics, we have previously recognized that such evidence "can be relevant if [it] match[es] details of the alleged crime" or "show[s] a defendant's knowledge or motive." *United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018). Some of the evidence was relevant to the charged conspiracies because

it helped the Government to establish identity and relationships given that the Defendants and co-conspirators are depicted together. Still more of this evidence lent additional support for components of the charged conspiracies. For example, they feature the Defendants surrounded by firearms or cash; making MMP hand signals or wearing MMP clothing; and flaunting a violent, drug-fueled lifestyle with specific lyrics and images connecting these acts specifically to MMP's turf. In short, we find no reversible error occurred under Rule 401's standards.

Nor have the Defendants shown plain error under Rule 403's grounds for admissibility. Under this rule, district courts have broad discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," *inter alia*, "unfair prejudice." Fed. R. Evid. 403. But this rule "generally favor[s] admissibility." *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998). Yet again, we are guided by our prior recognition that while there are times that "in some cases courts have excluded lyrics, finding they primarily served to paint the defendant in an unflattering light," "[t]his is not such a case." *Recio*, 884 F.3d at 236. The Defendants were charged for their conduct arising from a multi-year RICO and drug conspiracy involving the MMP, and evidence of the music videos, lyrics, and social media posts went to that point without being unfairly prejudicial as to matters beyond making that connection. Further, given the extensive evidence demonstrating each of the Defendants' own connection to specific acts within the conspiracies and other offenses, the admission of the challenged evidence—which went more broadly to big-picture matters in the case—was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be

disregarded."); Fed. R. Evid. 103(a) (stating that evidentiary errors require reversal only if they "affect[] a substantial right").

In short, the admission of this evidence does not constitute reversible error.

### b. Firearms-Match Evidence (Bailey)

Before James Wagster, an expert in firearms identification, testified on behalf of the Government, Bailey moved to exclude or limit his testimony on the ground that it was impossible to say with one-hundred-percent certainty that firearms and ballistics evidence "matched" each other. The district court ruled that Wagster could offer his opinion that something was a match, stating: "I'm not going to prevent him from saying that, in his opinion, it came from the same gun or that it is a match within a reasonable degree of certainty in the field of ballistics." J.A. 3858. The court also indicated that it would give a limiting instruction that "the fact that someone is allowed to testify as an expert does not mean that the jury has to accept that opinion." J.A. 3863.

At the outset of Wagster's testimony, the district court gave that limiting instruction. Wagster then testified about how he conducted comparisons of firearms and ammunitions components, the industry standards he uses in conducting his comparisons, and how his office runs cross-checks on their conclusions. Wagster then testified about ballistics evidence recovered from the scenes of two crimes allegedly involving Bailey: (1) a shooting on February 8, 2015, at a BP gas station, and (2) the murder of James Edwards on February 12, 2015. Wagster described the six casings and one live round recovered from the BP gas station shooting as all having been fired from "the same unknown firearm," a .40 caliber Smith & Wesson. J.A. 3883–88. He described casings and live rounds recovered

29

from the scene of Edwards' murder, stating that they too were fired from a .40 caliber Smith & Wesson and had all come from "the same firearm, same unknown firearm." J.A. 3888–90. Lastly, he testified that the casings and live rounds recovered at the BP gas station and the scene of Edwards' murder were all fired from "the same unknown firearm." J.A. 3890–92. On direct and cross-examination, Wagster reiterated the bases for making his comparisons and his conclusion about them. J.A. 3892–900. Bailey did not object to Wagster's testimony about his comparison conclusion at the time it was given.

On appeal, Bailey argues that the district court committed reversible error by allowing Wagster to testify in contradiction to the pre-trial ruling limiting the degree of certainty to which he could opine that the ballistics evidence matched. Bailey asserts that Wagster's testimony that the evidence was the "same" or a "match" expressed an impermissible level of certainty and was prejudicial because it served as the linchpin of the Government's case connecting Bailey to Edwards' murder. As such, he requests that this Court reverse his conviction for murder in aid of racketeering.

We discern no plain error in the admission of this evidence. At the outset, on appeal, Bailey does not challenge the district court's initial ruling on his motion in limine but instead argues that the court erred in allowing Wagster to testify outside the scope of that ruling at trial. It was Bailey's responsibility to object if he believed that this had occurred, yet he did not do so. Accordingly, we review his objection for plain error. *See United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (stating that the Court reviews for plain error when the "motion in limine was not based upon [and did not seek] a ruling on the *precise* issue [the defendant] now seeks to raise" (emphasis added) (cleaned up)).

30

Bailey's argument is predicated on a misapprehension of the district court's initial ruling and Wagster's actual testimony. The district court ruled that Wagster *could* testify that, in his opinion, the firearms evidence recovered from the scene of the BP gas station and Edwards' murder "matched." It could not have been clearer in rejecting Bailey's contention that such testimony veered into presenting opinion testimony as certitude, stating: "I think that saying that something is the same or a match, in his opinion, is not the same as saying, 'And I'm a hundred precent convinced that my opinion is correct.'" J.A. 3858. The Court then elaborated that it was "not going to prevent [Wagster] from saying that, in his opinion, it came from the same gun or that it is a match within a reasonable degree of certainty in the field of ballistics." J.A. 3858. Wagster's testimony fell within those parameters, providing his *opinion* that the crime-scene firearms/ballistic evidence from the BP gas station and Edwards' murder stemmed from the same firearm. The Government's questions on this point were framed in a broad manner so as to solicit Wagster's opinion without seeking the degree of certainty he had that his opinion was correct—*e.g.*, "what conclusions were you able to draw . . . ?," J.A. 3891, and "does that mean that you concluded . . . ?," J.A. 3893.

Not only did Wagster's testimony *not* express a degree of certitude in his opinion, but the district court's limiting instruction reinforced that point to the jurors, reminding them that although Wagster was permitted to offer opinion testimony on the firearms evidence, they were still charged with the duty to determine what weight to give it:

> I will remind the jury, as I think I said at the very outset of the case, the fact
> that a witness is found qualified to give you opinion testimony, it's still up to
> you whether to accept that testimony. It's up to you to listen; to consider the

31

reasons, the training and experience; and then you give an expert's opinion the weight, if any, that you believe it should have, just as you do with any other witness.

J.A. 3877. We generally presume the jurors follow such limiting instructions. *Samia v. United States*, 599 U.S. 635, 646 (2023) ("[O]ur legal system presumes that jurors will attend closely the particular language of such instructions in a criminal case and strive to understand, make sense of, and follow them." (cleaned up)); *United States v. Johnson*, 54 F.3d 1150, 1160–61 (4th Cir. 1995). No juror following this instruction would mistake Wagster's opinion testimony for certitude. Thus, considering both the substance and context of Wagster's testimony against the district court's pre-trial ruling, we reject Bailey's argument that reversible error occurred.

c.  Felon-Status Evidence (Anderson and Davis)

The final issue arising from the admission of evidence stems from the reversals of Anderson's and Davis' felon-in-possession convictions. As noted, after the trial and in light of *Rehaif*, the Government moved to dismiss Anderson's § 922(g) conviction. And, we have now held that Davis' § 922(g) convictions must also be reversed in light of *Rehaif*. Because the § 922(g) charges were at issue during the trial, the Government was permitted to introduce evidence of Anderson's and Davis' prior felony convictions. That evidence likely would not have been admissible without the § 922(g) charges. Anderson and Davis contend that the admission of that evidence had a prejudicial spillover effect that requires reversal of their remaining convictions.

To prevail on an assertion of prejudicial spillover effect, defendants must show two things: (1) "that the challenged evidence would have been inadmissible at trial without the

32

vacated count," and (2) that the challenged evidence "prejudiced his convictions on the remaining counts." *United States v. Hart*, 91 F.4th 732, 741 (4th Cir. 2024).

Anderson and Davis cannot show prejudice for at least three reasons. First, the evidence of a prior, *non-violent* felony conviction was introduced in a Sergeant Joe Friday "just the facts" manner—briefly and without any description of the underlying offense conduct. So, the jury could glean very little from the evidence before it that might tempt them to infer culpability for the charged offenses just as a consequence of any prior convictions. Second, the evidence showing Anderson's and Davis' culpability for the remaining convictions was extensive, amply supporting the jury's guilty verdicts beyond a reasonable doubt. Third, a jury instruction mitigated the risk of prejudicial spillover. Specifically, this Court has previously recognized that "concerns of prejudicial spillover [can be] mitigated by the district court's explicit instruction that the jury must consider each count separately." *United States v. Barringer*, 25 F.4th 239, 249 (4th Cir. 2022) (cleaned up). The district court gave that instruction here, and, absent evidence to the contrary, we can presume that the jury followed it. For these reasons, we conclude that Anderson and Davis have not shown any prejudicial spillover arising from the admission of their prior convictions.

5.     Banks' Verdict Form

Banks raises two arguments in support of his contention that his drug conspiracy conviction should be reversed because of a perceived flaw in the verdict form.

The charged conspiracy under 21 U.S.C. § 846 was an agreement to violate the terms of 21 U.S.C. § 841(b)(1)(C), which prohibits the distribution of certain controlled

33

substances, subject to a "term of imprisonment of not more than 20 years." That baseline offense is subject to two aggravated variations of the offense, which trigger different statutory punishments. Offenses involving "28 grams or more" of cocaine base are subject to a term of five years to forty years' imprisonment. § 841(b)(1)(B)(iii). And offenses involving "280 grams or more" of the same are subject to a term of imprisonment of ten years to life. § 841(b)(1)(A)(iii).

If the jury found Banks guilty of the drug conspiracy offense (as it did), then the jury was asked to "determine unanimously the quantity of cocaine base ('crack') reasonably foreseeable to him." J.A. 6356. The verdict form provided two options with a line for the jury to place a "check" next to its finding. One option was for an amount of "280 grams or more" and the other was for "[l]ess than 280 grams." J.A. 6356. The jury checked "[l]ess than 280 grams." J.A. 6356. Consistent with that verdict, the district court sentenced Banks to less than twenty years' imprisonment.

Banks first contends that the verdict form is erroneous, requiring reversal of his drug conspiracy conviction. As support, he argues that the statute divides the offense based on three drug weights—"less than 28 grams," "28 grams or more," and "280 grams or more" of cocaine base—and the verdict form impermissibly diverges from this language to create a new offense based on the drug weight of "[l]ess than 280 grams." Banks asserts that the verdict form's departure led to a conviction for a "judicially created, and, thus, constitutionally invalid offense," which must be vacated. Opening Br. 79.

Contrary to Banks' argument, this is not a case where the verdict form permitted the jury to convict a defendant of an offense that does not exist. To the contrary, §§ 841 and

34

846 permit a conviction based on evidence that the defendant entered into the charged conspiracy to distribute a controlled substance regardless of the specific type of narcotic or drug weight attributable to Banks personally. *See United States v. Collins*, 415 F.3d 304, 314 (4th Cir. 2005) ("Guilt of the substantive offense defined in § 841(a) is not dependent upon a determination of the amount or type of narcotics distributed."). Here, the operative indictment alleged a drug conspiracy to distribute, *inter alia*, 280 grams or more of cocaine base. The jury found Banks guilty of participating in that conspiracy. That's sufficient to sustain his conviction.

The verdict form's two choices for the jury's finding as to how much cocaine base to attribute to Banks was relevant solely for purposes of establishing what statutory penalties would apply to him as a result of that conviction. The baseline § 841 offense for distributing *any* amount of cocaine base—including amounts less than 28 grams—carries a penalty of zero to twenty years' imprisonment, and that's the range within which Banks was sentenced. Certainly, there are also two aggravated forms of the offense that subject a defendant to a higher statutory range based upon a jury's finding that the offense involved 28 grams or more or 280 grams or more. And under Supreme Court case law, findings that increase the *statutory* penalty to which a defendant is exposed must be submitted to the trier of fact and found beyond a reasonable doubt. *See United States v. Promise*, 255 F.3d 150, 154–57 (4th Cir. 2001) (en banc). But neither of those findings are *required* for the jury to find a violation of §§ 841 and 846 in the first instance. Rather, those findings as to drug weight were required strictly to determine whether the statutory penalty would be adjusted beyond the baseline statutory penalty. *See Collins*, 415 F.3d at 314–15; *see also*

35

*United States v. Brooks*, 524 F.3d 549, 558 (4th Cir. 2008) ("[A] jury . . . must determine the threshold drug quantity used to establish a defendant's statutory sentencing range under § 841(b).").

Here, the verdict form limited the statutory penalty to two options, one consistent with sentencing under the baseline penalty ("less than 280 grams," which would subject Banks to zero to twenty years' imprisonment) and one consistent with one of the enhanced penalty ranges ("280 grams or more," which would subject him to punishment between ten years' and life imprisonment). Far from a judicially crafted offense, this reflects a valid way to articulate the § 841 offense and a potentially applicable punishment variation had the jury made the requisite finding to support it. The jury did not find an amount of 280 grams or more attributable to Banks, so the district court's sentence needed to be—and was—within § 841's baseline statutory penalty for possession of *any* amount of cocaine base: zero to twenty years' imprisonment.

Next, Banks contends that the verdict form was flawed because the jury should have been permitted to hold him responsible for the lesser-included offense of participating in a conspiracy involving less than 28 grams of cocaine base. He contends that had the jury been instructed properly, it is likely that it would have found him responsible for that lesser quantity because the record evidence did not support a finding of 28 grams or more, just as it did not support a finding of 280 grams or more. This omission matters, he asserts, because the district court would have had to attribute less than 28 grams of cocaine to him for purposes of calculating his Guidelines offense level, which in turn may have resulted in a lower sentence.

36

We reject this argument based on the principles already discussed. Had the verdict form provided the jury with the option of finding "less than 28 grams" attributable to him, that would not have altered in any way the statutory penalty to which he was subject. And Banks' argument that this lesser option might have affected the Guidelines calculation is irrelevant. As we have repeatedly recognized, "[o]nce this maximum [statutory] penalty is established, a fact (sentencing factor) that may increase the actual sentence imposed *within* that maximum is not subject to" being found beyond a reasonable doubt by a jury. *Promise*, 255 F.3d at 156 n.5. Instead, at sentencing, the district "court is entitled to find individualized drug quantities by a preponderance of the evidence, as part of its calculation of an advisory Guidelines range, so long as its resulting sentence is within the relevant statutory range." *Brooks*, 524 F.3d at 562. That's exactly what the district court did here— it sentenced Banks consistent with the statutory penalty that would apply for a violation of § 841 involving *any* amount of cocaine base, and then, when calculating the advisory Guidelines range, it made findings about an individualized drug quantity to attribute to Banks using a preponderance-of-the-evidence standard. At bottom, the district court was not required to submit permutations involving the *Sentencing Guidelines*' assessment of drug weight to the jury because that is a separate function that occurs *after* the trier of fact establishes the defendant's *statutory* sentencing exposure.

Because the purported error Banks complains of would not alter the validity of his conviction, he has not shown error requiring reversal of his drug conspiracy conviction.

* * * *

To recap the issues related to the Defendants' convictions, we hold that Davis has shown reversible *Rehaif* error as to his § 922(g)(1) convictions but that the Defendants' remaining arguments challenging their convictions lack merit.[8] Next, we turn to the Defendants' challenges to their sentences.

---

[8] We have also considered the Defendants' other trial-oriented objections and conclude that they can each be rejected without lengthy discourse.

First, Davis and Anderson both challenge the sufficiency of the evidence to prove their participation in the two charged conspiracies. Our review of the record confirms ample evidence for the jury to find each element of the charged conspiracy was satisfied. Critically, the Government was not required to show that either defendant "knew the particulars of the conspirac[ies]" so long as the record shows that each defendant "joined with an understanding of the unlawful nature thereof and willfully joined in the plan on one occasion even if he played only a minor part" or was involved in only one aspect of it. *United States v. Tillmon*, 954 F.3d 628, 640 (4th Cir. 2019). Nor must the record "exclude every reasonable hypothesis of innocence" to provide sufficient evidence of guilt, "provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt." *Id.* (cleaned up). On this standard, in light of the extensive evidence put forward at trial, we hold that the evidence was sufficient to support the jury's verdicts.

Next, Banks, Anderson, and Davis assert that the district court abused its discretion in refusing to give a multiple conspiracies instruction. But that instruction "is not required unless the proof at trial demonstrates that [they] were involved *only* in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000) (cleaned up). And the failure to give a multiple conspiracies instruction constitutes reversible error only upon showing that "the evidence of multiple conspiracies [was] *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count[s] had it been given a cautionary multiple-conspiracy instruction." *United States v. Bartko*, 728 F.3d 327, 344 (4th Cir. 2013) (cleaned up). On this high standard and the evidence put forward at trial, we find no reversible error as to this issue.

Lastly, Anderson claims that his convictions should be reversed because the Government's arguments at closing contradicted the terms of a pre-trial stipulation. We have considered the underlying facts, including the terms of the stipulation and the Government's argument at closing, and conclude that Anderson's argument is predicated on an interpretation of the stipulation that goes beyond its actual language. Moreover, once Anderson objected at trial, he agreed to resolving his concern through clarifying statements (Continued)

B.  Sentencing Challenges

The Defendants raise several issues challenging the procedural or substantive reasonableness of their sentences, which we review under a highly deferential standard of review. *United States v. Provance*, 944 F.3d 213, 217 (4th Cir. 2019); *see Gall v. United States*, 552 U.S. 38, 46 (2007) (instructing that appellate review of a sentence "is limited to determining whether they are 'reasonable'"). The Court's first duty is to "ensure that the district court committed no significant procedural error," *Gall*, 552 U.S. at 51, such as by "failing to properly calculate the applicable Sentencing Guidelines range, failing to consider the 18 U.S.C. § 3553(a) factors, and failing to adequately explain the sentence— 'including an explanation for any deviation from the Guidelines range,'" *Provance*, 944 F.3d at 218 (quoting *Gall*, 552 U.S. at 51). Only upon assuring ourselves that the sentence is procedurally reasonable do we turn to the question of substantive reasonableness, which requires "taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* at 219 (cleaned up).

1.  Davis

Davis challenges the substantive reasonableness of his sentence, arguing that it was predicated on a criminal history assessment that was too high. He notes that his three past offenses consisted of "a juvenile adjudication and two minor convictions, none of which resulted in a sentence of imprisonment," making a criminal history category of III unreasonable. Opening Br. 91. He asserts the district court should have recognized that

---

to the jury, which were given. We therefore find no basis for reversing his convictions as a result of these circumstances.

the resulting Guidelines range over-represented his criminal history, making a sentence within that range substantively unreasonable.

We have reviewed the record and disagree with Davis. On appeal, we afford Davis' within-Guidelines sentence a presumption of substantive reasonableness. *See United States v. Yooho Weon*, 722 F.3d 583, 590 (4th Cir. 2013). Davis has not come forward with anything that rebuts that presumption. To the contrary, our review of the record and sentencing transcript confirms that the district court's chosen sentence was reasonable and adequately explained.[9]

### 2.  Anderson

Anderson challenges the procedural and substantive reasonableness of his sentence, arguing (1) the district court clearly erred in imposing U.S.S.G. § 2D1.1(b)(1)'s firearm offense-level enhancement because no evidence connected Anderson's possession of a firearm to his role in the drug conspiracy, and (2) the district court did not adequately

---

[9] In his reply brief, Davis adds a second argument to support his contention that his sentence is substantively unreasonable based on over-representation of his criminal history. Citing newly enacted and retroactively applicable amendments to the Guidelines (Amendment 821), he observes that the version of § 4A1.1(d) (2018) that had been used to assess one criminal history point apiece for two of his prior state convictions was repealed. Davis contends that the replacement language, which is retroactively applicable and found in § 4A1.1(e) (2024), is narrower and would not apply to him, resulting in two fewer criminal history points and a lower criminal history category. This change, he contends, further supports his position that his sentence should be vacated and remanded for resentencing based on his Guidelines range's over-representing his criminal history.

We decline Davis' invitation to address this Guidelines change now, but note that nothing prohibits him from arguing for relief based on Amendment 821 in a motion for a sentence reduction under 18 U.S.C. § 3582(c)(2).

explain the basis for imposing an upward variant sentence. Neither of these arguments has merit.

The court did not clearly err in calculating Anderson's offense level to include § 2D1.1(b)(1)'s firearm enhancement. That enhancement applies when a defendant possesses a "dangerous weapon (including a firearm)" during the course of the drug trafficking offense, "unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1(b)(1) & cmt. n.11(A). The district court reasonably held that the enhancement applied here given the extensive trial evidence that Anderson "suppl[ied] large quantities of heroin in other areas, traveling around, perhaps, to do that. . . . [And it] makes a great deal of sense that [the loaded, stolen handgun found in his possession] was for the purpose of . . . protecting himself and drugs in the course of the conspiracy." J.A. 6774–75.

We also reject Anderson's contention that the district court failed to adequately explain the basis for an upward-variant sentence. In imposing Anderson's sentence, the district court recapped his offense conduct, highlighting particular § 3553(a) factors and individual characteristics that drove its sentencing decision. It was not required to do more. The court's explanation for the sentence it selected shows "a rationale tailored to the particular case at hand and adequate to permit meaningful appellate review," "lea[ving] no doubt regarding the court's reasons for selecting the particular sentence." *United States v. Allmendinger*, 706 F.3d 330, 343 (4th Cir. 2013); *United States v. King*, 673 F.3d 274, 283 (4th Cir. 2012) (tethering the adequacy of the district court's sentencing explanation, including any deviation from the Guidelines range, to providing an "individualized

assessment" that "need not be elaborate or lengthy" so long as the court gives "serious consideration" to its decision (citations omitted)).

### 3.  Lockley

Lockley argues that his sentence is procedurally and substantively unreasonable because (1) it relied in part on his participation in a murder that the jury had specifically rejected finding him responsible for, and (2) it selected a sentence unreasonably aimed to avoid a sentencing disparity between co-defendants when they were far more culpable than he was. Having reviewed the record, we discern no error.

Under the preponderance-of-the-evidence standard applicable at sentencing, the district court found that Lockley was aware of other conspirators' violent acts, including having witnessed a murder, even though the jury determined that the evidence did not show beyond a reasonable doubt that murder was reasonably foreseeable to him in furtherance of the racketeering conspiracy. As we have previously recognized in a different, but comparable, context, "an acquittal does not necessarily establish the criminal defendant's lack of criminal culpability, and a jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty. Instead, the different standards of proof that govern at trial and sentencing enable the sentencing court to find a fact by a preponderance of the evidence that the jury may not have found beyond a reasonable doubt." *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012) (cleaned

up).[10] The district court thus did not err in considering Lockley's role in the murder despite the jury's finding.

We also reject Lockley's argument that his sentence is substantively unreasonable. In so arguing, he seriously understates the record evidence as to his role in the offense conduct. The district court ably supported the basis for the sentence it imposed, setting out in detail the offense conduct and other § 3353(a) factors that led to its decision. Moreover, the district court—which was intimately familiar with the specific nuances in each of the co-defendants' conduct—acted within its "sizeable discretion" to assess the Defendants' relative culpability in considering the statutory instruction to impose sentences that avoid unwarranted sentencing disparities. *United States v. Abu Ali*, 528 F.3d 210, 266 (4th Cir. 2008); *see* 18 U.S.C. § 3553(a)(6) (stating that one of the factors to consider in sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *United States v. Engle*, 592 F.3d 495, 500 (4th Cir. 2010) ("Given the institutional advantages of district courts with regard to sentencing matters, all sentences, including sentences significantly outside the

---

[10] We note that on April 17, 2024, the United States Sentencing Commission announced amendments to the Guidelines that will "prohibit" acquitted conduct from being used in calculating the Guidelines range. U.S. Sentencing Comm'n News Release, *Commission Votes Unanimously to Pass Package of Reforms Including Limit on Use of Acquitted Conduct in Sentencing Guidelines* (April 17, 2024), https://www.ussc.gov/about/news/press-releases/april-17-2024 (last visited June 5, 2024) [https://perma.cc/3MTH-XRGC]. Assuming Congress does not alter them, those amendments do not go into effect until November 1, 2024. *Id.* For that reason, those amendments have no bearing on our review.

Guidelines range, must be reviewed under a deferential abuse-of-discretion standard." (cleaned up)).

### 4. Banks

Banks contends that his sentence is procedurally unreasonable because the district court held him responsible for at least 196 grams of cocaine base, which he contends was too much and thus made his offense level too high. He argues that the district court's drug-weight calculation was inconsistent with the jury's verdict because the jury's rejection of a drug weight of "280 grams or more" necessarily means that it did not believe him to be responsible for some of the drug quantity that the district court later relied on at sentencing. He also contends that the district court improperly speculated about the drug weight for which to hold him responsible by engaging in random extrapolations rather than focusing on precise testimony to support the amounts.

We review for clear error the district court's calculation of drug weight for purposes of establishing a defendant's Sentencing Guidelines offense level. *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). The Guidelines notes instruct that when no known amount of drugs can be relied on to establish a defendant's attributable drug weight, the district court must "approximate the quantity of the controlled substance" at issue. U.S.S.G. § 2D1.1 cmt. n.5. In undertaking that task, district courts "enjoy considerable leeway" and "may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Williamson*, 953 F.3d 264, 273 (4th Cir. 2020) (cleaned up); *see also United States v. Kiulin*, 360 F.3d 456, 461 (4th Cir. 2004)

(observing that "a district court need not 'err[]' on the side of caution or otherwise; it must only determine that it was more likely than not that the defendant was responsible for *at least* the drug quantity attributed to him"). Further, "sentencing courts may consider acquitted conduct in establishing drug amounts for the purpose of sentencing, so long as the amounts are established by a preponderance of the evidence." *Perry*, 560 F.3d at 258. That said, courts must "exercise caution in estimating drug quantity at sentencing, and [must] not attribute speculative or scantily supported amounts to defendants." *Williamson*, 953 F.3d at 273.

Wherever the line between a proper estimate and speculation lies, it is far removed from what the district court did here. As the district court recounted, holding Banks responsible for 196 grams was a conservative estimate based on the evidence before it. Banks had participated in a multi-year conspiracy where he supervised others also engaged in the distribution of cocaine base. The district court reasonably extrapolated an approximate amount of cocaine base attributable to Banks based on his role in the narcotics conspiracy. It did not clearly err in that calculation, nor is any plain error otherwise evident from the record.[11]

---

[11] This argument fails for another reason too. Even if Banks were correct that the district court miscalculated the drug weight, any error at sentencing would have been harmless. At sentencing, the district court repeatedly stated that the Guidelines were just one factor in determining Banks' sentence, and it also expressly stated that "regardless of any error that I may have made in calculating the guidelines," "[t]he sentence that I have announced is the sentence that I believe is reasonable" based on the totality of the § 3553(a) analysis. J.A. 6438. So even assuming error occurred, we can be confident that the sentence would not have changed as a result of the drug-weight calculation and his sentence is otherwise reasonable.

III.

For the reasons set out above, we reverse Davis' § 922(g) convictions (Counts 16 and 30) for *Rehaif* error that is cognizable on plain-error review. We vacate and remand his criminal judgment solely for the district court to enter an amended judgment and sentence consistent with this decision without the need for plenary resentencing. As to the Defendants' other arguments, we reject them and thus affirm their convictions and sentences.

*AFFIRMED IN PART, REVERSED*
*IN PART, AND REMANDED*
*WITH INSTRUCTIONS*